# Exhibit A



# Preventing and Responding to Sexual Misconduct against Students in Chicago Public Schools

Preliminary Report

Margaret A. Hickey
Schiff Hardin LLP
August 16, 2018

# Table of Contents

Page

Executive Summary ..................................................................................................... 1

Background ................................................................................................................. 9

    Scope of the Evaluation ......................................................................................... 9

    Summary of the Evaluation ................................................................................. 12

    Sexual Misconduct against Primary and Secondary School Students ............................ 13

        Definitions ..................................................................................................... 13

        Primary and Secondary Schools Nationwide ................................................... 13

    Chicago Public Schools ........................................................................................ 16

        Systemic Deficiencies Regarding Sexual Misconduct against Students ............... 20

Roadmap .................................................................................................................. 23

I.        Implementing Title IX ................................................................................ 25

II.       Prevention ................................................................................................ 30

    A.      Title IX & Best Practices ......................................................................... 30

    B.      CPS Background Checks ........................................................................... 30

    C.      Ongoing Background Checks ................................................................... 37

    D.     Background Check Policy Changes and Recommendations ......................... 38

    E.      Reference Checks ................................................................................... 40

    F.      Students with Histories of Committing Sexual Misconduct ......................... 42

    G.     Building Security .................................................................................... 44

III.      Policies and Procedures ............................................................................ 47

    A.      Title IX & Best Practices ......................................................................... 47

    B.      CPS Policies and Procedures ................................................................... 50

    C.      Appropriate Relationships Between Adults and Students ........................... 51

IV.      Training .................................................................................................... 59

    A.      Title IX & Best Practices ......................................................................... 59

    B.      CPS Training ........................................................................................... 61

V.       Reporting ................................................................................................. 68

## Table of Contents (continued)

**Page**

| | | |
|---|---|---|
| A. | Title IX & Best Practices | 68 |
| B. | CPS Reporting Processes | 72 |
| C. | Initial Information Gathering | 75 |
| D. | Records of Sexual Misconduct | 75 |
| VI. | Investigations | 79 |
| A. | Title IX & Best Practices | 79 |
| B. | CPS Law Department's Investigations Unit | 82 |
| C. | Investigations and Disciplinary Process for Employees | 84 |
| D. | Ensuring Student Safety Beyond the CPS District | 85 |
| E. | Ongoing Changes and Specific Recommendations | 86 |
| VII. | Response | 90 |
| A. | Title IX & Best Practices | 90 |
| B. | CPS' Response to Sexual Misconduct by Adults | 91 |
| C. | Victim Services for CPS Students | 92 |
| Conclusion | | 95 |

## Executive Summary

Chicago Public Schools' (CPS') mission is to "provide a high quality public education for every child, in every neighborhood, that prepares each for success in college, career and civic life." While education is an end in itself, a high quality primary and secondary education is also a means for children to improve their financial security, employment prospects, and personal fulfillment. To satisfy its mission, CPS must also protect students. As stated repeatedly by CPS CEO Janice Jackson and the CPS employees we interviewed: student safety must always come first.

To prepare this report, we evaluated CPS' policies, procedures, and actual practices for preventing and responding to sexual misconduct against students. We reviewed CPS' historical practices to identify and address the causes of any deficiencies to better protect Chicago's children moving forward. While our evaluation is ongoing, we drafted this preliminary report to provide initial recommendations to CPS before the start of the 2018/2019 school year.

Throughout this report, we identify systemic deficiencies in CPS' efforts to prevent and respond to incidents of sexual misconduct. Our review showed systemic deficiencies in training, reporting, aggregating data, tracking trends, and comprehending the extent of the sexual misconduct facing CPS children. These deficiencies occurred at all levels: in the schools, the networks, the Central Office, and the Chicago Board of Education (Board). CPS did not collect overall data to see trends in certain schools or across geographies or demographics. Thus, CPS failed to recognize the extent of the problem. It is no surprise then that many of the employees we interviewed expressed shock about the reported extent of sexual misconduct against CPS students. While there were policies and procedures about sexual misconduct on the books, employees were not consistently trained on them, and there were no mechanisms to ensure that they were being uniformly implemented or to evaluate their effectiveness.

There are many causes for these inconsistencies. They include, among other things, administrative hurdles, gaps in leadership, and schools with more priorities than resources. First, as one of the largest school districts in the nation, CPS necessarily vests individual principals with significant discretion over their respective schools. For many issues, this practice provides significant benefits. But, for preventing sexual misconduct, it does not. CPS must have centralized policies and procedures regarding sexual misconduct that are implemented district-wide.

Second, the inconsistencies in implementing policies and procedures were also exacerbated by high turnover in leadership positions. Not only has CPS experienced several leadership turnovers recently—with one CEO indicted and another leaving amidst a cloud of allegations—but CPS also regularly has high turnover in other

leadership positions, such as network chiefs. This turnover makes it difficult to instill and maintain productive policies and procedures, stable systems independent of any person, and cultures of compliance.

Last, school employees are responsible for protecting students against a myriad of threats. That is another reason that CPS has not been effective in preventing and responding to sexual misconduct. To demonstrate this point, here is a by-no-means-exhaustive list of student-safety issues, aside from school-based sexual misconduct, that CPS employees must address every year:

► Community crime, including domestic violence, gang violence, gun violence, and homicides;

► The prevalence of illicit and prescription drugs in homes, communities, and schools;

► School violence, including threats to commit mass shootings;

► Abuse and neglect at home, including sexual misconduct;

► Suicidal ideation, attempts, and completions;

► Emergency medical situations, including chronic conditions;

► Accidents, including fires and car accidents; and

► Student homelessness.

Many of these threats are both more prevalent and visible than sexual misconduct. For this reason, some employees and schools may have allocated more time and resources toward these dangers, which caused them to give insufficient attention to sexual misconduct.

Nonetheless, CPS can do and is currently doing more to train employees and create a uniform, district-wide approach to respond properly to allegations of sexual misconduct. Before and after consulting with and receiving advice from Ms. Hickey, CPS took immediate action to better prevent and respond to sexual misconduct against students. Some of the most significant steps CPS and the Board have taken include the following:

► Altering the reporting and investigations structure so that allegations of adult-on-student sexual misconduct will be investigated by the CPS Inspector General's office, rather than the CPS Law Department;

► Requesting that the CPS Inspector General review all sexual-misconduct cases since at least 2000;

► Creating the new CPS Office of Student Protections and Title IX, which among other responsibilities, will investigate allegations of student-on-student sexual misconduct, ensure that victims of sexual misconduct receive support services, and collect and report data regarding sexual misconduct in CPS;

► Updating CPS' policies for reporting child abuse and neglect;

► Running new background checks on all CPS employees, vendors, and volunteers, and requiring periodic background checks moving forward;

► Establishing a new, centralized system to check references and employment histories before hiring new employees, which includes requiring the CPS Central Office to clear all athletic coaches before they start;

► Working to streamline notification procedures with the Illinois State Board of Education;

► Creating an internal task force whose members report directly to the CEO and oversee all issues regarding sexual misconduct;

► Partnering with Chicago Children's Advocacy Center to train administrators and employees on mandated reporting and how to recognize signs of abuse; and

► Hiring an independent law firm to give an honest, unbiased assessment of CPS' policies, procedures, and practices, and following our recommendations.

Throughout our evaluation, we found that senior leadership, department heads, principals, and other CPS employees demonstrated genuine concern for student safety and a sincere willingness to embrace necessary changes. In fact, many of the CPS employees we interviewed have children who are CPS students or graduates, and they are grateful for the attention, focus, and public resources CPS is now directing toward the important issue of student safety regarding sexual misconduct.

We must stress this fact: nearly all CPS employees care deeply about the health and wellbeing of their students. However, one employee who fails to protect a student will always get more attention than the hundreds of employees who routinely help students succeed. For students and the City of Chicago, CPS must continue to encourage their employees, vendors, and volunteers to protect, teach, and advocate for CPS students.

Good intentions are not good enough when it comes to protecting children against sexual misconduct. CPS must of course stop bad actors—and there will always be bad actors—because one student victim is too many. But to stop bad actors, CPS

must motivate and train its good actors to do better. CPS must teach its employees, vendors, and volunteers the rules, methods, and underlying justifications for preventing, identifying, and responding to sexual misconduct. And CPS must hold people accountable when they have been sufficiently supported yet still fail to know and follow these policies.

We have included throughout this preliminary report both specific and general recommendations for how CPS can improve its policies, procedures, and practices to prevent and respond to sexual misconduct involving students. When considering these recommendations, CPS should keep in mind that doing more is not always doing better. CPS must ensure that new policies and procedures to protect students from sexual misconduct do not inadvertently undermine its efforts to develop a nurturing culture in which students learn and grow or develop a culture in which students and adults fear unwarranted punishment.

This preliminary report contains the following key recommendations:

► **Title IX Office (Office of Student Protections and Title IX).** We have devoted a separate section of this preliminary report to discussing this new office, including suggesting best practices, discussing examples from other districts and post-secondary institutions, and providing specific guidance and recommendations.

► **Increased Security**

- **Background Checks.** We recommend that CPS continue to streamline background checks for adults who have frequent or one-on-one student contact. Until CPS develops a reliable method of receiving up-to-date information regarding new contacts with law enforcement, we recommend that CPS refresh all background checks on an ongoing, staggered basis.

- **Reference Checks.** Currently, CPS does not always perform reference checks before hiring a new teacher or other school-based employee. We recommend that CPS require reference checks with previous employers that include a question about potential allegations or adjudications regarding sexual misconduct. Furthermore, to the extent possible, CPS should enter into agreements with other districts to share information to prevent predators from regaining access to students.

- **Photo Identification (ID).** Currently, some schools require that adults wear IDs in schools, but others do not. We recommend that CPS adopt a district-wide requirement that all adults, including principals, employees, vendors, volunteers, and visitors, display an ID at all times while in a school to prevent unauthorized access.

- **Age Restriction for Volunteers.** A repeated source of concern has been recent secondary school graduates serving as coaches or volunteers at their alma mater. Given the difficulty of setting and maintaining boundaries among recent graduates, CPS should consider additional requirements for young volunteers, which may include setting an age-restriction for volunteers that have direct student contact.

- **Clarification on Removing Employees Pending Investigations.** CPS recently amended its policy to require the immediate removal from school of an employee who has been accused of sexual misconduct involving a student. Removing an employee is financially and emotionally costly, not just for the accused, but for students, schools, and the public. Removal is an important step, but the current policy is vague and needs clarification regarding when CPS will and will not remove an employee.

▶ **Streamlining Policies and Procedures**

- **Uniform Employee, Student, Parent, and Guardian Handbooks.** On July 27, 2018, CPS sent out district-wide a template for an employee handbook, which principals can supplement with school-specific information. CPS should continue to update this employee handbook with all relevant policies and procedures regarding sexual misconduct and the maintaining of appropriate boundaries between adults and students. CPS should also create a district-wide handbook for students, parents, and guardians or supplement existing district-wide materials, such as the Student Code of Conduct. In our opinion, this step is necessary to ensure that everyone has a consistent understanding of CPS policies and procedures and applies them consistently.

- **Policies and Procedures.** CPS should place all relevant sexual-misconduct policies and procedures in one easily searchable and regularly updated location. Although these policies may be partially consolidated in the district-wide employee handbook, many administrators whom we interviewed experienced difficulty locating current CPS policies and procedures. We recommend that CPS take steps through its already existing online resources to ensure that principals are better able to access policies and procedures in one central location.

▶ **Creating Accountability for Knowing Policies and Procedures**

- **Training for CPS Employees and Volunteers.** Currently, CPS does not adequately train its constituents regarding appropriate boundaries, the prevention of sexual misconduct or the response to such allegations. For example, in 2017, CPS created the "Guidelines Regarding Maintaining Professional Staff/Student Boundaries." The vast majority of administrators we

interviewed had never seen or heard of these guidelines. We recommend that CPS employees, vendors, and volunteers receive an annual online interactive training that addresses both the Illinois Department of Children and Family Services mandatory reporting rules and CPS policies and procedures regarding boundaries and sexual misconduct. Employees and volunteers should also certify that they received these trainings as a pre-condition of their employment and access to schools. Similarly, CPS should require principals to keep track of certifications for every employee, vendor, and volunteer in their building, and principals should be held accountable for doing so by their supervisors.

- **Response and Notification Checklist.** We recommend that CPS develop and distribute a simple checklist to principals and other employees that lists the steps they should take when they learn of potential sexual misconduct by adults or students. Currently, principals do not immediately recall the proper response and notification process and reported that they would likely have to call a superior in the event of an incident. Combined with training, a response and notification checklist will help to ensure that employees apply policies and procedures promptly and consistently.

- **Training for CPS Students, Parents, and Guardians.** We recommend that CPS also instruct students, parents, and guardians on appropriate boundaries between adults and students. For various reasons, victims may not always come forward, and predators may take steps to prevent detection from other adults. For these reasons, CPS should ensure that all members of the CPS community know how to identify and report sexual misconduct. We have provided some general ideas for implementing that instruction, including revising the already mandated Sexual Health Education curriculum to directly address that issue and providing information in student, parent, and guardian handbooks.

► **Creating Accountability for Implementing Policies and Procedures**

- **Accountability, Generally.** As is the case with any large organization, CPS finds it difficult to ensure uniform understanding and compliance throughout the system. Increased accountability is paramount to ensure that CPS effectively writes, teaches, and implements policies and procedures. We have noted throughout the report proposals to increase accountability.

- **Data Analytics.** CPS should compile and review data regarding actual and potential sexual misconduct. It is possible that once CPS has improved its policies, procedures, actual practices, and culture, complaints of sexual misconduct will increase. We recommend that CPS take steps to ensure that it stores and analyzes its data to better prevent and respond to future

incidents. We further recommend that CPS regularly share this data with the necessary stakeholders, including the Board.

- **Increased Transparency.** CPS has recently made many changes and improvements to its policies, procedures, and practices. While confidentiality is necessary to protect the rights of specific victims and the accused, CPS' policies and procedures should be transparent. The public should know how CPS and other stakeholders are keeping children safe, and what resources are available when needed.

CPS must gear its policies and procedures regarding sexual misconduct toward creating an equal outcome across schools: safe children. But CPS alone cannot resolve society's problems regarding sexual misconduct. Different schools and communities face different threats, and the practices that work best at one school may not work at another. CPS recognizes the need for school autonomy and flexibility, but left too much discretion with principals regarding sexual misconduct against students. Going forward, CPS must have a centralized approach to preventing and responding to sexual misconduct that provides all schools with a baseline while still giving administrators freedom to deviate from that baseline when warranted and approved.

Policies and procedures that work today may not work tomorrow. While many types of sexual misconduct are clear cut, many norms continue to evolve, with some conduct tolerated today that was not tolerated in the past and vice versa. Technological advances also pose new challenges, and sexual predators will continue to develop innovative techniques to accomplish their goals. SnapChat, for example, has only been around for less than seven years. For all these reasons, CPS must remain diligent and stay ahead of the curve by continuously listening to stakeholders and adjusting its policies and procedures to deter inappropriate behavior while also encouraging—or at least not discouraging—positive interactions and relationships between students and adults.

The recommendations in this Executive Summary are not exhaustive, and we provide more detail regarding these recommendations—and more specific recommendations—throughout this report. We expect our final report to contain additional findings and recommendations based on our further evaluation and the constructive feedback we expect to receive in response to this preliminary report.

## HICKEY'S KEY RECOMMENDATIONS TO CPS

### Implementing Title IX

→ Create and fully staff a Title IX Office.

→ Designate at least one trained contact in each school.

→ Create a comprehensive plan to prevent and respond to sexual misconduct against students in compliance with Title IX and best practices.

### Prevention

→ Streamline background checks for employees, vendors, and volunteers.

→ Refresh background checks on an ongoing, staggered basis until CPS develops a reliable method of receiving up-to-date information regarding new arrests and convictions.

→ Require reference checks with previous employers that include a mandatory question about allegations and adjudications regarding sexual misconduct.

→ Create agreements with other districts and entities to share information, to the extent possible, to prevent predators from regaining access to students.

→ Consider an age restriction and additional screening or oversight requirements for specific types of volunteers.

→ Require all adults to display photo-IDs while in schools.

### Policies and Procedures

→ Comply with Erin's Law: create and implement clear policies and procedures, including rules and standards for appropriate boundaries between adults and students.

→ Maintain current policies, procedures, and guidelines in one, easily searchable source.

→ Ensure that policies and procedures regarding sexual misconduct against students are available to everyone, including students, parents, and guardians.

→ Convert policies and procedures into easy-to-read student materials that highlight the most important takeaways.

→ Monitor compliance to address weaknesses and new and unique challenges across schools and grade levels.

→ Create or update uniform employee, student, parent, and guardian handbooks, which contain all relevant policies and procedures regarding sexual misconduct involving students and appropriate boundaries.

### Training

→ Train and frequently remind CPS employees, vendors, and volunteers how to prevent, identify, report, and respond to sexual misconduct—and that they are responsible for doing so. This training should include the following:

- Annual webinars for all adults who participate in school programs and events;

- Annual DCFS Mandatory Reporting Training;

- A notification checklist for the entire CPS community;

- Annual, district-wide training sessions during student and employee orientation.

- Age-appropriate education regarding sexual misconduct and appropriate boundaries across all grade levels; and

- Training sessions for parents and guardians.

→ Create accountability for trainings by requiring proof of attendance and comprehension and by tying this proof to evaluations.

→ Use experts to train CPS employees.

### Reporting

→ Provide clear avenues for mandatory, optional, and anonymous reporting of sexual misconduct.

→ Clarify what type of conduct triggers mandatory reporting requirements, particularly conduct that may be categorized as "grooming."

→ Implement a system to report and track allegations and incidents.

→ Log and analyze data, identify trends, and regularly share data with stakeholders.

→ Create a culture of reporting through transparency, due process, and clear understandings of rights, responsibilities, and expectations, including prohibiting retaliation for raising a concern or reporting an incident.

→ Train CPS employees on "information gathering" to address school issues and on filing effective reports without unnecessarily interrupting schools, re-traumatizing victims, or jeopardizing future DCFS, CPS Inspector General, criminal, or Title IX Office investigations.

→ Provide administrators a straight-forward notification and reporting checklist with key contact information.

### Investigations

→ Ensure trained and impartial experts conduct investigations, interviews, and interrogations.

→ Train administrators to handle and preserve evidence.

→ Coordinate with all investigatory entities to make investigations more efficient and minimize victim interviews

→ Include a children's advocate at victim interviews.

→ Clarify standards for when to remove employees from the school pending an investigation.

### Response

→ Hold employees, vendors, and volunteers accountable when they violate the policies and procedures with discipline that is commensurate with the violation.

→ Ensure CPS students have, are aware of, and receive social and emotional supports and victim services.

→ Ensure that schools sufficiently emphasize these supports across all regions and demographics, as warranted.

→ Use experts, such as the Chicago Children's Advocacy Center, to train employees on how to provide appropriate support for student victims and student perpetrators.

→ Develop a district-wide protocol for appropriately communicating sexual-misconduct incidents and allegations.

## Background

**Scope of the Evaluation**

In June 2018, the Chicago Tribune released a series of articles titled *Betrayed*.[1] The series drew attention to, among other things, a shocking number of incidents of sexual misconduct against CPS students throughout the city. The Chicago Tribune reported that, between 2008 and 2017, the Chicago Police Department had conducted 523 investigations that involved sexual assault or abuse of children within Chicago schools by fellow students or adults. To learn more about these cases, the Chicago Tribune "reviewed criminal charges and prosecutions, civil lawsuits filed by victims, CPS investigative reports and disciplinary actions, and state licensure hearings" and "spoke to 18 students or former students who reported being sexually abused by school employees." The Chicago Tribune focused on 108 of the cases and identified 72 alleged perpetrators who were former CPS employees.

The articles concluded that CPS had many systemic failures that led to the sexual victimization of CPS students by adults, including the following:

► Ineffective background checks;

► A lack of communication between CPS and other school districts regarding employees who resigned after allegations of sexual misconduct against students;

► Victims becoming re-traumatized through repeated questioning by insufficiently trained CPS employees;

► A conflict of interest within the CPS Law Department, which both investigated allegations of sexual misconduct and defended CPS and CPS employees in subsequent lawsuits;

► Failure to prioritize victims and their families; and

► Failure to effectively track child abuse by CPS employees and volunteers.

CPS leadership, community leaders, elected officials, and others responded to the Chicago Tribune series and immediately began calling for an evaluation of CPS' policies and procedures to help keep its students safe.

---

[1] *See* David Jackson, Jennifer Smith Richards, Gary Marx, and Juan Perez Jr., *Betrayed: Chicago schools fail to protect students from sexual abuse and assault, leaving last damage* (June 1, 2018), *available at* http://graphics.chicagotribune.com/chicago-public-schools-sexual-abuse/ (last visited August 14, 2018).

Just before the Chicago Tribune published the *Betrayed* series, the Chicago Board of Education (Board) retained Maggie Hickey, a partner at Schiff Hardin LLP. The Board asked Ms. Hickey to conduct an independent, comprehensive evaluation of CPS' policies and procedures for preventing and responding to sexual misconduct by adults against students under CPS' care. During the evaluation, the Board expanded the scope and asked Ms. Hickey to also evaluate CPS' policies and procedures for preventing and responding to sexual misconduct among students.

Maggie Hickey leads the Schiff Hardin team. Ms. Hickey joined Schiff Hardin in April 2018 as partner and practice group leader for the White Collar Defense and Government Investigations Group. Before she joined Schiff Hardin, Ms. Hickey had a distinguished career in public service, most recently as the Illinois Executive Inspector General for the Agencies of the Illinois Governor and, earlier in her career, as an Assistant U.S. Attorney and the Executive Assistant United States Attorney for the Northern District of Illinois. The Schiff Hardin team also includes two other Schiff Hardin partners, Paula Ketcham and William Ziegelmueller, both of whom have extensive experience in internal reviews. The team also includes Schiff Hardin associates, primarily Caitlin Ajax, Meredith R.W. DeCarlo, Michael Molzberger, Anthony-Ray Sepúlveda, and Brooke Clason Smith.

Less than a month after the Chicago Tribune published the *Betrayed* series, the Board directed the Office of the Inspector General for the Board (CPS Inspector General's Office) to review "sexual misconduct cases dating back to at least the year 2000, and further if determined necessary by the Inspector General or the Board President."[2] At CPS Inspector General Nicholas Schuler's request, the Board also transferred the responsibility for investigating all future allegations of sexual misconduct against CPS students by employees, vendors, and volunteers to the CPS Inspector General.[3]

Our evaluation and this preliminary report differ in scope from the CPS Inspector General Office's review of past incidents. The Board did not task Ms. Hickey with determining "who knew what and when." As a result, rather than duplicating the CPS Inspector General's ongoing work reviewing past incidents, we focused on improving policies, procedures, and practices to protect students moving forward. Although we examined specific incidents of sexual misconduct, our review of those incidents was limited to identifying systemic deficiencies that led to the incidents and that can inform our recommendations for systemic change.

Given the immediate need to address CPS' issues, Ms. Hickey has made recommendations throughout the course of our work, and she will continue to make

---

[2] *See* Chicago Board of Education Resolution 18-0627-RS4, *available at* http://www.cpsboe.org/content/actions/2018_06/18-0627-RS4.pdf (last visited August 14, 2018).

[3] *Id*.

recommendations, as warranted, as the evaluation continues. CPS has taken initiative and not waited for this preliminary report—or, in some instances, Ms. Hickey's recommendations—to act because students return for the next school year on September 4, 2018.[4]

For example, within two weeks after Ms. Hickey started this evaluation, she identified that sexual misconduct between students was also a significant issue for CPS and recommended that CPS create a Title IX Office. In response, CPS expanded the scope of our evaluation to include policies and procedures regarding sexual misconduct between students. On June 27, 2018, CPS announced that it was creating the Office of Student Protections and Title IX (OSP) with an anticipated annual budget of $3 million. CPS intends the OSP to address, among other things, allegations of sexual misconduct between students.[5]

There is another important point regarding our independence: Although the Board retained Schiff Hardin for this evaluation, we have functioned independently of CPS and the Board. The findings and recommendations in this report are exclusively our own. Further, we have identified many issues in the report that are outside of CPS' control. Some problems are endemic to society and require societal changes. Others require legislative action at the federal, state, or local levels. Still others require actions or contributions by other school districts or government agencies. As a result, we seek feedback from all stakeholders about this preliminary report and CPS' efforts.

Finally, it is important to note that this preliminary report is in fact preliminary. Our evaluation remains ongoing, and we will issue a final report once the evaluation is complete. In addition to incorporating constructive feedback from CPS and other stakeholders, additional witness interviews and analysis will shape our final report. CPS is also in the process of changing many policies and procedures and working with various stakeholders, such as the CPS Inspector General, to construct future reporting and investigative practices. Because many of these changes remain ongoing, our analysis of these changes must wait. At the end of this preliminary report, we provide a non-exhaustive list of the remaining steps for our evaluation.

---

[4]  School clerks return to schools on August 22, 2018, and teachers return on August 27, 2018.

[5]  About a month later, on July 26, 2018, the Chicago Tribune released a new set of articles in the *Betrayed* series that focused on sexual misconduct between CPS students. *See* David Jackson, Jennifer Smith Richards, Gary Marx, and Juan Perez Jr., *Abused by Students, Failed by Adults*, *available at* http://graphics.chicagotribune.com/chicago-public-schools-sexual-abuse/student-offenders/.

**Summary of the Evaluation**

We received the full cooperation of the Board and CPS during this evaluation. CPS provided us with access to thousands of documents, including policies and procedures and records regarding past investigations. Ms. Hickey consulted with CPS on an ongoing basis. She also gave presentations at each of the seven days of CPS' 2018 Legal Conference, reaching over 1,100 attendees, including Central Office employees, network chiefs, principals, and assistant principals. At the Legal Conference, Ms. Hickey highlighted the importance of CPS policies and procedures to prevent, identify, and report sexual misconduct and the importance of creating a school culture in which sexual misconduct and inappropriate relationships are not tolerated.

We also interviewed senior CPS leadership, including CPS CEO Janice Jackson and Board President Frank Clark, all 13 CPS network chiefs, and nearly 70 school administrators, including 48 principals and 21 assistant principals, representing 40 primary schools and 29 secondary schools.[6] We also interviewed other CPS employees as to their experience regarding background checks, software and reporting systems, investigations, and training programs.

In total, we interviewed more than 80 people and reviewed thousands of pages of documents. In addition, we researched and evaluated best practices and the policies, procedures, and practices of other primary schools, secondary schools, and colleges throughout the country.

Unfortunately, given the condensed timeframe for this evaluation, we were unable to reach everyone on our list or spend as much time as we would have liked with many whom we did contact.[7] Fortunately, many of the employees we interviewed had decades of experience at CPS and many different teaching and administrative positions throughout their careers.

Our evaluation remains ongoing. While Ms. Hickey has met with CPS Inspector General Nicholas Schuler and representatives from the Chicago Police Department and the Chicago Children's Advocacy Center, more communication is necessary. We also intend to speak with, among others, additional CPS teachers, athletics directors, and representatives from the Cook County State's Attorney's Office, the

---

[6]   We selected school administrators based on a combination of random selection, recommendations by CPS network chiefs, and deliberate choice to ensure that we spoke to leaders of primary and secondary schools that represented the broad economic, social, ethnic, and geographic diversity of Chicago schools and the children they serve.

[7]   For example, Ms. Hickey reached out to Chicago Teachers' Union Vice President Jesse Sharkey via telephone, text, and email, but he has yet to respond.

Illinois Department of Children and Family Services, the Chicago Police Department, the Illinois State Board of Education, the Illinois State Police, and various CPS partners.

**Sexual Misconduct against Primary and Secondary School Students**

*Definitions*

Definitions and terms used to describe inappropriate sexual behavior vary across regions, communities, and laws. And different types of inappropriate sexual behavior require different approaches to prevent, identify, and stop. When relevant, this report refers to specific terms and definitions.

In general, however, this report uses the term "sexual misconduct" to refer to all types of inappropriate sexual behavior, including sex crimes—such as sexual harassment, abuse, and assault—and violations of policies—such as consensual sexual contact between a teacher and an adult student. "Sexual misconduct" also includes behavior that could be innocuous if not for an adult's perverse intent to create a sexual relationship with a student. Predators use "grooming," for example, to lower boundaries and create opportunities to engage in and normalize sexual contact. As described further in the sections below, grooming includes conduct ranging from sending sexually explicit text messages to using seemingly innocent nicknames.

*Primary and Secondary Schools Nationwide*

A child victim of sexual misconduct can suffer a tremendous amount of harm.[8] Victims can suffer serious psychological, physical, academic, and behavioral consequences that last a lifetime.[9] Long-term symptoms can include "symptoms such as chronic headaches, fatigue, sleep disturbance, recurrent nausea, decreased ap-

---

[8] Although a concern in all workplaces, this report does not address sexual misconduct against adults.

[9] *See, e.g.*, Magnolia Consulting, LLC, *A Case Study of K–12 School Employee Sexual Misconduct: Lessons Learned from Title IX Policy Implementation* (September 15, 2017), 2, *available at* https://magnoliaconsulting.org/wp-content/uploads/2017/11/Full-Report-Department-of-Justice-School-Employee-Sexual-Misconduct-Case-Study.pdf.

petite, eating disorders, sexual dysfunction, suicide attempts, fear, anxiety, depression, anger, hostility, and poor self-esteem."[10] Victims are also more likely to suffer from substance abuse[11] and to be sexually abused as an adult.[12]

Given the harm caused by sexual misconduct against students, one student victim is too many. The cost of what could have prevented the harm will always appear to be less than the harm of the offense, and for most cases of sexual misconduct, the question is frequently at what stage a policy or procedure could have prevented the crime from occurring.

To put CPS' systemic deficiencies in perspective, it is important to understand the nationwide problem of sexual misconduct against students. While accurate statistics on sexual misconduct are difficult to gather, available figures are high. Between 2009 and 2013, national child-protective-services agencies substantiated or found strong evidence to believe that there were over 60,000 children a year who were victims of "sexual abuse."[13]

In September 15, 2017, the National Institute of Justice, the Office of Justice Programs, and the U.S. Department of Justice hired Magnolia Consulting to study sexual misconduct against primary and secondary school students by adults: "A Case Study of K–12 School Employee Sexual Misconduct." Magnolia Consulting made several key findings that are particularly relevant to this report:

► **Victims.**[14] While there is no national database tracking reported incidents of school employee sexual misconduct, research suggests that an estimated 1 in 10 students will experience school employee sexual misconduct by the time they graduate from secondary school. Victims of school employee sexual mis-

---

[10] *Id*.

[11] *See id*.

[12] *See, e.g.*, Katie A Ports, Derek C Ford, and Melissa T. Merrick, *Adverse childhood experiences and sexual victimization in adulthood. Child Abuse & Neglect* (January 2016), 51, 313-322, *available at* http://doi.org/10.1016/j.chiabu.2015.08.017.

[13] Rape, Abuse & Incest National Network (RAINN), *Children and Teens: Statistics*, https://www.rainn.org/statistics/children-and-teens (citing U.S. Department of Health and Human Services, Administration for Children and Families, and Administration on Children, Youth and Families, Children's Bureau, *Child Maltreatment 2014*, *available at* https://www.acf.hhs.gov/sites/default/files/cb/cm2014.pdf). For the purposes of the "over 60,000" a year figure, "sexual abuse" is defined as a "A type of maltreatment that refers to the involvement of the child in sexual activity to provide sexual gratification or financial benefit to the perpetrator, including contacts for sexual purposes, molestation, statutory rape, prostitution, pornography, exposure, incest, or other sexually exploitative activities." *Id*.

[14] As described further in this report, CPS does not have reliable data regarding victim demographics, but the limited available data follows national trends.

conduct cross all demographics, but most student victims are low income, female, and in secondary school. Students with disabilities are also more likely to be victims of sexual misconduct.[15]

▶ **Offenders.** Offenders are typically male, popular in their school, and often recognized for "excellence." While offenders work in various positions, employees who spend individual time with students—such as specialty teachers, coaches, and counselors—are more likely to engage in sexual misconduct. Otherwise, offenders can span all ages, ethnicities, and income levels. On average, teacher offenders move through three different districts before being stopped and can have as many as 73 victims.[16]

▶ **Schools.** Only 18 states currently require school districts to provide sexual misconduct awareness and prevention training to school employees.[17] While many schools have adopted formal policies regarding sexual misconduct, school employees remain largely "unaware of what school employee sexual misconduct is, what the warning signs are, and how and to whom to report it." And although the vast majority of states have mandatory reporting laws that require school employees to report suspected child abuse, many "school employees are apprehensive about reporting school employee sexual misconduct to authorities for a variety of reasons, including the potential stigma and loss of reputation for the school or district, as well as fear of legal repercussions and liability for monetary damages." For these reasons, only about 5% of sexual misconduct by school employees is properly reported.[18] The result is that many unreported cases are handled informally, disregarding law and policy. If a sexual predator is not convicted and does not have a clear disciplinary record that is shared with a new prospective employer, that person can "quietly leave the district, potentially to seek work elsewhere." Even when incidents of sexual

---

[15] Members of the Lesbian, Gay, Bisexual, and Transgender (LGBT+) community may also be victimized at disproportionate rates. *See e.g.*, S. Bryn Austin *et. al.*, *Disparities in Child Abuse Victim in Lesbian, Bisexual, and Heterosexual Women in the Nurses' Health Study II* (J Womens Health. May 2008), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912575/, and Centers for Disease Control and Prevention, *NISVS: An Overview of 2010 Findings on Victimization by Sexual Orientation* (2010), *available at* https://www.cdc.gov/violenceprevention/pdf/cdc_nisvs_victimization_final-a.pdf.

[16] *See also*, U.S. Government Accountability Office, *K-12 education: Selected cases of public and private schools that hired or retained individuals with histories of sexual misconduct. Report to the Chairman, Committee on Education and Labor, House of Representatives* (December 2010), *available at* http://www.gao.gov/assets/320/313251.pdf.

[17] *See also*, U.S. Government Accountability Office, *Child Welfare: Federal Agencies can Better Support State Efforts to Prevent and Respond to Sexual Abuse by School Personnel* (January 2014), *available at* https://www.gao.gov/assets/670/660375.pdf.

[18] Magnolia Consulting also provided an example from a 1994 study in New York State, which found that "only 1% of the 225 cases superintendents disclosed to researchers were reported to law enforcement or child welfare and resulted in license revocation." Magnolia Consulting, *A Case Study of K–12 School Employee Sexual Misconduct*, 5.

misconduct are properly reported, investigations are often botched by school administrators, including through improper collection and preservation of evidence, prematurely tipping off an offender, and improper witness and victim interviews.

These studies suggest that most schools in the nation need to do better and have not done so. If CPS remains diligent and uses this opportunity to implement key recommendations and best practices, CPS could become a national leader in protecting students from sexual misconduct.

### Chicago Public Schools

CPS is the nation's third largest school district, with over 370,000 students across 644 schools, including 513 district-run schools, 121 charter schools, nine contract schools, and one SAFE school, which is for students who have been expelled from other schools due to violence.[19] Most district schools are either primary schools—from pre-kindergarten or kindergarten through eighth grade—or secondary schools—from ninth grade through twelfth grade. About 70% of CPS students attend primary schools.

Throughout the calendar year, non-students can be in schools for a wide variety of reasons. CPS has over 36,000 permanent employees, including administrators, teachers, counselors, administrative assistants, security officers, janitors, and many others needed to run hundreds of buildings throughout Chicago. Many of these employees belong to unions with their own bargaining agreements, including the Chicago Teachers Union and Service Employees International Union. Other employees serve part-time and come and go from schools, including substitute teachers and members of the Local School Council.

There are also various instances when parents or guardians enter schools. In addition to hosting parents for teacher conferences, disciplinary meetings, student events, and early dismissals, at least 13 schools also house a CPS Parent University, which provides classes for adults in the community. CPS also accepts adult visitors for various other reasons.

CPS has over 4,000 active vendors. Some, like custodial employees from Aramark Corporation, work permanently in a single school, while many others, like food delivery vendors, enter many different buildings. CPS also has many volunteers, including parents, guardians, and students from other schools. Some district schools also share their buildings and parking lots with other schools, vendors, churches, or public entities, such as the Chicago Park District. Some also lease their

---

[19]  *See* CPS.edu, *CPS Stats and Facts*, https://cps.edu/About_CPS/At-a-glance/Pages/Stats_and_facts.aspx (last visited August 15, 2018).

facilities for events, such as sporting events, summer camps, community meetings, fundraising activities, and parking cars.

CPS' Chief Executive Officer and Central Office manage CPS, and they report to the Chicago Board of Education. The current CEO is Dr. Janice Jackson. The Central Office has many departments, including the following that are particularly relevant to this report:

► The Law Department,

► The Safety and Security Department,

► The Talent Office (also known as Human Resources),

► Office of Diverse Learner Supports and Services (also known as the Special Education Department),

► The Office of Family and Community Engagement in Education (also known as FACE),

► The Office of Language and Cultural Education,

► Local School Council Relations Office,

► The Department of Facilities – Asset Management,

► Information and Technology Services, and

► The Communications Department.

CPS organizes most district-run schools into networks led by network chiefs and their employees, which may include deputy chiefs, data strategists, instructional support leaders for each content area, and administrative support. The network chiefs report to the Office of Network Support. School principals report directly to network chiefs, except for Independent School Principals, who are allowed to run their schools independent of a network office after they meet certain qualifications and CPS approves.

When we started this evaluation, CPS had 13 networks divided by geographic region, and each network included primary and secondary schools. CPS is in the process of combining its secondary schools into one network. Because this transition

is still underway, we will continue to refer to the 13 networks in this preliminary report, as reflected below.[20]



The CPS Central Office does not have full control over schools. Local School Councils, for example, have discretion to hire and fire principals. In addition, CPS shares responsibilities for student safety with the following stakeholders:

▶ The CPS Inspector General,

▶ The Illinois State Board of Education,

▶ The Illinois Department of Children and Family Services,

▶ The Illinois State Police Department, and

▶ The Chicago Police Department.

---

[20] *See* Chicago Data Portal, *Chicago Public Schools – Geographic Networks*, https://data.cityofchicago.org/Education/Chicago-Public-Schools-Geographic-Networks/3y7n-mx9t (last visited August 16, 2018).

The over 600 Chicago public schools vary dramatically in size, demographics, school and community cultures, and scholastic achievement. As a result, different schools face different challenges and must set different priorities based on the varying needs of their students. CPS' current student demographics are as follows:

RACE/ETHNICITY (2018)

Hispanic ..................................................................46.8%
Black .......................................................................37.0%
White .......................................................................10.2%
Asian ........................................................................4.1%
Other ........................................................................1.9%

SOCIO-ECONOMIC STATUS[21]

Tier 1 (lowest) ......................................................28.4%
Tier 2 ....................................................................27.8%
Tier 3 ....................................................................25.5%
Tier 4 (highest) ...................................................18.23%

STUDENTS IN TEMPORARY LIVING SITUATIONS ......................................8.6%
(about 9,514 students)

LIMITED ENGLISH PROFICIENCY ........................................................18.2%

With household languages including Spanish, Arabic, English, Cantonese, Urdu, English, Yoruba, French, Swahili, Portuguese, Polish, Ukrainian, Assyrian, Vietnamese, Tagalog, and others

STUDENTS WITH INDIVIDUALIZED EDUCATION PROGRAMS

As of 2017: ....................................................................13.7%[22]

\*\*\*

---

[21] According to CPS' website, about 77.7% of CPS students in 2017/2018 were economically disadvantaged. *See* CPS.edu, *CPS Stats and Facts*, https://cps.edu/About_CPS/At-a-glance/Pages /Stats_and_facts.aspx (last visited August 15, 2018). CPS has found that the economically disadvantaged figure is not as reliable as the tier system, which bases socio-economic status on median family income, percentage of single-parent households, percentage of households where English is not the first language, percentage of homes occupied by the homeowner, and level of adult education.

[22] This 13.7% figure is based on an estimate for the 2017-2018 school year. *See id*.

*Systemic Deficiencies Regarding Sexual Misconduct against Students*

During this evaluation, it was our goal to determine how best to arm the CPS community—including administrators, employees, vendors, volunteers, students, parents, and guardians—with effective policies and procedures to prevent and address sexual misconduct. To achieve that end, we interviewed over 80 CPS employees, including nearly 70 CPS administrators, about what CPS was or was not doing before the *Betrayed* series and why. Their responses inform this report and are cited throughout. Here is a brief summary of what they said:

▶ **Initial Background Checks.** For the last few years, CPS has done background checks for all new CPS hires. CPS cannot confirm that all of its vendors received background checks. It is clear, however, that not all schools required volunteers with substantial student contact to go through the requisite background checks. During their interviews, many administrators did not know whether volunteers had received background checks, and many admitted that some volunteers who needed to receive background checks probably did not. This fact was proven this summer: When CPS reemphasized the importance of background checks for volunteers, some schools had to temporarily shut down their summer athletics programs to meet this requirement.

▶ **Ongoing Background Checks.** CPS did not have a reliable method for receiving updates regarding CPS employees' arrests or convictions during their tenure. CPS did not have a method for checking vendors' or volunteers' arrests or convictions. Volunteers—who do not go through the same onboarding process that employees do—needed to go through background checks only once to volunteer indefinitely.

▶ **Reference Checks.** CPS divides the hiring of school employees among various departments. CPS typically leaves reference checks to individual principals and assistant principals. Whether principals did reference checks and how they did them varied. Most principals said that they did not perform reference checks, because CPS prohibited them from asking any helpful questions. Others said that CPS provided no guidance as to what they could ask, and therefore, they would feel free to ask anything, although they never considered asking about whether someone had a history involving sexual misconduct. Instead, these principals assumed that the person giving the reference would mention any history of sexual misconduct. Yet, most principals said that if they were called for a reference check, they would not disclose if a former employee resigned or was terminated because of sexual misconduct. Most reported that they would say only that they would not rehire the person or they would only provide the job title and dates of employment.

▶ **Policies and Procedures.** CPS has many policies, procedures, and guidelines. Principals cannot memorize all of them, but ideally, they would know where to

find them. Unfortunately, CPS policies, procedures, and guidelines are spread throughout different platforms and sources and sometimes contain conflicting information or priorities. Some policies and procedures are on the Chicago Board of Trustees website. Others are on CPS' human resources website ("HR4U"). Others are on CPS' online "Knowledge Center," which grants users with different levels of access different policies and procedures, including, for example, the "Principal Handbook" for administrators. Other policies and procedures are on individual school websites. Some schools have school-specific policies and procedures in employee, student, parent, and guardian handbooks. Some principals said that they resorted to internet searching to locate policies, without confirming that the search result was actually the current policy. Many principals expressed confusion or frustration with where the policies and procedures were located, how they were organized, and how new policies and updates were delivered.

▶ **Training.** CPS did not consistently train employees, vendors, volunteers, students, parents, or guardians about its policies and procedures regarding sexual misconduct against students. Most CPS principals described learning CPS' policies and procedures on the job as issues came up, rather than by having a thorough training on the front end. Most principals said, for example, that they receive general policy and procedure refreshers at the annual Legal Conference, from internal emails, weekly newsletters, and from communications with other CPS Departments or through their network chief. Many principals believed that CPS' Talent Office trains new employees on these policies and procedures during the "on-boarding" process, but they could not say for sure. Some principals went beyond the training CPS required, but more principals reported that they trained their employees only every few years through the Illinois Department of Children and Family Services (DCFS) online mandatory reporting training. Other principals admitted that they did not train for employees regarding sexual misconduct. Regarding student training, many principals were unaware of the Sexual Health Curriculum requirement and others confirmed that they did not meet these requirements. Only a handful of principals held any relevant training sessions for parents or guardians, but they also added that it is difficult to get parents or guardians to attend these events.

▶ **Reporting.** CPS policies require employees to contact DCFS regarding sexual misconduct involving a student and an adult. CPS recently added a requirement for employees to also notify their principal. But most principals said that their schools already followed this practice, and principals knew to contact the CPS Law Department, notify parents or guardians, log an "incident report" in CPS' Verify Incident Management software system (Verify), and call the police if the allegation described a crime. Other principals, however, were unsure of the reporting process, especially for student-on-student sexual misconduct. What is more concerning is that these principals were unsure whether or when

they should record non-student misconduct in Verify.[23] Likewise, for sexual misconduct between students, some administrators would leave the decision to notify the police up to the victim's parents or guardians. Most principals said that they did not and would not notify the Illinois State Board of Education for adult perpetrators since they assumed someone from the Central Office would do so. Given the difficulty of finding accurate policies, the urgency of the situations, and the fear of doing something wrong, many principals said that their first call was to CPS' Law Department. Many principals said, however, that they would conduct an initial investigation into allegations before reporting out and had not received training on how to do this or what the scope of this initial fact-finding should be.

▶ **Investigations.** DCFS, the Chicago Police Department, CPS' Law Department, and, sometimes, local school administrators investigated allegations of sexual misconduct by adults against students. In comparison, local-school administrators typically investigated allegations of sexual misconduct between students and referred serious offenses to parents or guardians, the Law Department, and the Chicago Police Department. In general, CPS did not provide sufficient training for administrators or investigators on how to investigate these cases. Most administrators said, for example, that they learned how to handle cases on the job, as issues arose. As a result, it is unlikely that evidence was stored or preserved consistently or correctly in all cases, and many victims were asked the wrong questions during multiple interviews in the wrong settings by untrained employees.

▶ **Response.** Most schools have some access to CPS guidance counselors, social workers, case managers, and psychiatrists. The vast majority of administrators said that these positions are understaffed. Many schools, however, used their schools' discretionary funds to add additional support and partnered with local organizations to provide additional resources to children, such as psychologists or additional counselors. Some victims, however, did not receive sufficient support—or any support.

---

[23] CPS is in the process of moving to a new software reporting system, called Aspen, by January 2019.

## Roadmap

To address the systemic issues raised by the *Betrayed* series and those we identified during this evaluation, we divided this report into seven broad categories: (1) Title IX, (2) Prevention, (3) Policies and Procedures, (4) Training, (5) Reporting, (6) Investigations, and (7) Response.

We start with best practices and recommendations for CPS' new Office of Student Protections and Title IX (OSP). Although these best practices and recommendations overlap with the other six categories, we have separated Title IX into its own section, because its application is unprecedented at CPS, as well as most primary and secondary school districts. Specific recommendations and further details for the OSP are within each section.

Although the other six categories also overlap, they track Title IX requirements, and we have found the category distinctions to be analytically useful. Within each section, we refer to both past and current practices for each category when there are relevant distinctions, given the recent changes by CPS, and provide our corresponding recommendations, including mechanisms for accountability.

We conclude with a non-exhaustive list of additional steps and goals we plan to complete before providing our final report.

# Implementing Title IX

## I.　　Implementing Title IX

KEY RECOMMENDATIONS

→ Create and fully staff a Title IX Office.

→ Designate at least one trained Title IX Office contact in each school.

→ Create a comprehensive plan to prevent and respond to sexual misconduct against students in compliance with Title IX and best practices.

Title IX of the Education Amendments of 1972 (Title IX), applies to all education programs and activities by recipients of federal funds, including primary and secondary schools and districts, such as CPS.[24] In short, Title IX:

▶ Protects all students from unwanted sexual conduct by students, employees, and third parties;

▶ Applies in all school operations and programs, whether on or off site; and

▶ Requires schools to stop and prevent unwanted sexual conduct, as well as remedy the effects of unwanted sexual conduct on victims.[25]

This responsibility is particularly true for primary and secondary schools, which have "a substantial degree of supervision, control, and disciplinary authority over the conduct of students."[26]

The Supreme Court, Congress, and federal executive agencies, including the Department of Education, recognize that unwelcome sexual conduct—*i.e.*, "sexual harassment," broadly defined—involving a student can violate Title IX as a form of discrimination.[27] According to guidance from the U.S. Department Education Office for Civil Rights, the key question to determine whether the unwanted sexual conduct violates Title IX is whether it denies or limits a student's ability to participate in or benefit from the school's activity.[28] This can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct, including sexual violence.[29]

---

[24] 20 U.S.C. § 1681 *et seq*. *See also*, 34 C.F.R. Part 106.

[25] *See, e.g.*, U.S. Department of Education Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (January 19, 2001), 4, 10, *available at* www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[26] *Id.* at 11.

[27] *Id.* at 4.

[28] *Id.* at 5.

[29] *See id*.

Title IX's prohibition against sexual harassment does not extend, however, to appropriate, nonsexual conduct, such as: a high-school coach hugging a student who scores a goal; a kindergarten teacher giving a consoling hug to a child with a skinned knee; or a student demonstrating a sports technique that requires contact with another student.[30] In some circumstances, however, conduct that would otherwise be nonsexual may take on sexual connotations and become unwanted sexual conduct. For example, a teacher "repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment."[31]

Thus, CPS is responsible for stopping, remedying, and preventing sexual harassment of students by students, employees, and third parties. Specifically, Title IX requires CPS to:

► Implement a policy against sex discrimination;[32]

► Adopt and publish grievance procedures for prompt and equitable resolution of sex-discrimination complaints;[33] and

► Designate at least one employee to coordinate compliance with Title IX regulations, and ensure that all employees and students know who this employee is and how to contact him or her.[34]

In addition to these requirements, CPS should follow best practices, especially the following:

► Adopt specific policies to address sexual misconduct by adults—including conduct that involves students above the age of consent—because all sexual misconduct by adults has the potential to violate Title IX;[35]

► Train employees, students, parents, and guardians on all relevant policies and procedures regarding sexual misconduct;

► Provide regular training for the Title IX Coordinator and the Title IX contacts in each school to fulfill their responsibilities, including understanding policies and procedures and best practices for investigating complaints; and

---

[30] *See id*.

[31] *Id.* at 2.

[32] *See* 34 CFR § 106.9.

[33] *See* 34 CFR § 106.8(b).

[34] *See* 34 CFR § 106.8(a).

[35] *See,* U.S. Department of Education Office for Civil Rights, *Revised Sexual Harassment Guidance*, 19-20. *See also* U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting* (March 2017), *available at* https://www.rems.ed.gov/docs/ASMTrainingGuide.pdf.

► Establish clear and comprehensive reporting practices.

As noted in the Background Section, CPS is developing the Office of Student Protections and Title IX (OSP) to address, among other things, allegations of sexual misconduct between students. The OSP can and should be CPS' cornerstone for addressing sexual misconduct against students.

CPS is currently working through the logistics of how to staff and implement the OSP. CPS anticipates designating 20 OSP employees, including investigators. The OSP will be responsible for investigating sexual misconduct between students and will likely create policies and procedures regarding sexual misconduct; train employees, students, parents, and guardians on, among other things, those policies and procedures; and be a general resource for the CPS community.

We also recommend that the OSP have trained, designated Title IX contacts in every school throughout CPS. It is unlikely that CPS can afford a designated Title IX employee, who has no other responsibilities, at each school. It is important, however, that schools have at least one employee designated and trained to be the Title IX contact. This employee should, for example, be trained on how to gather information regarding alleged sexual misconduct without unnecessarily interrupting schools, re-traumatizing victims, or jeopardizing future Illinois Department of Children and Family Services (DCFS), CPS Inspector General, or criminal investigations.[36]

We recommend that CPS use the OSP to develop a comprehensive plan to prevent and respond to sexual misconduct against students that, at minimum, incorporates Title IX compliance, best practices, and Illinois law regarding sexual misconduct—including "Erin's Law."[37] This plan should include information about updates to existing policies and procedures, plans to prevent sexual misconduct, trainings targeting all stakeholders regarding sexual misconduct, reporting checklists and

---

[36]  As clarified in the following sections, this does not mean that CPS employees should be conducting sexual-misconduct investigations themselves. Realistically, however, allegations come in all forms—which may not appear to involve sexual misconduct—and all levels of seriousness. CPS should have at least one employee in each school who can effectively gather enough information to make a report to DCFS, the CPS Inspector General, the OSP, or law enforcement.

[37]  105 ILCS 5/10-23.13. *See also* 105 ILCS 110/3 (requiring "age-appropriate sexual abuse and assault awareness and prevention education in grades pre-kindergarten through 12."), 105 ILCS 5/27-9.1(c) (requiring "All classes that teach sex education and discuss sexual intercourse in grades 6 through 12 shall . . . teach pupils to not make unwanted physical and verbal sexual advances and how to say no to unwanted sexual advances. Pupils shall be taught that it is wrong to take advantage of or to exploit another person. The material and instruction shall also encourage youth to resist negative peer pressure."), and 105 ILCS 5/27-13.3 (Internet Safety Education Curriculum for grades 3 through 12, recommending instruction on "Recognizing, avoiding, and reporting online solicitations of students, their classmates, and their friends by sexual predators.").

contacts, investigation strategies, victim services, regular data collection, and feed-back mechanisms, such as surveys of students and employees regarding sexual misconduct, resources, and corresponding culture in CPS. CPS should also build in supervision and accountability mechanisms.[38]

For these reasons, each of the following sections—prevention, policies and proce-dures, training, reporting, investigations, and response—will begin with best prac-tices and include recommendations that involve the OSP.

---

[38] *See* EduRisk, *Educator Sexual Misconduct, A Policy and Audit Guide for Protecting Children* (2016), *available at* https://www.icmec.org/wp-content/uploads/2016/05/Policy-and-Audit-Guide-for-Protecting-Children.pdf.

# Prevention

## II.     Prevention

KEY RECOMMENDATIONS

→  Streamline background checks for employees, vendors, and volunteers.

→  Refresh background checks on an ongoing, staggered basis until CPS develops a reliable method of receiving up-to-date information regarding new arrests and convictions.

→  Require reference checks with previous employers that include a mandatory question about allegations and adjudications regarding sexual misconduct.

→  Create agreements with other districts and entities to share information, to the extent possible, to prevent predators from regaining access to students.

→  Consider an age restriction and additional screening or oversight requirements for specific types of volunteers, such as assistant coaches and alumni.

→  Require all adults to display photo-IDs at all times while in schools.

A.     Title IX & Best Practices

This entire report is aimed at preventing sexual misconduct against students, whether by keeping predators off school premises, identifying would-be offenders before they harm a child, stopping an offender from harming a child again, or deterring sexual misconduct by conducting swift and efficient investigations and adjudications. This section focuses specifically on mechanisms to prevent sexual misconduct by securing schools through background checks, reference checks, and building security.

CPS is continuing to work out the logistics of the Office of Student Protections and Title IX (OSP). As CPS' experts on Title IX and sexual misconduct against students, the OSP employees will likely be able to help create improved background-check procedures.

B.     CPS Background Checks

According to CPS, it has historically housed responsibility for background checks in several different CPS departments. Before 2011, the Talent Office, the Safety and Security Department (Safety and Security), and the Family and Community En-

gagement Department conducted background checks. During this time, background checks for different groups, such as employees, vendors,[39] and volunteers, were siloed within these different departments. This process was inconsistent for vendors and volunteers, and some departments were not conducting checks for vendors or volunteers at all.

From 2012 to 2015, the Talent Office conducted background checks for employees and some vendors, the Local School Council Relations Office conducted background checks for Local School Council members, and the Family and Community Engagement Department conducted background checks for volunteers. During this time, official guidance from the Illinois State Board of Education (ISBE) stated that schools could hire new employees begin work before their background checks were completed.[40] New CPS employees received their identification badges and access to the schools on the same day that they were fingerprinted and before they had cleared their background check. At that time, routine background checks sometimes took months to complete.

In 2015, Safety and Security took over responsibility for all background checks except for members of Local School Councils. In 2018, Safety and Security also assumed responsibility for background checks of Local School Council members. As of the present date, Safety and Security is responsible for all CPS background checks.

Safety and Security has seven employees dedicated to conducting background checks. Each employee has responsibility for a category of CPS-affiliated adults: one for CPS employees; two for vendors; two for charter schools; one for volunteers; and one for field experience (student teachers). The employees assigned to volunteers and field experience divide responsibility for background checks of Local School Council members. All background-check employees are cross-trained to conduct checks outside of their designated category.

Safety and Security conducts fingerprint-based criminal background checks. It searches records of the Illinois State Police (state and local), FBI (federal, non-Illinois, and non-local), state and national sex offender registries, Murder and Violent Offender Against Youth registry, DCFS (child abuse or neglect), and the City of Chicago's "Do Not Hire" records. This is one of the most comprehensive background checks in the nation and exceeds most published recommendations regarding

---

[39] For the purposes of this report, the word "vendor" includes all profit and non-profit organizations that work with CPS schools.

[40] *See* ISBE, *Criminal History Records Information Checks for Certified and Non-Certified School Personnel* (2012), *available at* https://www.isbe.net/Documents /guidance_chr.pdf.

background checks of people working with children.[41] At present, each background check costs $42.25. Background checks can be completed in as little as 24 hours, but can take up to 30 days.

CPS also has an informal process in place to review applicants for abuse and neglect adjudications under the Juvenile Court Act. In December 2016, the Chicago Board of Education amended its policy to allow the Talent Office to consider an applicant or current employee's child abuse and neglect history, including "indicated" findings from DCFS.[42] CPS now sends the names of all new CPS employees, vendors, charter and contract school employees, and Level One volunteers to DCFS for any "indicated" findings of child abuse or neglect to determine whether an applicant may have a Juvenile Court Act adjudication. Since 2016, CPS has also submitted the names of all current employees to DCFS. DCFS provided information for employees with indicated findings, and CPS disciplined those employees as appropriate, up to and including discharge. We understand that CPS is still waiting for some additional information from DCFS for current employees. While this process with DCFS is not part of the standard background-check procedure, we understand that CPS and DCFS are working on an intergovernmental agreement to formalize this process.[43]

When a background check returns without any "hits"—contacts with law enforcement—Safety and Security clears the applicant. When a background check returns with hits, Safety and Security sends the results of criminal background checks to the Criminal Background Committee (Background Committee). That committee is in the CPS Law Department's Office of Employee Engagement. The Committee is responsible for evaluating these hits to determine whether an applicant can be cleared for a potential hire. The Background Committee reviews roughly 3,000 background checks each year. The Background Committee is currently composed

---

[41] *See, e.g.,* Noy S. Davis, Kathi L. Grasson, Kimberly Dennis, Susan J. Wells, and Marsha B. Liss, *Guidelines for the Screening of Persons Working with Children, the Elderly, and Individuals with Disabilities in Need of Support* (1998), U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *available at* https://www.ncjrs.gov/pdffiles/167248.pdf; Kristen D. Anderson and Dawn Daly, *What You Need to Know About Background Screening* (2013), U.S. Department of Justice, Office of Community Oriented Policing Services with the National Center for Missing and Exploited Children, *available at* https://ric-zai-inc.com/Publications/cops-p260-pub.pdf.

[42] *See* Rules of the Chicago Board of Education, 4-4(b), *available at* http://www.cpsboe.org/content/documents/complete_board_rules_december_2017.pdf

[43] As we continue our evaluation, we intend to reach out to DCFS, because the "indicated" findings appear limited. According to CPS, DCFS only asks the Cook County State's Attorney Office to file juvenile court proceedings against people who are parents, guardian, or custodians of the abused or neglected child. As a result, the Cook County State's Attorney would not file against other categories of people under the Juvenile Court Act, including those who are "responsible for the child's welfare," such as a teacher or daycare worker. The Cook County State's Attorney Office may, instead, criminally charge those individuals in the Circuit Court of Cook County. CPS continues to explore further information sharing with DCFS to better protect children.

of representatives from the following offices: Employee Engagement, Safety and Security, Talent, Equal Opportunity Compliance, Facilities, and Languages and Cultural Education. There is no formal requirement for the number of people or department representatives that must be at each meeting, but the Office of Employee Engagement usually has a greater representation than other departments. Each representative at a Background Committee meeting is allotted one vote, and decisions about whether to clear or deny candidates are made by majority vote.

If the hit is an "enumerated offense" (as defined below), the Background Committee automatically denies the applicant. If the hit is a non-enumerated offense, the Background Committee evaluates the hit, including requesting police reports, court documents, or letters of explanation, and determines whether to clear the person. An applicant who is denied a position based on the results of the background check may appeal the Background Committee's decision within five days.

In evaluating whether to clear a person, the Background Committee considers felony and misdemeanor convictions. The Background Committee also investigates arrests that did not lead to convictions or dispositions that are not considered convictions. Applicants may need to provide police reports and letters of explanation if they have been arrested for serious violence, including multiple arrests for domestic abuse; a single felony violence charge; sexual conduct; or for an offense where there is a nexus between the arrest and job duties. CPS has not always performed a full investigation into the circumstances surrounding misdemeanor arrests or convictions that were pleaded down from a higher offense. In evaluating patterns of past conduct, the Background Committee closely scrutinizes applicants for positions that work with especially vulnerable students, such as special education teachers, bus aides, and security officers. Occasionally, the Background Committee will refer applicants to the Investigations Unit of the Law Department if the Background Committee finds that it needs more information to evaluate the applicant. The Background Committee uses guidance from the Equal Employment Opportunity Commission to evaluate applicants with arrest records.[44]

▶ CPS Employees

Since August 12, 2004, the Illinois School Code requires school districts to perform a fingerprint-based background check on all employees.[45] Both the Illinois School Code and Board Rules prohibit CPS from employing anyone who has been convicted of a criminal offense that is enumerated in the Illinois School Code ("enumerated offense"). These offenses include homicides, sex offenses, and certain

---

[44]  *See* U.S. Equal Employment Opportunity Commission, *EEOC Enforcement Guidance: Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964* (2012), *available at* https://www.eeoc.gov/laws/guidance/arrest_conviction.cfm.

[45]  *See* 105 ILCS 5/34-18.5(a).

drug offenses.[46] CPS is also prohibited from employing someone who has been found to be the perpetrator of sexual or physical abuse against a minor under the Juvenile Court Act, but as noted, these records are not always accessible.

In 2012, CPS audited their records to ensure it had at least one background check for all employees on file. CPS identified that some employees needed to receive a background check, and some of these employees' background checks led to CPS terminating their employment. According to CPS, it has conducted background checks for every new CPS employee since this audit.

Safety and Security has one employee dedicated to conducting CPS employment background checks. Newly hired CPS employees are not permitted to start work until they have been affirmatively cleared in writing by the Talent Office. This prohibition applies to hourly and miscellaneous employees, athletic coaches, former students, and any other person applying for a job within schools.

► Volunteers

A person convicted of an enumerated offense is ineligible to be a volunteer,[47] as is anyone on a sex-offender registry.[48] But there is no legal requirement that CPS conduct criminal background checks on volunteers. CPS is authorized, however, to conduct background checks on volunteers under the Uniform Conviction Information Act[49] and the Adam Walsh Act.[50]

Before 2014, CPS conducted name-based background checks on volunteers. Since 2014, CPS has conducted fingerprint-based background checks on volunteers expected to have a certain level of student access. CPS divides volunteers into two groups: Level One and Level Two. All volunteers must complete an application to volunteer through the Family and Community Engagement Department (also known as FACE), but only Level One volunteers are background checked. CPS policy clearly defines the distinction between Level One and Level Two volunteers, based on the number of hours spent with students on a weekly basis, whether there is an overnight stay involved, and other characteristics.[51] CPS has previously considered but elected not to require background checks for Level Two volunteers, because of their limited amount of unsupervised student contact and the chilling ef-

---

[46] *See* 105 ILCS 5/21B-80.
[47] *See* CPS Policy Manual § 801.2 (Volunteer Policy) (adopted March 26, 2014), *available at* https://policy.cps.edu/download.aspx?ID=272.
[48] *See id*.
[49] 20 ILCS 2635/1 *et seq*.
[50] 42 U.S.C. § 16911 *et seq*.
[51] *See* CPS Policy Manual § 801.2.

fect it would have on undocumented parents or guardians. Principals have discretion to require Level Two volunteer background checks, but if they elect to do so, they must check all Level Two volunteers.

Under CPS' Volunteer Policy, the principal at each school, with assistance from the Department of Family and Community Engagement, is responsible for reviewing volunteer application forms from eligible candidates, completing an interview with the candidate, as necessary, and determining whether the candidate is a Level One or Two volunteer. Principals then send the names of Level One volunteers to Safety and Security for a full background check. Safety and Security has one employee dedicated to conducting volunteer background checks. The Background Committee reviews results of Level One volunteer background checks and determines whether to clear volunteers. The Background Committee is not required to adhere to the Equal Employment Opportunity Commission guidance in determining whether to clear volunteers and, in practice, tends to evaluate volunteers under a stricter standard than employees or vendors.

In practice, most interviewed principals who had volunteers at their schools did not personally oversee the volunteer intake process or conduct interviews of volunteers. Instead, principals delegate this task to subordinates. For example, many athletic directors and coaches have significant discretion in selecting their own volunteers. To be clear, in practice, most volunteers do not go through any formal "interview."

Volunteers must receive an approval notice before volunteering in a school. When a volunteer completes the approval process, the volunteer and the Volunteer Coordinator at the relevant school will receive affirmative notice in writing. Questions about a volunteer's clearance are directed to Family and Community Engagement.

▶ Vendors

The Illinois School Code requires that districts conduct fingerprint-based background checks for certain vendors.[52] The same background check used for CPS employees is used to screen all people and employees of firms holding contracts with CPS who have direct, daily student contact, and vendor employees who have a conviction on the enumerated offense list or involving sexual or physical abuse of a minor under the Juvenile Court Act cannot work in CPS buildings.[53] Safety and Security has two employees dedicated to conducting vendor background checks. Historically, CPS has conducted such checks for employees of its largest vendors (*e.g.*, Aramark, Sodexo, and Safe Passage), but other vendors are supposed to conduct background checks themselves. Vendor employees providing services with

---

[52]  105 ILCS 5/34-18.5(f).
[53]  *See id.*

student contact must be background checked, such as custodians. Certain vendor employees with little to no student contact do not have to be background checked, such as landscapers.

▶ Charter and Contract Schools

Charter schools are publicly funded but operate independently from CPS and can hire their own employees without CPS involvement. As a result, charter schools are not legally required to comply with CPS background-check policies.

Since 2017, however, CPS has been actively working to ensure all charter-school employees undergo the same background-check procedures as CPS employees, and Safety and Security has two employees dedicated to conducting background checks for charter schools. CPS has memoranda of understanding with some charter schools to follow CPS' background-check procedures. On October 24, 2017, the CPS Inspector General's Office found that 163 former CPS employees on CPS' permanent Do Not Hire list were working at charter and contract schools. CPS had placed three of these employees on the Do Not Hire list because of sexual misconduct against students.

According to CPS, it cannot legally force charter schools to comply with CPS' background-check process.[54] Although charter school have the ultimate authority on whether to hire an applicant, the Background Committee reviews background checks for prospective charter-school employees and provides relevant information to the charter schools so that they can make fully informed decisions.

As of November 22, 2017, 131 of 142 charter schools voluntarily agreed to use CPS' background-check process. In response, CPS released the names of the 11 charter schools that refused to follow CPS' background-check process.[55]

▶ Field Experience

Like other teachers, student teachers who have been convicted of an enumerated offense or of an offense involving sexual or physical abuse of a minor under the Juvenile Court Act cannot work in CPS.[56] The Illinois School Code requires that all student teachers and interns submit to a fingerprint-based background check and

---

[54] *See* CPS.edu, *CPS Releases List of Charter Schools Refusing to Use CPS Background Check Process* (last modified November 22, 2017), https://cps.edu/News/Press_releases/Pages/PR1_11_22_17.aspx (last visited August 16, 2016).

[55] *See id.*

[56] *See* 105 ILCS 5/34-18.5(g).

pay the costs of the check.[57] Safety and Security designates one employee to conduct field experience background checks.

▶ Local School Councils

Members of Local School Councils are required to undergo background checks,[58] and enumerated offenses disqualify a person from serving on a local school council.[59] Until 2017, Local School Council Relations Office maintained responsibility for conducting background checks on members of Local School Councils but was not consistently conducting these checks. In 2017, Safety and Security took over responsibility for Local School Council background checks, and the people responsible for volunteer and field experience background checks are jointly responsible for local school council background checks. Local School Council background checks are sent to the Background Committee. If a Local School Council member has a criminal history containing an enumerated offense, that person will not be cleared.

▶ Coaches

In accordance with the policies above, coaches who were employees or Level One volunteers received the corresponding background checks. Coaches who were Level Two volunteers did not need to receive background checks. But not all principals and athletic directors followed this policy, and some principals reported that some coaches were allowed to volunteer without any assessment of whether they qualified as a Level One or a Level Two volunteer. When refreshing background checks in the summer of 2018, CPS discovered that some volunteer coaches had never received a background check.

We understand that CPS is currently amending their volunteer policy to require all coaches to receive background checks.

C.    Ongoing Background Checks

The Illinois State Police's "Rap Back" program is supposed to inform CPS whenever an employee—who has received a fingerprint-based background check—is *convicted* of a crime. CPS then sends that information to the CPS Law Department for review and appropriate disciplinary action. Because the Rap Back program applies

---

[57]  *See* 105 ILCS 5/10-21.9(g). Initially, there was some confusion about whether the universities providing these student teachers should conduct these checks. Subsequent, official ISBE guidance, however, states that student teachers should authorize the school district to conduct the background checks, pay the costs, and receive a copy of the report. *See* Illinois State Board of Education, *Criminal History Records Information Checks for Certified and Non-Certified School Personnel* (Fall 2012), 7, *available at* https://www.isbe.net/Documents/guidance_chr.pdf.

[58]  *See* 105 ILCS 5/34-2.1(f).

[59]  *See* 105 ILCS 5/34-2.1(f-5).

only to convictions, there is a long, inherent delay between arrest, conviction, and the notification to CPS—if any notification arrives at all. The Rap Back program applies only to Illinois convictions, so CPS would not receive any notification of convictions in other state or federal courts. CPS policy requires employees to self-report to CPS when they have been convicted of certain enumerated convictions.[60]

CPS has not historically conducted additional or ongoing background checks for any groups after the initial check and has instead relied entirely on self-reporting and the Illinois Rap Back program.[61]

D.    Background Check Policy Changes and Recommendations

This summer, with our consultation, CPS announced a background check "refresh." All employees, vendors, and Level One volunteers are required to submit to a new background check through the CPS background-check process. Anyone who does not complete the background-check process before the start of school will not be allowed to enter a school until he or she complies. For this background check re-fresh, Safety and Security is conducting *all* of the background checks, including those of vendor employees whose employers would typically conduct their own background checks. As vendor contracts come up for renewal, CPS plans to revise the contracts to require that CPS, rather than the vendor, conduct all background checks.

CPS is instituting a new policy requiring all athletic coaches to go through a cen-tralized eligibility screening process before any coaching activity. Anyone involved with a team, including game day and practice volunteers, team managers, trainers, and former student athletes, are considered coaches that must go through the el-igibility process. The eligibility process will include a background check, certifica-tions, and training on recognizing, preventing, and reporting sexual misconduct.

CPS set specific deadlines to complete stages of the background check refresh. CPS began employee background checks in June. CPS launched principal webinars and trainings on June 20th and 21st. By June 29, principals were to complete an inven-tory of volunteers, vendors, and coaches at their schools. For coaches of fall-sea-son sports, CPS set a deadline of July 27 to complete the eligibility process. For the remaining groups, CPS set a deadline of August 24 to complete the background checks. During July and August, CPS is conducting background checks of volun-teers, vendors, and coaches. CPS relied on principals to provide updated lists of the volunteers, vendors, and coaches working within their schools through the

---

[60]  *See* Rules of the Chicago Board of Education, 4-5, *available at* http://www.cpsboe.org/content
/documents/complete_board_rules_december_2017.pdf.

[61]  In the next phase of our evaluation, we will be working with the Illinois State Police to learn
more about the Rap Back program and how to improve outcomes for CPS.

Online Data Acquisition system, known within CPS as "ODA." As of the date of this report, CPS was still in the process of conducting employee background checks.

By conducting the background check refresh, CPS has made significant progress toward ensuring that all adults working in schools have been background checked under uniform, rigorous standards. We recommend that CPS continue to implement this background-check protocol for all new employees, Level One volunteers, vendor employees with direct student contact, charter schools, field-experience employees, Local School Councils, and coaches.

The next step for CPS is to ensure that all adults are checked for criminal activity on an ongoing basis after they begin working in the schools. The current reliance on the Illinois Rap Back program is insufficient because it applies only to CPS employees and Illinois convictions. For these reasons, we recommend that CPS re-check employees periodically. CPS could implement ongoing employee background checks in multiple ways. The best practice is to re-check all employees after specific intervals of time, for example, every five years. CPS could stagger these re-checks to avoid the burden of re-checking all employees at the same time. If periodically re-checking all employees is economically unfeasible, CPS could conduct ongoing random background checks as an alternative.

In addition to conducting periodic employee background checks, we recommend that CPS implement ongoing background checks for the other groups as well. For vendors, we recommend that CPS retain control over background checks for all relevant vendor employees, and as vendor contracts are renewed, that CPS revise the contract language to reflect this policy. We recommend periodic or random checks similar to the recommendations given above for CPS employees.

We recommend that CPS re-check volunteers (including unpaid coaches) every year. More frequent background checks are necessary for volunteers because they are not included in the Rap Back program and do not have the same level of contact with or oversight from school administrators. We also recommend that, after each election, all members of Local School Councils undergo the same background-check procedure as all other adults working in CPS.

Moreover, there is an added difficulty in setting and maintaining boundaries between students and volunteers who recently attended or graduated from the school where they are volunteering. In fact, recent graduates who serve as coaches have been implicated in issues and incidents of sexual misconduct. For these reasons, CPS should consider additional screens, levels of oversight, or age restrictions for certain types of volunteers, especially assistant coaches.

For charter schools, we recommend that CPS exert control over background checks for all charter school employees to the greatest extent legally permissible and implement the same ongoing background-check procedures as for CPS employees.[62]

We also make recommendations relevant to the Background Committee: We recommend that the Background Committee endeavor to obtain any information that may provide greater context and clarity to the hits uncovered during the background check. We understand that the Background Committee is required to evaluate a vast number of background checks every year, about 3,000, and that this burden and limited resources constrain the Background Committee from exhausting all sources of additional information. We therefore recommend that, for all hits that are sexual or violent in nature, the Committee submit a FOIA request to the relevant jurisdiction and require the applicant to provide a letter of explanation.

E.    Reference Checks

This section addresses reference checks, *i.e.*, communicating with a candidate's previous employer(s) before hiring a prospective school-based employee. This section first discusses historical and current practices before turning to recommendations to improve the reference-check process for school-based prospective hires.

Prospective school-based CPS employees include a list of references in their employment applications, such as previous employers. The Talent Office does not handle reference checks. Instead, the hiring principal determines whether to check one or more of the listed references. In practice, CPS principals do not always perform reference checks before recommending that a candidate be hired and submitting the candidate to the Background Committee for clearance. In many cases, formal reference checks are not performed because a candidate has been endorsed or referred to the principal by people they trust, such as other teachers or employees. In other instances, a reference check simply is not performed.

Related to reference checks is the CPS Do Not Hire list. The CPS Law Department may designate former CPS employees as "Do Not Hire." The Do Not Hire list provides an important supplement to formal criminal background searches, as it includes former CPS employees who resigned after allegations were made against them but before formal findings were entered. The Do Not Hire list thus provides an important backstop to prevent CPS from inadvertently hiring a candidate who had been accused of sexual misconduct. CPS principals reported that they are likely to be candid with other CPS administrators regarding whether a candidate resigned amidst allegations of impropriety.

---

[62]    We note that recently enacted legislation will likely significantly expand the Rap Back program and will impact our recommendations regarding ongoing background checks depending on how that legislation is implemented by the Illinois State Police. *See* Illinois Public Act 100-0718.

If a candidate has not worked within CPS, however, the reference-check process becomes more important given the absence of a Do Not Hire list. Unfortunately, out-of-district reference checks often yield less fruitful information. Many states regulate the information that a former or current employer may permissibly disclose to a prospective employer. In addition to state laws, many employers and school districts have adopted their own formal policies regarding the disclosure of information during a reference check. Because of those laws and policies, many employers receive information designed to minimize potential liability, and many companies and school districts, as a practical matter, do not disclose much, if any, information in response to a reference check.[63]

We recommend that CPS create a consistent reference-check process for all prospective school-based hires. We further recommend that the reference-check process include a mandatory question regarding any allegations of sexual misconduct.

To generate truthful responses from a candidate's former employer, we recommend that CPS require candidates to sign a release or consent form stating that the candidate waives all claims against CPS and the candidate's former employer and authoring the former employer to provide information about the candidate.[64] To ensure that CPS does not illegally deny employment to a prospective candidate, the CPS Law Department should develop appropriate forms to be signed by candidates to authorize the release of information.

Principals currently perform reference checks. Rather than training all principals to do reference checks correctly and consistently, the Talent Office could perform reference checks. We understand that the Talent Office is establishing a system to ensure that references and employment histories are reviewed before a candidate is cleared for employment.

Although a centralized approach would be easier to apply and enforce, there are drawbacks to having people other than principals perform reference checks. For example, principals may be more open to discussing a potential candidate with another principal than with a CPS administrator. An alternative approach would be to have principals perform reference checks, but have the Talent Office request records regarding sexual misconduct through a formal, written request to the candidate's former employer(s), enclosing a copy of the candidate's consent and authorization form discussed above.

---

[63] We note that although many organizations have "no response" policies for reference checks, there is some incentive to respond truthfully regarding dangerous former employees because failing to disclose this kind of information could potentially lead to liability for the former employer if the employee engages in such conduct at his or her new employer.

[64] The form of the waiver may need to vary depending on the state in which the former employer is located.

Regardless of who performs the reference check, we recommend that CPS establish procedures to ensure that reference checks are performed. One method to ensure accountability would be to prevent the Talent Office from hiring anyone without a reference check, ideally from a former administrator. CPS could require principals to send a confirmation to the Talent Office, in writing, that a reference check had been performed. We understand that since 2016, CPS has emphasized to principals the importance of reference checks during the annual legal conferences, but in our opinion, emphasis without accountability is insufficient.

F.      Students with Histories of Committing Sexual Misconduct

Unlike its ability to exclude adults, CPS cannot simply exclude students with histories of sexual misconduct from schools. As a result, CPS has had, and will continue to have, students attending schools on a daily basis who have broken laws or victimized others. CPS is in the difficult position of balancing these students' best interests with the safety of other children. Developing specific recommendations to help CPS manage this balancing act and prevent students with histories of committing sexual misconduct from reoffending will be a major focus of our continuing evaluation, although we note some of the issues here.

Perhaps most importantly, Illinois and federal laws reduce much of CPS' discretion. Students with serious behavioral issues—including those involving sexual misconduct—have privacy rights and are entitled to a public education. CPS cannot refuse to educate a child because of the child's background. Many state and federal laws govern the confidentiality of student records, including the Family Educational Rights and Privacy Act (FERPA), the Illinois School Student Records Act (ISSRA), and the Individuals with Disabilities Education Act (IDEA).[65] CPS also cannot refuse a student who fails to present a permanent or temporary record from a previous

---

[65]    According to CPS policy: "The CPD will notify CPS only of students who have been arrested or charged by the CPD for: (1) unlawful use of weapons (720 ILCS 5/24-1); (2) violation of the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.*); (3) violation of the Cannabis Control Act (720 ILCS 550/1 *et seq.*); or (4), forcible felonies as defined in Section 2-8 of the Illinois Criminal Code (720 ILCS 5/2-8), which are listed as 'treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily and/or permanent disability or disfigurement, and any other felony which involves the use or threat of physical force or violence against any individual.'" CPS Policy Manual, § 705.1 (Reciprocal Records Agreement Between Chicago Public Schools and Chicago Police Department) (adopted December 17, 1997).

school.[66] CPS may not be aware that a student has a juvenile delinquency adjudication, much less know the circumstances of the offense.[67] As a result, CPS may not know whether to take special preventative measures with a particular child.[68]

If CPS is made aware that a student has a history of committing sexual misconduct, CPS may institute a plan to provide the student with an education, while also taking measures to protect other students. Depending on the student's eligibility for special education or accommodations, these plans could include an Individualized Education Programs (commonly referred to as IEPs) under the Individuals with Disabilities Act; 504 plans, under Section 504 of the Rehabilitation Act of 1973; CPS Student Safety Plans; and CPS Functional Analysis/Behavior Intervention Plans. CPS often develops Student Safety Plans, which address safety issues, with CPS Functional Analysis/Behavior Intervention Plans, which address student behavioral concerns.

CPS Student Safety Plans provide special supervision to particular students, which should include specific interventions to target dangerous or potentially dangerous behavior. Ideally, the school, the student, and the student's parents or guardians collaborate to create Student Safety Plans, and Safety and Security may also be involved. These plans are revised, at least every quarter, to update all involved parties with the student's progress. The plan should then be shared with any adult in the school who has an active role in the student's education, including substitute teachers.

CPS provides principals with an example Student Safety Plan for "*Sexualized Behaviors*." For students with sexual behavior problems, based on the severity and type of behaviors, these plans can include steps to ensure the following:

► The student sits alone on the bus near the bus driver, is escorted by an adult, and has specified bathrooms;

► The student is separated from the victim(s) at bus stops, on buses, in classes, or sports—with the victim(s) having the first choice of classes and sports;

► An assigned adult escorts the student;

► The student has scheduled check-ins and check-outs with a specified adult; and

---

[66] *See* 105 ILCS 10/8.1(a) (Illinois School Student Records Act).
[67] *See* 705 ILCS 405/1-8(f) (Juvenile Court Act).
[68] If a student shows up without school records, CPS must still enroll that student before obtaining their records. *See* 105 ILCS 10/8.1(a).

► The student is prohibited from certain events, locations, and privileges, like school dances, on-site daycare centers, or from being near students in special education classes, or who are three or more years younger.

Student Safety Plans may also specify penalties for non-compliance. An example Student Safety Plan includes the following language for adults who are responsible for ensuring the plan is followed, which includes an emphasis on confidentiality:

> The confidentiality of this contract is crucial. Each participant agrees that s/he will not disclose the nature of the student's adjudication of delinquency or the terms of this contract to any other person. A violation of the confidentiality of this contract is cause for discharge under the Chicago Board of Education's Employee Discipline Code. Each participant also agrees that s/he will make every effort to ensure that students who are affected by this contract are not stigmatized. . . . All participants are aware that an overly restrictive safety contract may be detrimental by creating a negative self-fulfilling prophecy that could increase risk. Participants have reviewed the results of a current sex offense specific evaluation/risk assessment to ensure that the appropriate level of supervision has been implemented for the student's level of risk.

In interviews, CPS principals had mixed reviews as to the effectiveness of Student Safety Plans in correctly balancing the interests of students. Some principals called for increased transparency for children who have committed sex crimes. Other principals did not trust communities to use that information constructively and feared employees creating self-fulfilling prophecies of failure for children with Student Safety Plans.

Balancing the public interest in protecting children from students with a record of sexual misconduct with the public interest in rehabilitating those children is a question not only for CPS, but for the community at large. Current laws may appropriately balance those interests, or they may not. It may be in the best interest of many school communities if, for example, Illinois law were to make information about students who have been convicted of sex crimes more available to school principals and employees, but these choices are largely outside of CPS' control. We also note that the students who need extra attention, such as detailed Student Safety Plans, are not evenly distributed across schools or grades. Some schools may need additional resources and assistance to manage students effectively.

G.    Building Security

School security has been a focus area for CPS in recent years, particularly with respect to gun violence. School building security is partially outside the scope of our evaluation, but we discuss building security insofar as it is relevant to preventing

sexual misconduct.[69] Improvements to building security will ensure that unauthorized people are not able to commit misconduct in the future.

As noted above, CPS is one of the largest school districts in the nation. Each school is unique. In some instances, multiple schools are located within a single building; in other instances, a single school spans multiple buildings.[70] While some security protocols may not be feasible or even advisable in each school,[71] CPS should at least consider the following security measures for each school:

▶ **Visitor Sign-In and Sign-Out Sheets.** We recommend that security require all visitors to sign-in and sign-out so that there is a clear record of access during school hours. One method that some CPS schools use to ensure visitors sign out is for school security or administrative employees to hold onto visitors' IDs until they leave.

▶ **Requiring Visitors IDs.** Schools should require visitors to present photo identification to enter a school. Security should then provide visitors with a temporary visitor pass. Some schools have the ability to scan copies of the visitor's ID and print a temporary photo ID. Either way, visitors should have and visibly display visitor IDs.

▶ **Photo-ID Badges.** We recommend that CPS require that every adult authorized to be in a school wear and display photo-ID at all times. This would include employees, vendors, and volunteers. To minimize the impact of stolen ID cards, CPS should periodically reissue IDs, and use a different color background to allow observers to quickly differentiate between valid and expired IDs.

Requiring ID badges for adults is about more than just building security; it is also about creating a district-wide culture that sends the message that the CPS community cares about student safety and that all eyes are watching to report unrecognized adults and inappropriate conduct. As a result, we recommend that CPS place these ID rules in every CPS handbook for employees, students, parents, and guardians, so that both adults and students will know the rule and to react if they observe any adult not wearing an ID.

---

[69] Nearly all known incidents of sexual misconduct at CPS were committed by a trusted adult or a student, rather than by a stranger who snuck into the school.

[70] To illustrate the differences between schools that affect potential district-wide security measures, we note that one school even has a 78-acre campus that includes a functioning farm and that some other schools share their buildings with other organizations, such as the Chicago Park District.

[71] A minority of principals said that CPS did not provide enough security cameras for their schools, which they believed may be cost-prohibitive. Adding additional security cameras may not be economically feasible, but security cameras provide clear benefits to preventing sexual misconduct and responding to sexual-misconduct allegations, such as direct evidence to convict or exonerate the accused.

# Policies & Procedures

### III.     Policies and Procedures

KEY RECOMMENDATIONS

→ Comply with Erin's Law, and create and implement clear policies, procedures, and guidelines, including rules and standards for appropriate boundaries between adults and students.

→ Maintain current policies, procedures, and guidelines in one, easily searchable source.

→ Ensure that policies and procedures regarding sexual misconduct against students are available to everyone, including students, parents, and guardians.

→ Convert policies and procedures into condensed, easy-to-read student materials that highlight the most important takeaways and are consistent, engaging, and age-appropriate.

→ Monitor compliance and update policies on an ongoing basis to address weaknesses and new and unique challenges across schools and grade levels.

→ Create or update uniform employee, student, parent, and guardian handbooks, which contain all relevant policies and procedures regarding sexual misconduct involving students and appropriate boundaries.

### A.     Title IX & Best Practices

Title IX requires CPS to have policies and procedures to address unwanted sexual contact against students, and CPS should have policies and procedures to address sexual misconduct, generally. These policies should include, among other things:

▶ Prevention strategies for students, employees, vendors, volunteers, parents, and guardians, including the following:

• How to identify signs of sexual misconduct and the importance of reporting questionable conduct early, before a hostile environment develops or sexual misconduct occurs;[72] and

---

[72]  The CPS Inspector General and the Office of Student Protections and Title IX will split jurisdiction between allegations regarding adult-on-student sexual misconduct allegations and student-on-student sexual misconduct allegations, respectively.

- Policies for monitoring and securing school environments—such as locked classrooms, storage rooms, and offices—especially before and after class.[73]

► Background-check policies for all adults.

► Rules and standards addressing appropriate and inappropriate oral, written, electronic, and physical conduct before, during, and after school. These rules should include exceptions (such as an appropriate employee helping a special education student who needs help using the restroom) and address "gray areas" like the following:

- Interactions between students over the age of consent and students under the age of consent;

- Interactions between students over the age of consent and adults;

- Transporting students (*e.g.*, to and from athletic events);

- After-school tutoring guidelines;

- An employee giving special attention toward a student; and

- Social-media boundaries.[74]

► Policies establishing that neither illegal nor inappropriate conduct will be tolerated and can lead to termination of employment.

► Guidance for reporting potential sexual misconduct, including:

- An internal and external reporting policy that provides clear channels for reporting suspected sexual misconduct by students and by adults;

- Mechanisms for reporting concerns to the state education officials who certify and license educators—*i.e.*, the Illinois State Board of Education (ISBE); and

- The prohibition of false reports.

► School and district-wide systems to ensure impartial investigations, including how to handle evidence (*e.g.*, sexual images or "sexts" sent between children).

---

[73] *See* U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*.

[74] *See id*.

► Methods for requesting and sharing records between schools and districts that address employees' formal reprimands and dismissals for violating policies regarding sexual misconduct.[75]

CPS should adopt the policies mentioned above in addition to the mandated reporter policies under Illinois law.[76]

Further, CPS should share its policies with all stakeholders, so the people of Chicago know how their children are being protected and can provide feedback to improve and update these methods. The U.S. Department of Education, for example, recommends that school districts post policies and procedures on their websites and share them with parents; all school employees every school year during orientation; all school volunteers, vendors, new school employees, and volunteers as they come on board; the school board; state agencies; and law enforcement.[77]

Finally, CPS should have policies and procedures to address sexual misconduct not only because it follows best practices, but because it is the law. "Erin's Law" requires CPS to "adopt *and implement*" policies addressing sexual abuse.[78] While Erin's Law does not require specific policies or procedures, it provides recommendations, which we recommend CPS adopt and we discuss in the relevant sections of this report.[79]

As described in the following subsections, to date, CPS has partially complied with Erin's law by *having* "policies addressing sexual abuse." CPS has not, however, effectively *implemented* those policies.

---

[75] *See id.* at 13.

[76] *See id.* at 17-18.

[77] *Id.* at 12.

[78] 105 ILCS 5/10-23.13 (emphasis added). Erin's Law is named after Erin Merryn, an activist, author, and survivor of child sexual abuse. Erin's Law is intended to "shatter the silence and stigma around sexual abuse and educate children and empower them with their voice." *See* https://www.erinslawillinois.org/about/.

[79] These recommendations include the following: "age-appropriate curriculum for students in pre-K through 5th grade; training for school personnel on child sexual abuse; educational information to parents or guardians provided in the school handbook on the warning signs of a child being abused, along with any needed assistance, referral, or resource information; available counseling and resources for students affected by sexual abuse; . . . emotional and educational support for a child of abuse to continue to be successful in school[;] . . . methods for increasing teacher, student, and parent awareness of issues regarding sexual abuse of children, including knowledge of likely warning signs indicating that a child may be a victim of sexual abuse; . . . actions that a child who is a victim of sexual abuse should take to obtain assistance and intervention; and . . . available counseling options for students affected by sexual abuse." 105 ILCS 5/10-23.13.

B.    CPS Policies and Procedures

With these best practices in mind, CPS has had comprehensive policies and procedures in place for a long time. Here is a non-exhaustive list of relevant Board policies in effect:

► 102.8: Comprehensive Non-Discrimination Title IX and Sexual Harassment (adopted May 25, 2016);

► 410.5: Policy for School-Based Health Centers (adopted September 23, 1998);

► 504.10: Student Teacher and Pre-Service Teacher Enrollment (adopted April 26, 2006);

► 511.1: Reporting of Child Abuse and Child Neglect (adopted July 23, 2008; recently amended June 27, 2018);

► 604.1 Acceptable Use of the CPS Network and Computer Resources (adopted July 22, 2009) (changes pending);

► 604.3: Student Travel (adopted May 26, 2010);

► 704.4: Domestic Violence, Dating Violence and Court Orders of Protection, Restraint or No Contact (adopted June 25, 2008);

► 704.5: Student Social and Emotional Health Policy (adopted September 22, 2004);

► 704.6: Sexual Health Education (adopted February 27, 2013);

► 705.5: Student Code of Conduct for Chicago Public Schools (adopted July 25, 2018);

► 705.6: Procedures for Interviewing Students in Chicago Public Schools (adopted July 23, 2008); and

► 801.2: Volunteer policy (adopted March 26, 2014) (changes pending).

CPS has many other policies, procedures, guidelines, manuals, and school-specific handbooks. Unfortunately, they are spread throughout different platforms and sometimes contain conflicting information or priorities and may be out of date.[80] Many principals expressed confusion or frustration with where the policies and

---

[80]   There are policies and procedures, for example, on the Chicago Board of Trustees website, CPS' human resources website ("HR4U"), CPS' online "Knowledge Center," and on individual school websites.

procedures were located, how they were organized, and how new policies and up-dates were delivered. Some principals use Google to find CPS policies, without confirming that the search result produced the current policy. Thus, we recom-mend that CPS maintain current policies, procedures, and guidelines in one, easily searchable source.

We further recommend that CPS make the policies and procedures regarding sex-ual misconduct involving students available to everyone, including students, par-ents, and guardians. CPS should also distill the most relevant aspects of the policies and procedures regarding sexual misconduct into district-wide handbooks for em-ployees, students, parents, and guardians. Most of the principals we spoke to thought that district-wide handbooks would be helpful, although some principals may want to supplement these handbooks with school-specific information. CPS could also update its Student Code of Conduct, which already includes policy ref-erences for students, parents, and guardians.

Following our suggestion, CPS recently sent a template employee handbook to principals, which includes, for example, policies mandatory reporting and appro-priate boundaries between adults and students. CPS will have to update this hand-book as policies and procedures develop and the new Office of Student Protec-tions and Title IX takes form.

While well-drafted policies and procedures can influence positive change, school culture is often what determines good behavior, with or without policies and pro-cedures. The most perfectly crafted policy at a school that does not care to know or follow it is worth less than a mediocre policy at a school that cares. Thus, we determined that a line-by-line breakdown of each policy and procedure is unlikely to be fruitful for the purposes of this preliminary report. But one CPS policy, de-scribed in the following section, provides a perfect example of CPS' general issue: reasonable policies with ineffective implementation.

C.      Appropriate Relationships Between Adults and Students

        1.      The CPS Policy

In 2017, CPS issued guidance addressing appropriate boundaries between stu-dents and employees in a document titled "Guidelines Regarding Maintaining Pro-fessional Staff/Student Boundaries" ("Guidelines"). CPS also discussed these Guidelines with administrators during the 2017 Legal Conference. The Guidelines note that healthy relationships between students and school employees are im-portant to protect both students from sexual misconduct and adults from misun-derstandings and false accusations. The Guidelines apply to "all staff members, including and without limitation to teachers, coaches, counselors, administrators,

volunteers and other third-parties who interact with students." As written, we believe that the Guidelines are a good start, but that CPS will have to refine the Guidelines over time, for reasons described below.

The Guidelines prohibit, for example, employees from singling out students for personal attention or friendship beyond the normal employee-student relationship; gift giving, other than nominal gifts to multiple students; sexual banter and flirting; and inappropriate physical contact. The Guidelines also prohibit employees from initiating, accepting, or communicating with students on social networking sites and prohibit employees from transporting a student without written consent from the principal and the student's parent or guardian and without having an additional adult present.

While predators may not be deterred by any policy, these Guidelines could prevent sexual misconduct against students by adults by helping the CPS community identify warning signs and stop inappropriate behaviors, and by fostering a culture where everyone is encouraged and expected to report questionable conduct.

For example, these Guidelines may be particularly helpful at assisting the CPS community with identifying "grooming," the process by which a perpetrator seeks to gain the trust of a potential child victim to normalize sexual conduct over time. In general, perpetrators may engage in four stages of "grooming": (1) targeting a potential victim; (2) building trust and friendship; (3) starting to isolate and control the victim and building loyalty; and (4) initiating sexual contact and securing the victim's secrecy.[81]

Establishing appropriate boundaries between adults and students is a starting point for detecting grooming behaviors before sexual contact can occur. The Guidelines should help members of the CPS community more readily recognize and stop inappropriate and unprofessional behaviors before sexual misconduct occurs. If a potential perpetrator's grooming behaviors are outside the acceptable, established interactions between adults and students, then it is much easier for others to detect grooming behaviors and root out potential perpetrators before inappropriate relationships develop or sexual contact occurs.

  2.  Enforcement Mechanisms

In theory, once the CPS community is familiar with the Guidelines, their enforcement will help innocent personnel avoid any appearance of impropriety while deterring improper relationships with students. As broadly defined by CPS policy,

---

[81] Brackenridge, Fasting. *The Grooming Process in Sport: Narratives of Sexual Harassment and Abuse* (2005), 5.

most instances of grooming will be very hard to prove,[82] because it relies on proving that behavior that may otherwise look innocuous is part of a pattern of improper conduct with improper motivations.[83] The best way to prevent improper relationships from occurring is not to wait to prove that grooming actually occurred but to prevent situations that could lead to grooming from ever occurring. The Guidelines, properly implemented, will help adults avoid situations that could appear improper and recognize situations that actually involve or could lead to inappropriate relationships.

A well-written boundaries policy expresses both specific rules and general guidelines for interactions between adults and children. The rules should prohibit activities that clearly should not occur between adults and students, such as a teacher inviting a student to his home or to dinner without parent approval. More general guidelines should be provided to help adults navigate conduct that may be proper and beneficial under certain circumstances but improper under others, such as one-on-one tutoring, congratulatory hugs, and so forth.

When administrators enforce the rules and standards of a boundaries policy, well-intentioned adults—that is, most adults—will be incentivized to learn and think about what appropriate boundaries are, and to recognize and report potentially inappropriate conduct. Administrators then can evaluate the conduct, consider whether discipline is appropriate, counsel the adult to avoid such conduct in the future, and monitor the situation to ensure that inappropriate activities do not continue.

Many principals were skeptical of whether the rules and standards in the Guidelines were enforceable as written. With this in mind, we recommend that CPS

---

[82] According to CPS policy, grooming is "behavior an adult uses to build an emotional connection with children to gain their trust and break down their inhibitions for the purpose of sexual abuse." CPS Policy Manual § 511.1 (Reporting of Child Abuse, Neglect and Inappropriate Relations Between Adults and Students) (updated June 27, 2018). The policy adds that "An adult may be 'grooming' a child or engaging in inappropriately intimate behavior with a child when the adult creates isolated, one-on-one interactions with a child (e.g., transporting a child without the written authorization of the principal and the parent, texting or direct messaging); gives gifts to a particular child (e.g., money, clothing); crosses physical boundaries (e.g., touching, giving prolonged frontal hugs, or making the child sit on the adult's lap)."

[83] The Illinois Criminal Code's definition of "grooming" is also narrower than CPS' definition: "A person commits grooming when he or she knowingly uses a computer on-line service, Internet service, local bulletin board service, or any other device capable of electronic data storage or transmission to seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice, a child, a child's guardian, or another person believed by the person to be a child or a child's guardian, to commit any sex offense as defined in Section 2 of the Sex Offender Registration Act, to distribute photographs depicting the sex organs of the child, or to otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child. As used in this Section, 'child' means a person under 17 years of age." 720 ILCS 5/11-25.

reevaluate which conduct should be governed by a rule or a guideline and confirm that expectations and disciplinary criteria are clear for both adults and students.

### 3.    Implementing the Guidelines in the CPS Community

CPS has not taught or implemented the Guidelines effectively or sufficiently, rendering them ineffective. Even though CPS introduced the Guidelines in 2017 and posted the Guidelines on CPS' new "Protecting Chicago's Students" website[84] in response to the Chicago Tribune's *Betrayed* series, the vast majority of interviewed principals and assistant principals said that they had not seen the Guidelines.[85] At one end of the spectrum, some principals reported that they had adopted portions of the Guidelines or similar rules within their individual school handbooks and discussed them with employees annually during fall "professional development" days. On the other end of the spectrum, some principals reported essentially no familiarity with the Guidelines. Others had only limited familiarity with the topics contained in them and had not discussed these topics with employees, let alone vendors, volunteers, students, parents, and guardians.

CPS took several steps to communicate the Guidelines to its school leaders and administrators. But the fact that most of these leaders still did not know the Guidelines exist shows that CPS' steps have been insufficient and ineffective.[86]

Unsurprisingly then, schools have implemented the Guidelines in varying degrees. Some principals reported that they enforced the Guidelines or similar rules and that their employees had found alternative ways to accomplish communication with their students while still complying with the Guidelines. Other principals acknowledged that employees at their school consistently violate the Guidelines by, for example, permitting coaches to text message students privately or permitting coaches to transport students without prior permission. Many CPS employees appear to follow this reasoning: "Of course these policies are important, but they do not apply to me because I am not a predator." This is a dangerous mindset and can lead to a dangerous culture. CPS' ability to prevent sexual misconduct cannot rely on the CPS community's ability to accurately guess intent.

We recommend that CPS take steps to train principals, employees, vendors, volunteers, students, and guardians on the Guidelines, and then *enforce* the Guidelines. As discussed in the next section, this training should not only provide a copy of the Guidelines, but also explain why the Guidelines are important, and how they

---

[84]  *See* CPS.edu, *Protecting Chicago's Students* (last modified July 27, 2018), https://cps.edu/pages /protectingstudents.aspx (last visited August 16, 2018).

[85]  In fact, during the July 2018 Legal Conference, CPS quickly reiterated the existence of the Guidelines to administrative staff. Still, most administrators who attended the 2018 Legal Conference before we interviewed them remained unaware of the Guidelines.

[86]  The Guidelines should be an important part of a mandatory online training, as discussed in Section IV (Training).

help detect and deter sexual misconduct. The training should also address the perceived drawbacks of certain aspects of the Guidelines. Better training on the Guidelines will also lead to more reporting of grooming behaviors and should operate to help prevent inappropriate relationships from forming or progressing.

### 4.    Moving Forward

As written, the Guidelines can help the CPS community navigate appropriate relationships between adults and students.[87] Because these Guidelines will need to be tried and tested within CPS, we do not speculate about which parts of the Guidelines will work and which will need to be amended.[88] We do, however, have some additional general recommendations for CPS to consider:

▶ **Address Positive Activities.** Given the recent scrutiny, many principals expressed concern that the Guidelines would deter positive relationships and that even good employees would resist beneficial student relationships if they fear losing their jobs after false reports. To provide clearer guidance to employees about what is appropriate, and to not discount the importance of positive relationships, the Guidelines should provide some examples of affirmative, permitted conduct between employees and students. Many principals—particularly those whose students suffer from higher rates of violent crime and poverty in their communities—emphasized the need for strong bonds between employees and students. As they put it, some students come to school with unique problems and struggles and, thus, need special attention. Some students, for example, do not receive sufficient support outside of school, and they may not see a purpose in education or investing in themselves unless they learn it in school. Some of these students may also have challenges with their peers or responding to authority, unless it is from a trusted adult with whom

---

[87]  A U.S. Department of Education report provides detailed guidance regarding appropriate versus inappropriate conduct. *See* U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*. Appropriate conduct between adults and students, for example, includes praise, positive reinforcement for good behavior or work product, humor and friendly comments, non-personal compliments, and interactions with students that are in plain sight, with doors open. Examples of inappropriate conduct, on the other hand, include sexually provocative or degrading comments, risqué jokes, singling out students for favors, personal written notes or electronic communications between adults and students, and suggestive teasing that references gender or sexual innuendo.

[88]  We note, however, that the Guidelines may be unnecessarily restrictive in some instances, as pointed out by many principals—who are ultimately responsible for enforcing the Guidelines—once we showed them the Guidelines. This is particularly true with respect to limiting the resources that staff may use to communicate with students. We understand that CPS is currently reviewing its policy regarding approved electronic resources. As part of that review, we recommend that CPS ensure that appropriate phone applications and other classroom tools are vetted and permitted, so that principals and teachers do not feel inclined to simply disregard the policy as too restrictive.

they have a personal connection. Principals pointed to healthy relationships between employees and students as a method for reducing student misconduct and fostering a positive school culture.[89] Principals uniformly agreed that the Guidelines—if known and implemented—could help foster these healthy and necessary relationships.

▶ **Consider Differences Between Age Groups.** CPS should consider whether it would be useful for the Guidelines to discuss differences in appropriate contact between age groups, from pre-kindergarten through twelfth grade.

▶ **Note Special Circumstances.** For clarity, the Guidelines should address the existence of unique student relationships and contacts, including student groups that need extra attention and services, *e.g.*, students with disabilities who need assistance in the restroom or with other activities of daily living.

▶ **Post-Incident Reporting.** CPS cannot write the Guidelines in a digestible format that anticipates all circumstances. In case these policies are overly restrictive or fail to foresee some necessary exception, employees should still be required to report exceptional circumstances immediately. If the policy prohibits employees from being alone in a closed room with a student, for example, but a seriously distraught student comes into a teacher's room crying and needing a moment to calm down, a teacher may decide that it is best to give that child a moment to recover. In that instance, the teacher should report that exceptional circumstance to the principal. The principal should then record the incident report, not to punish the teacher—unless the teacher's decision was somehow egregious—but to explain why the Guidelines were not followed, to promote transparency, to protect everyone involved, and to track trends.

▶ **Enforce, Monitor, and Update.** CPS should welcome and consider feedback from school leaders who are required to enforce the Guidelines, because there may be aspects of the policy that work well in some schools but have unintended consequences in others. For example, some principals said that some employees are friends with students on social media—especially to keep up with and assist former students who are in college. Principals mentioned that some employees have used social media to identify serious threats between students, which the school has then used to prevent disputes or violence. Most principals, however, said that students will raise those issues to CPS employees by themselves, and the risks of social media connections between adults and students outweigh the benefits. This latter set of principals may be correct, or

---

[89]  The number of students who need this extra support varies among schools—with some principals saying that all students in their schools need someone that they connect with. One staff member cannot have this bond with all students, and schools will need to divide and conquer. According to some principals, the student is often the one who chooses the adult to will connect with, which is why the relationship works.

both sets of principals may be accurately reflecting differences in cultures at their schools. CPS must keep in mind the unintended consequences of the Guidelines, listen to feedback from principals regarding recurring and new challenges (such as technology and changing norms), and be flexible when necessary—even if that means making some school-specific modifications for some aspects of the Guidelines.

# Training

### IV.    Training

KEY RECOMMENDATIONS

→ Train and frequently remind CPS employees, vendors, and volunteers how to prevent, identify, report, and respond to sexual misconduct—and that they are responsible for doing so. This training should include the following:

- Annual webinars for all adults who participate in school programs and events;

- Annual Illinois Department of Children and Family Services Mandatory Reporting Training;

- A notification checklist to all members of the CPS community;

- Annual, district-wide training sessions during student and employee orientation (also known as "professional development" days for employees);

- Age-appropriate education regarding sexual misconduct and appropriate boundaries across all grade levels; and

- Training sessions for parents and guardians.

→ Create accountability for trainings by requiring proof of attendance and comprehension and by tying this proof to evaluations.

→ Use experts, such as the Chicago Children's Advocacy Center, to train CPS employees and members of the Title IX Office.

### A.    Title IX & Best Practices

As referenced in the previous section, to prevent sexual misconduct, CPS must create, maintain, and regularly update its policies and procedures that prohibit sexual misconduct, identify the warning signs of sexual misconduct, and explain how members of the CPS community should report and respond to allegations of sexual misconduct.[90] All members of the CPS community must understand and appreciate these policies to prevent, identify, stop, and respond to sexual misconduct. Employees, vendors, volunteers, students, parents, and guardians must hold each other accountable. This accountability is particularly important because reports of sexually misconduct cannot be expected to always come from the victims. In fact, children who have been successfully "groomed" by predators are unlikely to come

---

[90]    *See also*, U.S. Department of Education Office for Civil Rights, *Revised Sexual Harassment Guidance*, 25.

forward until it is too late. To best protect children—inside or outside of school—CPS and the City of Chicago need all stakeholders to be ready, willing, and able to report inappropriate behaviors and sexual misconduct against children. For this reason, all members of the CPS community must understand not only the "what" but also the "why" behind the rules. High-quality training can help them get there.

Specifically, CPS must provide general training regarding sexual misconduct involving students for employees, students, parents, and guardians. Most of this section is devoted to discussing this training, but it is also important that CPS provide specific training for administrators, investigators, and clinical employees to effectively prevent and address sexual misconduct against students without unnecessarily interrupting schools, re-traumatizing victims, or jeopardizing future DCFS, CPS Inspector General, criminal, or Title IX investigations.[91] We recommend that the Office of Student Protections and Title IX (OSP)—with the help of experts—develops, administers, and monitors all of these training sessions.

CPS should implement a mechanism to ensure that all employees, vendors, volunteers, and students complete trainings regarding sexual misconduct against students. CPS can, for example, require employees, vendors, and volunteers to certify that they have completed mandatory web-based training regarding sexual misconduct every year. To make these requirements meaningful, CPS administrators must also hold employees accountable by issuing unfavorable evaluations or taking disciplinary action against people who do not complete mandatory trainings or follow the corresponding policies and procedures.

At minimum and as a starting point, CPS should require annual sexual misconduct trainings for all CPS employees. These trainings can be web-based, with advancement through each "level" of the training determined by whether trainees answer specific questions correctly. Training for new hires should occur before they begin working with students.

Additionally, CPS should soon require mandatory training for vendors, Level One volunteers, coaches, and students through a similar web-based training interface.[92] These trainings should also be strongly encouraged for parents and guardians. CPS should offer a separate training for each group listed above so that the content of the training can focus on each group's responsibilities in identifying, preventing, and reporting sexual misconduct.

Trainings should focus on more than Title IX compliance and explain what sexual harassment, sexual misconduct, and sexual violence are,[93] how to identify warning

---

[91]  The importance of this training is discussed further in the following section (Reporting).

[92]  *See, e.g.*, U.S. Government Accountability Office, *Child Welfare*.

[93]  *See* U.S. Department of Education Office for Civil Rights, *Dear Colleague Letter* (April 4, 2011), 14, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

signs, and how to keep students safe. Importantly, trainings must include detailed information about warning signs and "grooming" behavior.[94] Relatedly, trainings should also include a component on how to identify the warning signs of *online* sexual misconduct. This training component should emphasize issues that may arise with the use of electronic applications, such as texting and social media.

We also recommend that CPS create or update district-wide employee, student, parent, and guardian handbook or materials and take related steps to ensure that CPS policies and procedures regarding sexual misconduct and appropriate boundaries are applied uniformly. Since CPS already includes policy references for students, parents, and guardians in the Student Code of Conduct booklet, CPS could supplement this booklet with the updated policies and procedures regarding appropriate boundaries and sexual misconduct against students.

B.      CPS Training

Despite thorough policies and procedures, CPS failed to achieve uniform adoption and application of its policies and procedures, because it lacked proper training.

Many principals said that they do not recall any type of training regarding sexual misconduct involving students besides the DCFS mandatory reporter training when they were hired. Other principals reported that they could not remember being trained on sexual misconduct at all, and that if it ever came up, the topic was not emphasized enough to remember. As a result, most principals said that they only learned how to respond to sexual-misconduct allegations on the job as issues arose.

We include below a description of CPS' historical training practices, the deficiencies in those practices, and some additional, specific recommendations expanding on the best practices discussed above.

1.      CPS Employees

Illinois law requires all CPS employees to be "mandated reporters."[95] Mandated reporters must immediately call the DCFS hotline when they have reasonable cause to believe that a child known to them in their official capacity as a CPS employee may have been abused or neglected. Since 2008, all new CPS employees

---

[94] *See* U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*, 8 (defining grooming as "desensitizing the student to inappropriate behaviors and making the child feel special in sexual and nonsexual ways"). *See also* EduRisk, *Educator Sexual Misconduct*.

[95] 325 ILCS 5/1 *et seq*. *See also* CPS, *Crisis Management Manual* (2012), 92-93, *available at* https://chooseyourfuture.cps.edu/sites/default/files/crisis_final_manual_update.pdf.

were required to complete an online training provided by DCFS regarding mandatory reporter obligations.

Some principals reported that they required their employees to annually complete this online training because they believed it was mandatory or was in accord with best practices, but most principals did not require employees to complete it annually. We are not aware that CPS had any requirement before June 2018 that employees complete training annually.

CPS' new policy, effective in June 2018, requires that all employees annually complete the DCFS mandatory reporter online training. The policy also requires each employee who completes the DCFS online training to retain a copy of the certificate of completion and provide it to their principal or supervisor.

We recommend that CPS requires principals to verify that all CPS employees in their buildings have completed the training before the start of every school year and to verify that new employees hired during the school year have completed that training before having contact with children. We further recommend that network chiefs require principals to certify that they have complied with this requirement and maintained a file of their employees' certifications. We further recommend that principals and teachers be held accountable through their evaluation process by providing these certifications to their supervisors.[96] If CPS holds principals and other employees accountable in this way, employees will complete the training, know their reporting requirements, and understand the importance of reporting suspected abuse and neglect.

In addition to the DCFS mandatory reporter training, administrators historically received formal training on appropriate boundaries and sexual misconduct only through the annual Legal Conference, which addresses various legal topics and CPS policies.[97] Some principals reported that they were told at the annual Legal Conferences to convey this information to their employees during fall professional-development days. Some reported that they did so, but many did not, and the depth and content covered varied from school to school. Some principals added that they did not feel competent to meaningfully train their schools on information that was only briefly covered during one session of a one-day legal conference.

We understand that CPS will now require all schools to devote time annually during fall professional-development days to discuss appropriate boundaries, mandatory reporting, and sexual misconduct. To help ensure consistency of content, we

---

[96]  Principals should also provide proof during their evaluations that their school employees received requisite trainings.

[97]  The vast majority of interviewed principals reported that the Legal Conference was useful, and many recommended that CPS extend the Legal Conference from one to two days.

recommend that CPS provide materials to principals, *e.g.*, a straightforward PowerPoint presentation with simple bullet points and guidelines, copies of the relevant policies and guidelines, and several hypothetical situations for principals to discuss with their employees.[98]

One training at the beginning of the year, however, is unlikely to ensure that people sufficiently understand these issues. CPS may need to encourage additional sessions during the year to refresh what employees learned in the beginning of the year and supplement that training with additional insights or updates. We understand that CPS is developing additional trainings for employees on these topics with the help of the Chicago Children's Advocacy Center and that CPS is planning for all employees to receive training from the OSP during the 2018/2019 school year.

Further, as a more general recommendation, we believe it would be beneficial for CPS to provide principals with a checklist of additional mandatory topics to cover during fall professional-development days. Of course, principals need to exercise their own discretion in determining what topics to cover during this limited and valuable time, but there are certain universal topics that should be included. Many interviewed principals reported that they would find a checklist useful, as they were unclear which topics CPS required, or preferred, them to address during fall professional development beyond required teacher evaluation training (REACH).

We recommend that all principals and employees annually receive a training specifically geared towards understanding and implementing CPS policies and procedures regarding sexual misconduct and appropriate boundaries. Because of the sheer number of CPS employees, the most practical training method is likely an online webinar.[99] Another benefit of online training is the ease of accountability, because participation and completion can be tracked electronically.

CPS recently created a universal, district-wide employee handbook that includes CPS policies and procedures regarding appropriate boundaries and mandatory reporting. We recommend that CPS continue to update this handbook as other policies and procedures regarding sexual misconduct against students develop, including reporting structures.

### 2.  Volunteer Training

The vast majority of principals were not aware of any volunteer training that related to appropriate boundaries or sexual misconduct. A few principals reported

---

[98]  CPS is also working with the Chicago Children's Advocacy Center to develop training for principals to deliver during this year's fall orientation.

[99]  We understand that CPS intends to work with the Chicago Children's Advocacy Center to develop web-based training. We recommend that the training has an interactive education component and certification after completion.

that they believed volunteers might receive some informal guidance on appropriate boundaries, but they did not know any more details.

We recommend that volunteers also receive mandatory instruction as a component of the volunteer application regarding appropriate boundaries, including appropriate physical contact, electronic communication, social media, and transportation. This training could also be conducted through an interactive online training rather than through an in-person training. CPS could hold volunteers accountable by refusing to approve the volunteer application until the volunteer completes the online training. To be clear, we believe that the OSP should oversee creation of this training rather than Family and Community Engagement.

We do not recommend that this training be mandatory for Level Two volunteers. Level Two volunteers have minimal student contact, and this training may unnecessarily deter them from participating in school activities.

### 3.    Vendors

We are not aware of any training requirements for vendors regarding sexual misconduct against students. We recommend that CPS require vendors that have substantial student contact to complete an online training regarding appropriate boundaries and that CPS take appropriate steps to ensure accountability.

### 4.    Students

Most principals reported that their students did not receive any instruction or training relating to appropriate boundaries or how to respond if they are concerned about inappropriate conduct by an adult, other than general instruction to tell a trusted adult about any concerns. A minority of principals reported that during fall student orientation their students receive instruction regarding appropriate boundaries between adults and students. Even fewer principals reported that students are given periodic refreshers on appropriate boundaries. Some of these principals partnered with outside vendors to provide specific instruction to their students regarding appropriate boundaries between adults and students.

At minimum, we recommend that CPS require all schools to include in their student handbooks (or in the Student Code of Conduct) a discussion of appropriate boundaries and ways to report inappropriate adult behavior.

CPS should go further, and we understand that it is in the process of developing additional training sessions. We recommend that CPS provide students with age-appropriate instruction regarding appropriate boundaries between themselves and adults, including but not limited to school employees, and education for preventing, identifying, and reporting sexual misconduct to all grade levels. At mini-

mum, we recommend that some instruction occur during fall orientation. To ensure that students actually receive instruction on appropriate boundaries and how to report potential misconduct, CPS should implement appropriate mechanisms to ensure accountability and keep records to reflect which students received an age-appropriate training.

Because there is already some overlap and only so much time in a school year, CPS could include instruction on these issues in its Sexual Health Education curriculum. Currently, schools must instruct kindergarten through fourth grade students 300 minutes per year on Sexual Health Education and fifth through twelfth graders for 675 minutes per year.[100] CPS reports that only 15% of schools meet these requirements. In fairness, minutes requirements may not be the best metric for a successful Sexual Health Education program.

As a further complication, parents and guardians are permitted to opt their children out of the Sexual Health Education curriculum. CPS may therefore want to conduct training regarding sexual misconduct separately. Parents who object to their children learning about safe sex may not object to their children being taught how to guard against predators. If CPS chooses to incorporate this training into the Sexual Health Curriculum, we recommend that it provide an alternative online training for those students whose parents opt them out of the Sexual Health Education curriculum, subject to a separate opt-out.[101]

If CPS does incorporate training regarding sexual misconduct into its Sexual Health Education curriculum, we recommend that CPS re-evaluate the curriculum, identify the most important aspects of the curriculum that students need to receive, and then make sure that they receive it.

5.     Parents and Guardians

Most principals told us that they do not offer training for parents or guardians regarding sexual misconduct against students. While some principals provide some information regarding mandatory reporting requirements for CPS employees and contact information for support services in their school-specific parent and guardian handbooks, these handbooks are inconsistent.

A handful of principals reported that they have general information sessions with parents that may cover CPS policies and procedures. At least one school has pro-

---

[100] Principals reported varying levels of compliance with the mandate to teach Sexual Health Education, with some schools reporting that minimal, if any, instruction was provided, and other principals reporting that the minute requirements were satisfied through Sexual Health Education taught during health class, physical education class, biology class, or other methods.

[101] Some schools may also receive waivers from the Sexual Health Education curriculum. We recommend that these students also receive an online training.

vided trainings, including sessions in Spanish, for adults using methods the employees learned from the Chicago Children's Advocacy Center. Most principals said that it is difficult to get parents to attend these events and that the level of community involvement depends on the community.

We recommend that CPS find ways to educate and train parents on how to identify and report sexual misconduct against children, especially with the help of experts like the Chicago Children's Advocacy Center. This approach must include, at minimum, parent and guardian handbooks that uniformly address these topics—or sufficient updates to the Student Code of Conduct—for all CPS communities and in all necessary languages.

# Reporting

## V.     Reporting

KEY RECOMMENDATIONS

→ Provide clear avenues for mandatory, optional, and anonymous reporting of actual and suspected sexual misconduct.

→ Clarify what type of conduct triggers mandatory reporting requirements, particularly conduct that may be categorized as "grooming."

→ Implement a system to report and track allegations and incidents.

→ Log and analyze data, identify trends, and regularly share this data with stakeholders, including the Chicago Board of Education.

→ Create a culture of reporting through transparency, due process, and clear understandings of rights, responsibilities, and expectations, prohibiting retaliation for raising a concern or reporting an incident.

→ Train CPS employees on "information gathering" to address school issues and on filing effective reports without unnecessarily interrupting schools, re-traumatizing victims, or jeopardizing future DCFS, CPS Inspector General, criminal, or Title IX investigations.

→ Provide administrators with a straight-forward reporting checklist with key contact information.

A.     Title IX & Best Practices

Reporting allegations and incidents of sexual misconduct quickly is essential to complying with Title IX, the success of investigations, providing assistance to victims, stopping perpetrators, and preventing further misconduct. A well-designed system for tracking reports also allows data analysis to identify patterns, to improve methods, and to target issues that need specific attention.

Under Title IX and Illinois law, school employees must report sexual misconduct against students.[102] In designing procedures to report incidents of sexual misconduct in a timely manner, experts and federal agencies recommend the following best practices:[103]

▶ **Limited Initial Fact-Finding.** The role of school employees who discover potential sexual misconduct is "not to investigate or evaluate the alleged abuse, but to *report the behavior which raised concern* to those charged with conducting an investigation,"[104] such as specially-trained Title IX employees or the CPS Inspector General.[105] Therefore, if a child discloses sexual misconduct, school employees should be instructed to listen attentively and ask minimal fact and open-ended questions. It is acceptable to ask clarifying questions, but asking leading questions or pushing for information could both re-traumatize the child and compromise an investigation. School employees should convey that a parent or student disclosing sexual misconduct is believed and that the sexual misconduct is not the child's fault. The DOJ-funded report, "A Case Study of K–12 School Employee Sexual Misconduct: Lessons Learned from Title IX Policy Implementation," has cautioned that, although these investigations are usually well intentioned, district administrators often do not have the training to conduct investigations effectively and do not have the authority or knowledge to confiscate and protect key evidence. As a result, these internal investigations can interfere with child welfare or law enforcement investigations. For instance, administrators' investigative efforts can tip off an offender to likely law enforcement actions, prompting him or her to destroy important evidence or intimidate victims to keep them from providing testimony. The resulting loss of critical evidence can affect the ability of law enforcement to

---

[102] Title IX requires "responsible employees" to report sexual misconduct. A responsible employee includes any employee who has the authority to take action to redress sexual violence, are required to report incidents of sexual violence, or whom a student reasonably believes has this authority or requirement. The White House Task Force to Protect Students from Sexual Assault noted that, "At the [primary] and secondary school level, this could include school administrators, school law enforcement personnel, and teachers and may also include bus drivers, cafeteria staff, and other employees depending on the district's practices and procedures." *Considerations for School District Sexual Misconduct Policies* (September 2016), note 2 at 7, *available at* https://www.justice.gov/ovw/file/900716/download. Likewise, Illinois law requires "school personnel (including administrators and both certified and non-certified school employees)" to report sexual misconduct against students. 325 ILCS 5/4. *See also*, CPS Policy Manual § 511.1.

[103] These recommendations are based on the following sources: U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*, 13, 17-18; White House Task Force to Protect Students from Sexual Assault, *Considerations for School District Sexual Misconduct Policies*, 7-8; EduRisk, *Educator Sexual Misconduct*, 28-29; Magnolia Consulting, *A Case Study of K–12 School Employee Sexual Misconduct*, 37.

[104] U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*, 18.

[105] We specifically include the CPS Inspector General here because that office has been tasked with investigating adult-on-student sexual misconduct.

prosecute a case, potentially allowing the offender to escape criminal conse-
quences.

▶ **Formal Reporting.** CPS should provide and identify options to formally report
suspected sexual misconduct. These options should include reporting to: (a) a
"responsible employee" under Title IX, which will trigger the district's obliga-
tions to respond and investigate under Title IX; (b) child protective services; (c)
law enforcement; (d) state education officials that certify and license educa-
tors; and for CPS, (e) the CPS Inspector General.[106] Policies and distributed ma-
terials should explain how each option works, including how to make a report
for each option, and provide contact information for doing so.

▶ **Alternative Reporting.** CPS may also consider providing and identifying alter-
natives to formal reporting for students, parents, and guardians. These may
include: (1) informal processes, which may entail site-level investigation and
resolution, but should include mechanisms for reporting and tracking incidents
under Title IX; or (2) privileged or confidential resources, which could allow
students, parents, and guardians to seek assistance without triggering a dis-
trict's obligation to investigate under Title IX. A district should take care to ex-
plain in its policies what information will be kept confidential and what infor-
mation may be disclosed, to whom it will be disclosed, and why. A district
should also explain when it can and cannot honor a request that a student's or
employee's name not be disclosed to the alleged perpetrator or that no inves-
tigatory or disciplinary action be taken. The district should also identify the
employee or employees responsible for evaluating such requests for confiden-
tiality or no action. In short, a district's policy should allow a student, parent,
or guardian to understand an employee's reporting obligation before he or she
reveals any information to that employee.

▶ **Anonymous and Confidential Reporting.** CPS should provide procedures for
addressing anonymous complaints, or situations where a complainant re-
quests confidentiality (noting that a report to law enforcement or child protec-
tive services may still be required). Recognize that in these situations, after
complying with mandatory reporting requirements, a district may address al-
leged sexual misconduct and strengthen its prevention efforts without initiat-
ing formal action against an alleged perpetrator by, for example: providing in-
creased monitoring, supervision, or security at locations or activities where the
misconduct occurred; providing training and education materials for students
and employees; revising and publicizing the district's policies on sexual mis-
conduct; and conducting student, parent, and employee climate surveys re-
garding sexual misconduct.

---

[106] As referenced above, we specifically include the CPS Inspector General here because that office
has been tasked with investigating adult-on-student sexual misconduct.

▶ **Supervisor Notification.** CPS policy should indicate whether the responsible employee or mandated reporter should inform his or her supervisor(s).

▶ **Track Incidents.** CPS should create a system to report and track incidents and complaints. At minimum, the following information should be collected as an initial report progresses through resolution: the date of the incident or incidents; the names and ages of the children involved; a description of what happened; actions or statements by the children; actions or statements by the alleged offender; a statement as to how and whether the incident was resolved; a list of witnesses and their contact information; and the name of person to whom the report is submitted.

▶ **Encourage Reporting.** School employees may be concerned about reporting a colleague's suspected misconduct for fear of making a false accusation. Policies can address this concern by stressing that the purpose of reporting is to ensure that everyone is aware of what is going on for the protection of the child as well as the employee, and reporters are expected to act in good faith on suspicions, not certainty. Policies should also prohibit the making of knowingly false complaints by students and employees, and provide for appropriate consequences.

▶ **Consider Amnesty.** Where doing so would promote reporting and investigation of sexual misconduct, CPS should consider whether to grant amnesty for a violation of other discipline or student-conduct policies not related to sexual misconduct. Policy should outline the circumstances under which such accommodations may apply.

▶ **Prohibit Retaliation.** CPS reporting policies should prohibit retaliation against those who file a complaint (including third parties) or otherwise participate in the investigatory or disciplinary process (*e.g.*, as a witness), provide a process to report such retaliation, and provide for consequences if retaliation occurs.

▶ **Notification Checklist.** Once updated reporting policies are in place, they must be clearly communicated to school employees, vendors, volunteers, students, parents, and guardians. For school employees, it is helpful to include requirements about how soon a report should be made, as well as the consequences for not reporting. Providing a booklet or quick-reference guide is good practice. Such a reference guide can also provide information about responding to an incident or complaint, such as contact information for trained resources (both within the district and in the community) who can provide an immediate response to a crisis (*e.g.*, obtain needed resources, explain reporting options, and help navigate the reporting process).

B.    CPS Reporting Processes

This section addresses the current reporting structure when a CPS employee learns of potential violations of the boundaries policy or sexual misconduct. The administrators we interviewed uniformly understood that they, and all school employees, are mandated reporters. Some principals report that their school-specific employee handbooks include a section on mandatory reporting that they review with their employees at least annually, usually during orientation or "professional development" days at the beginning of each school year. Many principals, however, were not confident that teachers and other employees understand their obligations and believed that their employees were reluctant to report signs of abuse or neglect to DCFS themselves—preferring that the principals do it.

Unfortunately, however, most principals view their obligations solely through the lens of a mandated reporter, and we found a lack of a uniform understanding as to what constitutes "abuse or neglect" and what other actions are required or appropriate under various circumstances.

In June 2018, CPS adopted a new policy for the Reporting of Child Abuse, Neglect, and Inappropriate Relations Between Adults and Students to provide a comprehensive framework for the reporting of suspected abuse or neglect, the documentation of such incidents, and the steps that should be taken after each reported incident to support the victim(s) and the mandated reporter. This policy, if effectively implemented, should provide uniform guidance to CPS employees and remedy many of the discrepancies in the practices for reporting and documenting sexual misconduct that has previously existed throughout CPS.

1.    Mandatory Reporting of Suspected Abuse or Neglect

As noted, in accordance with the Illinois Abused and Neglected Child Reporting Act, it is the policy of CPS that all school employees are "mandated reporters."[107] Any mandated reporter who has reasonable cause to believe that a child known to him or her in his or her official capacity as a CPS employee may have been abused or neglected shall immediately call the DCFS Hotline.

CPS' current policy makes clear that "abuse," for purposes of the mandated reporting obligation, includes both physical and sexual abuse, as well as "grooming." Grooming is defined in the policy as behavior intended to gain a child's "trust and break down inhibitions for the purpose of sexual abuse."[108] Before June 2018, however, CPS' policy for the Reporting of Child Abuse and Child Neglect did not mention "grooming" or otherwise make clear that acts that did not constitute actual sexual offenses still had to be reported to DCFS.

[107]  325 ILCS 5/1 *et seq.*
[108]  CPS Policy Manual § 511.1 (updated June 27, 2018).

But CPS still needs to clarify its definition of "grooming," for the purposes of mandatory reporting. Under the policy's current broad definition, innocuous, or even beneficial behavior—such as tutoring and mentoring—may appear to be grooming behaviors to a third-party. While there are clear cases of grooming, such as "sexting," many cases are not clear, and CPS needs to balance the interests of protecting all children from sexual misconduct with the need to provide them with the resources and support necessary to receive an education and grow into a well-rounded adult. It is not enough to say that this balance should be completely on the side of protecting children, or else we would not allow children to ever come into contact with other students or adults. But CPS should err on the side of caution by encouraging over-reporting. Ideally, most reports of improper contact will prove not to involve grooming or abusive behavior, but they will be flagged, logged, and analyzed for trends in a way that does not automatically trigger removal or disciplinary action.

While nearly every administrator we interviewed has personally reported, or assisted another employee in reporting an incident of suspected abuse or neglect to DCFS at some point in their career, there is a significant disparity in the frequency with which administrators encounter situations that trigger their mandatory reporting obligations. Because the vast majority of such incidents involve suspected neglect (*e.g.,* homelessness or malnutrition) or non-sexual abuse, employees from schools in lower socio-economic neighborhoods may contact DCFS several times a month, while employees in other schools may go years without observing something that would trigger their reporting obligation.[109] Both extremes of this continuum suggest the need to adequately train, and regularly remind, all mandated reporters of the scope of their obligations. An employee who frequently encounters neglected children, for example, may be less likely to recognize a distinct sign of abuse, while an employee who has not had to even consider his or her reporting obligation in years may be overly hesitant to identify behavior that would trigger a reporting obligation.

As noted in the previous section, we recommend that all mandated reporters undergo annual training, in addition to the required DCFS online training, to recognize the signs of grooming and to understand the scope of their obligations as mandated reporters and their obligations under CPS policy.[110]

---

[109] We note that some cultures may have differing views on appropriate conduct, such as the line between child discipline and child abuse. CPS employees would also benefit from training or resources that address these nuances to help ensure uniformity.

[110] It is worth noting that some administrators said that DCFS is understaffed, has a slow turnaround time, and as a result, will often find allegations unfounded that administrators believe warrant investigation. We have not had the time to evaluate these claims or to hear from DCFS. For these reasons, among others, we intend to contact DCFS for more information. While we do not take a position on these claims, CPS should not—and there is no indication that it has—view DCFS reporting alone as a sufficient response to sexual misconduct allegations.

2.       Reporting of Suspected Abuse or Neglect to CPS Supervisor

CPS' current policy for the Reporting of Child Abuse, Neglect and Inappropriate Relations Between Adults and Students requires a mandated reporter to notify his or her principal or supervisor of the report after calling the DCFS Hotline. This policy, enacted in June 2018, represents a significant change from the prior policy, which provided only that a mandated reporter "may choose to inform his/her supervisor" of the report.

Many, but not all, of the principals we interviewed stated that they have instructed their employees to inform them of any DCFS reporting. Those who have not previously required such notice cited a desire to protect the confidentiality of the mandated reporter and a preference to let the reporter decide whether to notify the principal about the incident. The vast majority of interviewed principals reported that they were unaware of a time when an employee notified DCFS of suspected abuse or neglect and did not also inform the principal before or after—although principals may not necessarily be in a position to know if this occurred.

We endorse the current policy to notify the principal or supervisor. Any incident serious enough to prompt a mandatory report to DCFS is serious enough to bring to the attention of the principal, who, in turn, is required to document the incident in CPS' incident-reporting system (Verify). CPS is in the process of moving to a new reporting system, called Aspen, by January 2019. In addition, the new policy requires employees who observe "inappropriately intimate interaction or behaviors" to report that conduct to their principal or supervisor even if they conclude they do not have a mandatory reporting obligation because the conduct did not give rise to a "reasonable suspicion" that sexual misconduct occurred. The principal, in turn, must decide whether reporting is required and must document the report of inappropriate conduct in Verify. Such reporting within CPS will facilitate the investigation by the proper authority—such as law enforcement, the CPS Inspector General, or the CPS Office of Student Protections and Title IX (OSP).

We further recommend that CPS create alternative mechanisms to permit employees, students, parents, guardians, or others to report suspected incidents or inappropriate behaviors directly to the CPS Inspector General or the OSP. CPS is in the process of working out the logistics for the new reporting structure with relevant stakeholders, including law enforcement and the CPS Inspector General. When the process is resolved, CPS will provide the CPS community with an email address (or addresses) and a phone number (or phone numbers) to report allegations of abuse or neglect. There is already such a hotline in place for reporting concerns about

suspected gun violence. Additional training and promoting—including a notification checklist—will likely be required to ensure that all stakeholders are aware of the new alternative reporting mechanisms and how to use them.[111]

C.     Initial Information Gathering

In our interviews with principals, the vast majority were unaware of what CPS policy was on the "information gathering" process. The principals' responses to what they have done or would do in response to initial allegations were inconsistent and often involved far more than the sort of initial information gathering contemplated by best practices. The CPS Crisis Management Manual, for example, only recommends that, currently untrained, principals "conduct a brief fact-finding inquiry with the alleged victim, the alleged offender, and any witnesses."[112]

To report allegations and incidents, administrators must know how to gather information, internally and externally. This initial information gathering is extremely important and sensitive; care must be taken to balance several competing interests. A principal must gather some information before knowing how to report it. Principals must ensure the safety of their students and employees—and the ongoing administration of the school—and therefore, many principals feel compelled to move quickly after learning of serious allegations. At the same time, to avoid interfering with the investigatory process, principals must not interrogate victims, witnesses, or perpetrators.

Most administrators expressed confusion and concern about how new policies and processes will affect the more frequent instances of misconduct in schools. According to these administrators, the vast majority of potential misconduct at schools does not involve issues of sexual misconduct. But, partially in fear of losing their jobs, these administrators expressed confusion about how they should or will handle some of the more common situations moving forward.

We recommend that CPS provide training to OSP coordinators and principals on this "information gathering" process so that a principal can be better informed when a situation arises. CPS will also need to update its Crisis Management Manual—and other guidelines, policies and procedures—to reflect best practices.

D.     Records of Sexual Misconduct

As indicated above, when a mandated reporter notifies a principal of a call to DCFS' hotline, or inappropriate conduct that was not reported to DCFS, the principal is

---

[111]  In some instances, someone may not feel comfortable reporting to a principal. This is one of many reasons why the OSP will be so important moving forward.

[112]  CPS, *Crisis Management Manual* (2012), 93-94. CPS will need to update this policy in accordance with other policies and best practices. *See e.g., id.* at 91 ("The employee does not have to notify his/her supervisor of the Hotline call.").

required to complete an incident report and, subsequently, to ensure that the written confirmation received by the mandated reporter is uploaded to the incident-reporting system.

CPS' current incident-reporting system is Verify, which we understand has been in use since 2010. CPS plans to migrate its incident reporting function to a new system in January 2019. Were CPS not already committed to replacing Verify, we would devote more space to suggested improvements to the Verify system, which is almost universally viewed by principals as cumbersome and inefficient. In short, Verify is a menu-based system that allows administrators to choose from a menu of various types of possible incidents, choose from a series of check-boxes to designate whether certain things happened in a given incident, and enter a narrative description of the incident. Verify contains certain triggers that will provide electronic notifications to other CPS employees if certain parameters are met, or certain boxes are checked, in the report.

We found a marked disparity among principals as to how they use and understand the Verify system. As an initial matter, many principals, especially those in secondary schools and larger schools, choose to delegate all, or a subset, of their incident reporting responsibilities to an assistant principal, dean, or clerk. Many, but not all, principals receive email notices of each incident report entered by a colleague; none seem aware of a setting or option that lets them choose which type of reports to receive and which not to receive. Regarding what they enter, or instruct others to enter, into the Verify system, many principals initially stated that they want "everything" entered into Verify. When pushed to explain what "everything" entails, however, no principal could point to any policy or manual that contains such guidance, and practices seemed to vary significantly.

The new policy, if appropriately communicated to principals, should help clarify the requirement and ensure that documentation is made in the incident-reporting system of each incident of actual or suspected sexual misconduct. We recommend that CPS create and distribute to principals a notification checklist that describes in one page the notification steps after learning of potential misconduct.[113]

In implementing the new incident-reporting system that will replace Verify, CPS must carefully design the system to reflect the logic of its policies for the reporting of various types of incidents. The menu structure should differentiate between neglect, physical abuse, sexual abuse, grooming, and inappropriate behavior; and within each category of incidents the system should differentiate between conduct

---

[113] *Cf.* New York City Department of Education, *Quick Guide for School Administrators & Counselors Reporting Suspected Child Sexual Abuse* (2017), *available at* http://text.nycenet.edu/NR/rdonlyres/3479BD4A-243B-4A79-BBF9-CD6FE2BDE080/0/GREENCARDTheQuickGuide.pdf; and Berkeley Public Schools, *Harassment Handoff Card* (2016), available at http://www.berkeleyschools.net/wp-content/uploads/2015/03/Harassment-Handoff-Card-16-17-FINAL.pdf.

involving adults and conduct solely between children.[114] The reporting system should always reflect and reinforce CPS' protocol for the reporting of such events by, for example, reminding a person entering information about any type of suspected abuse of a child that DCFS must be called immediately, and requiring the user to check a box indicating that DCFS has been called before proceeding with the report. The system should contain similar prompts and, where possible, automatic triggers, to ensure that appropriate officials are promptly notified, including but not limited to law enforcement, the CPS Inspector General, the OSP, CPS' Safety and Security Department, the school principal or network chief, and a student's parent or guardian. The system should permit users to log incidents that are not considered disciplinary violations or "misconduct," to encourage the reporting of acts that are potentially innocent or inadvertent.

A properly designed incident-reporting system will help administrators correctly implement CPS' policies for the reporting of abuse and neglect. We found that administrators currently cannot rely on the Verify system to notify DCFS, law enforcement, or other CPS officials of incidents, nor did they have ready access to any written protocol or policy that specifies who should be notified of various possible incidents. In the absence of such guidance, administrators are often left to exercise their individual judgment as incidents occur. While many administrators say that they frequently call the Law Department or the network office for advice about how to respond to incidents, the current practice is overly reactive and invites inconsistencies in the reporting, documentation, and response to incidents. A more robust incident-reporting system should help standardize the documentation of various incidents, ensure that proper reporting occurs, and facilitate CPS' response.

Likewise, CPS should make sure that its new incident-reporting system has the capability to store and analyze data and a robust function to generate custom reports based on that data. This functionality can help CPS identify repeated conduct by a specific person, or a trend at a particular school, that could inform its prevention and response methods for future incidents. An effective reporting function should also help principals, networks chiefs, the Central Office, and the Chicago Board of Education monitor the number and type of incidents, react to trends, and hold appropriate people accountable for investigating and responding to incidents. Without adequate data, CPS and the City of Chicago are left with conjecture and a series of prominent instances when CPS did not protect its students.

---

[114] The system should also include any other fields that the CPS Inspector General or the OSP deem necessary.

# Investigations

## VI.    Investigations

KEY RECOMMENDATIONS

→ Ensure trained and impartial experts conduct investigations, interviews, and interrogations.

→ Train administrators on how to handle and preserve evidence.

→ Coordinate with all investigatory authorities and relevant entities to make investigations more efficient and minimize victim interviews.

→ Include a children's advocate at victim interviews.

→ Clarify standards for when to remove employees from a school pending an investigation.

This summer, CPS recognized that there were flaws in its process for investigating allegations of sexual misconduct, including the appearance of conflicts of interest involving its investigators. Shortly after the Chicago Board of Education (Board) hired Ms. Hickey, it transferred the responsibility for future investigations of adult-on-student sexual misconduct to the CPS Inspector General from the CPS Law Department's Investigations Unit. After further consultation with Ms. Hickey, CPS also announced that it would transfer future investigation of student-on-student sexual misconduct allegations from the CPS Law Department to the new Office of Student Protection and Title IX. The Board also gave the CPS Inspector General the authority to review all CPS Law Department Investigations Unit cases involving allegations of adult-on-student sexual misconduct since at least 2000.

Because of these developments, our discussion of CPS Law Department's Investigations Unit is more limited than it might otherwise have been. We begin with explaining best practices and making general recommendations for Title IX investigations. Many of these best practices also apply to investigations by the CPS Inspector General. We also describe below the historical investigations process, deficiencies in that process, and the evolving current approach to investigations, and we provide further recommendations.

A.      Title IX & Best Practices

Title IX does not allow a school district to delegate its obligation to investigate incidents to law enforcement or child protective services, so CPS must develop its own strong, sound investigative policies and practices. Indeed, in certain cases the district is the only entity that has investigative authority, *e.g.*, when a student vic-

tim is over the age of 18. In those cases, child protective services cannot investigate, and unless the conduct is criminal, neither will the police. In designing processes to investigate incidents of sexual misconduct, experts and federal agencies recommend the following best practices[115]:

▶ **Impartiality.** The people who conduct the investigations, or decide the outcome of complaints, should be trained and impartial. Processes should permit parties to raise issues potential conflicts of interest.

▶ **Training.** Investigations must have capable investigators. As a result, the Title IX Coordinator and designated school-based employees must be trained regularly in Title IX compliance. These people must know and understand the district's policies and procedures regarding sexual misconduct, as well as Title IX grievance processes and procedures. These people should also continue periodic training to stay up-to-date on developments in Title IX law and the district's compliance obligations.[116]

▶ **Clear Processes.** Policies and procedures should include clearly defined investigative protocols and should consider whether investigative protocols should differ for incidents involving particular student populations, such as very young children or students with disabilities.

▶ **No Mediation.** Because mediation is never appropriate in sexual-misconduct cases, complainants should not be required or asked to work out issues directly with an alleged perpetrator.

▶ **Preservation of Evidence.** Protocols for preserving evidence should be clearly defined. For example, CPS should consider (perhaps in consultation with law enforcement) the circumstances under which a student's or alleged perpetrator's cell phone may be seized.

▶ **Protection and Victim Services.** Policies should explain the steps a district may take to protect complainants while an investigation is pending. These steps may include altering academic or bus schedules for either the complainant or the alleged perpetrator, changing locker locations, allowing the complainant to withdraw from or retake a class without penalty, providing an escort to ensure

---

[115] *See* U.S. Government Accountability Office, *Child Welfare*, 34-35; U.S. Department of Education Office of Safe and Healthy Students, *A Training Guide for Administrators and Educators on Addressing Adult Sexual Misconduct in the School Setting*, 18; White House Task Force to Protect Students from Sexual Assault, *Considerations for School District Sexual Misconduct Policies*, 8-9.

[116] *See* EduRisk, *Title IX Compliance in K-12 Public Schools: Key Steps to Compliance* (2015), 10, *available at* https://www.ue.org/uploadedFiles/Title%20IX%20and%20Sexual%20Harassment%20in%20K-12%20Public%20Schools.pdf.

that the complainant can move safely between classes or other activities, and providing tutoring or additional academic support.

► **Investigators.** Title IX investigators and fact finders must be trained on all aspects of Title IX compliance, as well as best practices for investigating complaints that are sent to the Title IX Office.

► **Length of Investigation.** Policies should include timeframes for the major stages of the process, including the time by which CPS must conclude an investigation and issue notice of the outcome.[117]

► **Evidentiary Hearings.** The policy should provide for equitable treatment of the parties during the investigative process, such as an equal opportunity for both parties to present witnesses and other evidence. The policy should select and explain the standard of proof—such as preponderance of the evidence—that will be applied in determining the outcome of the investigation and in related proceedings.

► **Potential Punishments and Remedies.** The policy should describe the potential remedies, which may include sanctions; accommodations for the complainant; rehabilitative treatment or counseling for the perpetrator; and additional remedies for the school community.

► **Written Notice to the Parties.** Procedures should set out how parties will be given written notice of the outcome and the option to appeal, if applicable. If a district permits appeals, its policies should specify the grounds for appeal, standards of review, the person or entity that will decide appeals, and the timeframes for the process. The policy should specify how the district will inform the complainant as to whether it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant, any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the district has taken to eliminate the hostile environment and prevent recurrence.

► **Community Notice.** Districts should also have procedures to notify the school community about incidents and the district's responses while affording appropriate confidentiality and other protections to the parties.

► **Memoranda of Understanding.** Investigation policies should address coordination between a district's independent investigative agency, the prosecutor's office, law enforcement, child protective services, children's advocacy centers,

---

[117] Under now-rescinded Obama-era guidance, sixty days was the standard timeframe for completing an investigation. *See* U.S. Department of Education Office for Civil Rights, *September 2017 Q&A on Campus Sexual Misconduct*, 3, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

local advocacy groups, community programs regarding sexual misconduct, and other relevant agencies. CPS should consider entering into memoranda of understanding (MOUs) that specify how the district and other agencies will share information, and outline policies to minimize additional harm to the victim. The MOUs should state that the district has the right, and usually the obligation, to investigate while a criminal or child-protection investigation is proceeding.

B.      CPS Law Department's Investigations Unit

Before mid-2018, the Investigations Unit within CPS' Law Department investigated allegations of sexual misconduct, along with other forms of employee and student misconduct. The Investigations Unit's size varied slightly over time but currently consists of a Manager of Investigations, two full-time investigators, six part-time contract investigators, two part-time investigative aides, and one administrative assistant. The Investigations Unit is heavily reliant on contractor employees and engages three investigative vendors. The Investigations Unit investigates incidents that are reported through CPS' Verify system. Verify reports include incidents that are much broader than sexual misconduct, including general student and employee misconduct. On average, the Investigations Manager reviews 200 emails a day generated by the Verify reporting system in response to a broad range of alleged employee misconduct and negligence.

As generally described by the CPS Law Department, the process to investigate an allegation against a student was as follows:

► If the immediate initial assessment by the Law Department investigators revealed a serious child-abuse allegation, then investigators notified attorneys in the Employee Discipline Unit and School Law Unit of the Law Department;

► Investigators went to schools to conduct interviews for serious allegations, obtain witness statements, review documents, review video surveillance, and gather social-media information as allowed by law;

► The Law Department investigator coordinated the investigation with law-enforcement agencies and DCFS, which cooperated and shared information;

► Investigators were trained to review and report the entire process to Central Office, DCFS, and the Chicago Police Department; and

► A final investigative report was sent to the Board attorneys in the Law Department's Employee Discipline Unit to implement disciplinary action, if necessary.

We identified several problems in the CPS Law Department Investigations Unit processes that are still relevant, despite the fact that the CPS Inspector General's office and the Office of Student Protections and Title IX will handle future investigations of sexual misconduct. [118]

First, the Investigations Unit is understaffed, even if it no longer has responsibility for handling the sexual-misconduct investigations, because of a lack of adequate funding. As noted earlier in this section, the Investigations Unit is composed of a Manager of Investigations, two full-time investigators, six part-time contract investigators, two part-time investigative aides, and one administrative assistant. The Investigations Unit also contracts with vendors to perform investigations. These few full-time employees and contractors are responsible for investigating all instances of misconduct that occur within all CPS schools.

Consider the monumental nature of this task: During the 2016-17 school year, over 7,500 Verify reports were reviewed and analyzed by the Investigations Unit, including over 2,300 "DCFS Contacted Notification Emails," over 1,600 "Sexual Harassment Notification Emails," over 1,600 "Employee Misconduct Notification Emails," and over 1,500 "Student/Staff Altercation Notification Emails."[119] To be clear, the actual number of incidents is fewer than the 7,500+ Verify reports, because multiple reports sometimes refer to the same incident. Nonetheless, absent additional funding, the Investigations Unit is likely to continue to remain understaffed.

Second, the Investigations Unit and vendor investigators are not uniformly or adequately trained. Although the employees and vendors are well intentioned, the lack of formal training creates inconsistencies in the investigation process.

Third, the Investigations Unit relies too heavily on contract employees and outside investigative vendors to do the investigations rather than on full-time CPS professionals. This is a direct outgrowth of insufficient funding allocated to the Investigations Unit. In our opinion, there is no reasoned explanation, other than resource limitations, for the extensive reliance on vendors.

Fourth, the Investigations Unit's documenting and tracking of incidents is antiquated and deeply flawed. The Investigations Unit relies on an Excel spreadsheet to track cases and investigations. The way that data is managed and tracked makes any sort of meaningful analysis nearly impossible to conduct. CPS must invest in a case management system that will allow the Investigations Unit to track cases, run

---

[118] To be clear, the Investigations Unit will still be responsible for investigating incidents other than sexual misconduct moving forward.

[119] CPS determined these numbers after the *Betrayed* series, and this data was not at anyone's fingertips at CPS. The Verify reports were not uniformly entered, and CPS did not have the proper controls to run such reports at the push of a button. This is one of the many reasons no one recognized the full scope of sexual misconduct at CPS.

reports, and perform meaningful data analysis. Ideally, the forthcoming Aspen software program should integrate smoothly with the Investigations Unit's case management system.

Fifth, although CPS has some interagency agreements with other entities, there are not the type of comprehensive memoranda of understanding that would minimize unnecessarily redundant questioning of witnesses and facilitate properly coordinated investigations.

Sixth, because the CPS Law Department was responsible for both investigating allegations of sexual misconduct and also defending CPS in civil proceedings against suits brought by alleged victims, there was the appearance that it had a conflict of interest in fulfilling both of these roles.

Seventh, the Investigations Unit, and CPS as a whole, failed to appropriately review and consider the causes of specific sexual-misconduct incidents and take corrective action to prevent future incidents.

C.     Investigations and Disciplinary Process for Employees

After it investigates alleged sexual misconduct, CPS must determine whether discipline is warranted, including termination. The CPS Law Department's Employee Discipline Unit handles dismissal proceedings. The precise process for dismissals varies by employee category because of varying contractual terms and due process requirements:

► The CEO may dismiss probationary employees in non-teaching positions by a letter without a hearing or Board approval;

► CPS may dismiss probationary appointed (non-tenured) teachers after an investigatory conference in the Office of Employee Engagement, if the CEO recommends dismissal and the Board approves;

► CPS may dismiss non-teachers who have completed their probationary period after an evidentiary hearing in the Office of Employee Engagement, if the CEO recommends dismissal and the Board approves (the employee's union may contest a dismissal decision in grievance-arbitration); and

► CPS may dismiss tenured teachers after an evidentiary hearing before an Illinois State Board of Education Hearing Officer. The tenured teacher may appeal a dismissal determination to the Illinois Appellate Court.

Dismissal hearings based on sexual misconduct are particularly challenging for a number of reasons. First, when a child's testimony is required, care must be taken to ensure that the child is not further traumatized by testifying. Second, parental

consent is needed for the child to testify. Third, children can be challenging witnesses. Fourth, the general nature of the allegations lends itself to a strenuous defense, which can include cross-examination of the child's credibility. Fifth, as with any dismissal hearing, employees have due process rights that must be accounted for and respected.

D.  Ensuring Student Safety Beyond the CPS District

CPS also faces a related issue, which is ensuring that a CPS employee who resigns or is dismissed amidst allegations of sexual misconduct is not rehired into another district within Illinois or elsewhere. The Illinois State Board of Education (ISBE) is responsible for licensing teachers, substitute teachers, and paraprofessionals. Since July 1, 2009, the Illinois School Code has required that school districts provide written notice to ISBE when there is reasonable cause to believe that a certificate holder has committed an intentional act of abuse or neglect of a child and the action caused the certificate holder to resign or be dismissed.[120] This law applies only to "certificated"—that is, licensed—employees; non-certificated employees are not covered.

CPS has struggled to implement this law. We are informed by the CPS Law Department that in 2015 it sent a batch of notification letters to ISBE when the Board discovered it had failed to notify ISBE of probationary employees and substitute teachers who were covered by the law because they are "certificated" employees. Additionally, in 2017, CPS sent a second batch of notification letters to ISBE after realizing that timely notices had not been sent due to a change in personnel at the Board.

We have not completed our evaluation regarding CPS' compliance with the ISBE notification requirement or our analysis regarding additional procedures that CPS might adopt to ensure that a teacher who resigns under a cloud of sexual misconduct allegations is not able to transfer districts. We suspect that improvements can be made. Ms. Hickey is still evaluating these issues.

CPS must also provide guidance to principals on what they are permitted and not permitted to say when someone from another district calls about a reference check. CPS of course must comply with applicable law and also operate to minimize its liability in responding to reference check inquiries. But CPS should take steps to disclose information about sexual misconduct within the confines of the law so that students outside of CPS are also protected.

It should be noted that Illinois already provides immunity to former employers when they provide written disclosures of information regarding an employee or

---

[120] *See* 105 ILCS 5/10-21.9

former employee's job performance or work-related characteristics that the employer in good faith believes is truthful.[121] CPS should consider specifically disclosing information regarding sexual misconduct if the reference check is accompanied by a release of claims or waiver and an authorization form signed by the current or former employee.

We recommend that CPS further explore enacting a formal policy requiring that if a principal is contacted by a prospective employer regarding a candidate who has been accused of serious misconduct, the principal must refer the prospective employer to the Law Department so that CPS can make appropriate disclosures while ensuring that it complies with substantive law and minimizes CPS' legal risk.

We further recommend that CPS consider centralizing the response to incoming reference checks from other districts in a single department rather than having individual principals handle reference checks. To minimize liability while incentivizing disclosure, we also recommend that CPS consider requiring that an incoming reference check be accompanied by a waiver or authorization form.

In short, if CPS fires an employee or accepts a resignation amidst allegations of sexual misconduct, those actions may protect CPS students from further sexual misconduct, but more needs to be done to ensure that problem employees are not rehired elsewhere. To be clear, we are not recommending that an employee be blacklisted anytime an allegation of sexual misconduct occurs. Instead, we recommend that CPS make appropriate disclosures so that a prospective employer is fully aware of previous allegations and any findings.

E.      Ongoing Changes and Specific Recommendations

During the summer of 2018, CPS announced that the CPS Inspector General's office will be taking over investigations of incidents involving adult-on-student sexual misconduct. The new Office of Student Protections and Title IX will handle investigations of student-on-student sexual misconduct. As of the date of this preliminary report, CPS is finalizing policies and procedures to effectuate this division of responsibility. Ms. Hickey was involved, and remains involved, with these decisions and the implementation of these changes. In our opinion, it is crucially important that CPS establish a clear intake process to ensure that incident reports and allegations—including anonymous and confidential allegations—be promptly steered to the appropriate investigating entity.

As of this preliminary report, CPS is still finalizing how to minimize repeated interviews of victims through memoranda of understanding and ensuring that a chil-

---

[121] *See* 745 ILCS 46/1 *et seq*. A slight majority of states have similar statutes immunizing employers from liability for disclosures during reference checks.

dren's advocacy representative is present during victim interviews. CPS has indicated that it will use trained investigators to conduct interviews and will create procedures to prevent CPS students from being interviewed repeatedly. These efforts are in line with the best practices recommended by experts and federal agencies. As the U.S. Government Accountability Office has explained,

> Because different agencies can be involved with investigating reports of alleged child sexual abuse or misconduct by school employees for different reasons, each of the agencies' particular goals may lead to potential interference with another agency's investigation . . . Specifically, conflicting missions can lead to subjecting children to multiple interviews, not sharing reports, and prematurely alerting alleged perpetrators of investigations.[122]

The DOJ-funded report, "A Case Study of K–12 School Employee Sexual Misconduct: Lessons Learned from Title IX Policy Implementation," similarly cautions, "Further, the proliferation of separate investigations and offender attempts to intimidate victims may require victims to be interviewed multiple times, potentially exacerbating their trauma."[123]

Therefore, developing policies that address coordination with other investigative agencies is essential. Ms. Hickey remains engaged with CPS, the CPS Inspector General, the Chicago Children's Advocacy Center, and others regarding appropriate coordination among agencies and ensuring the presence of a children's advocate at investigative interviews.

Another change that CPS instituted during the summer of 2018 is the new policy to remove teachers from the school immediately after there has been an allegation of "sexual abuse." We recommend that CPS further clarify this new policy. While this policy is sound, in principle, to the extent it relates to credible allegations of abuse, we believe that more clarification is required to specify under what circumstances CPS will remove an employee pending an investigation.

For example, the policy could be interpreted, as currently written, to require immediate removal of a teacher after a coworker reports that the teacher gave candy to a student. Giving a student candy *could* be "inappropriate contact" since it *could* be "grooming" behavior, which constitutes "sexual abuse" under the policy. It is critically important that new policies, which are intended to foster a culture of respect and encourage the reporting of potentially improper conduct, not impose such harsh and immediate punishments that have the unintended consequence of deterring reporting. CPS should update the policy to make clear what allegations

---

[122] U.S. Government Accountability Office, *Child Welfare*, 32.
[123] Magnolia Consulting, *A Case Study of K–12 School Employee Sexual Misconduct*, 6.

will result in immediate removal and who will make that determination.[124] CPS should also consider preventative measures short of removal that could be implemented pending a complete investigation—such as warnings, no-contact directives, and supervision—and include guidelines for how to impose those measures.

---

[124] CPS must also update the policy to incorporate the Office of Student Protections and Title IX.

# Response

## VII.    Response

KEY RECOMMENDATIONS

→ Hold employees, vendors, and volunteers accountable when they violate the policies and procedures with discipline that is commensurate with the violation.

→ Make the CPS Office of Student Protections and Title IX the nerve center for the CPS community to learn about and receive victim support services.

→ Ensure that CPS students have, are aware of, and receive social and emotional supports and victim services by using the tracking and accountability mechanisms described above.

→ Ensure that schools sufficiently emphasize these supports across all regions and demographics, as warranted.

→ Use experts, such as the Chicago Children's Advocacy Center, to train employees on how to provide appropriate support for student victims and student perpetrators.

→ Develop a district-wide protocol for appropriately communicating sexual-misconduct incidents and allegations with school communities.

### A.    Title IX & Best Practices

Title IX requires CPS to remedy any effects of sexual misconduct against students, end identified sexual misconduct, and prevent recurrence.[125] This responsibility includes providing victim services, separating offenders from victims or potential victims, and if applicable, providing sufficient discipline, including limiting access to children, terminating employment, and removing licenses. CPS should not agree to expunge a school's findings that an adult has engaged in sexual misconduct with a child, or agree to keep a finding confidential.[126]

---

[125] *See* U.S. Department of Education, *Revised Sexual Harassment Guidance*, 10.

[126] *See also*, 20 U.S.C. § 7926 (Prohibition on aiding and abetting sexual abuse) (effective December 10, 2015) ("A State, State educational agency, or local educational agency in the case of a local educational agency that receives Federal funds under this chapter shall have laws, regulations, or policies that prohibit any individual who is a school employee, contractor, or agent, or any State educational agency or local educational agency, from assisting a school employee, contractor, or agent in obtaining a new job, apart from the routine transmission of administrative and personnel files, if the individual or agency knows, or has probable cause to believe, that such school employee, contractor, or agent engaged in sexual misconduct regarding a minor or student in violation of the law.").

CPS must enforce its policies and procedures for employee discipline. The punishments, however, should fit the "crime." Since many policies and procedures focus on preventing *opportunities* for sexual misconduct—rather than on actual sexual contact—policies and procedures will necessarily govern conduct that is not inherently sexual.[127] For these reasons, CPS should consider all relevant circumstances (which will be easier to do after CPS logs and analyzes data regarding reports of inappropriate conduct). In these instances, CPS should also log the reasons why employees did or did not receive discipline.

Regarding other violations, CPS policy should provide for a range of sanctions, including oral and written warnings, suspension, loss of pay, or probation. CPS may also require corrective actions, such as directing the person to attend training programs or transferring the person to positions that do not involve regular or unsupervised contact with children. A school official should meet with the person and discuss the corrective action.

Factors to consider in deciding the appropriate level of discipline based on the offense include the harm or potential harm to children, educators, and the school community; the overall record of the responsible educator; and any corrective steps taken to remedy the misconduct.[128]

B.     CPS' Response to Sexual Misconduct by Adults

Since late 2011, CPS' Law Department has investigated over 450 allegations of adult sexual misconduct against students. The Law Department concluded that sexual misconduct occurred in nearly half of those investigations. Of those cases, CPS terminated the employment of most of the adults—or, if the adult was a volunteer, removed the person. A minority of employees received lesser discipline, and an even fewer number of employees received no discipline.

We do not know if these were the right results in all cases. We do know, however, that many—if not most—CPS schools did not know or enforce all relevant policies and procedures, some predators went undetected or unpunished throughout this time, and some serious offenders were able to get jobs in other school districts.

Throughout this report we have repeatedly emphasized that CPS must ensure accountability by enforcing its policies and procedures consistently. We will not repeat these recommendations here. We must, however, reiterate the importance of our recommendations in Sections II (Prevention) and VI (Investigations) regarding updating reference-check policies and memoranda of understanding with

---

[127] An adult giving a child a ride home, for example, is not sexual, but without policies and procedures that govern this activity, a predator could have extensive opportunities to harm children.

[128] *See* EduRisk, *Educator Sexual Misconduct*, 33.

other districts to prevent predators from accessing students inside and outside of CPS.

C.     Victim Services for CPS Students

CPS has various resources for student victims, including CPS school-based employees, Central Office support, and government and private partners. Most administrators believe that, while these resources are available for all schools, schools use them and promote them to differing degrees. As referenced throughout this report, many administrators did not believe that they were adequately trained to handle allegations of sexual misconduct.

As a result, many administrators did not emphasize victim services in any uniform manner. According to CPS records, for example, CPS provided support services to most victims when an investigation was initiated within the last three school years. This number, however, was not 100%.

Nonetheless, most schools have some access to CPS clinical-support employees, including social workers, case managers, occupational therapists, psychologists, and clinician trained guidance counselors. In addition to providing one-on-one support, some counselors also use "Needs Based Assessments" to identify the types of issues that their student body faces, then work to resolve those issues. Most notably for this preliminary report, one school identified the need for additional training regarding sexual misconduct after a Needs Based Assessment discovered that there were multiple students who had been victimized by sexual misconduct in the community, outside of the school setting. That school took the initiative to create partnerships to increase annual training for employees and students.

Unfortunately, most administrators reported that they did not have enough clinical-support employees. Recently, however, CPS added 100 new social workers throughout CPS. While some administrators still believe that CPS needs to do more, most agreed that this was a major step in the right direction. While most administrators praised their clinical-support employees as trusted and experienced professionals, some administrators said that the quality of clinical-support employees varies dramatically and complained that turnover is high.

If students or employees do not feel comfortable with their school's clinical-support employees, CPS Central Office also offers students district-wide support structures through the Safety and Security Department's Crisis Management Unit, which students can reach through the Crisis Hotline. As described above, students, parents, and guardians can also contact the Illinois Department of Healthcare and Family Services by contacting the Crisis and Referral Entry Service (CARES). Students, parents, and guardians can then receive mental health services through the Screening, Assessment, and Support Services (SASS) program.

Likewise, the Chicago Board of Education has approved many private vendors to provide student support. We know that schools have used Rape Victim Advocates, Chicago Children's Advocacy Center, Between Friends, and Peer Health Exchange, among others, for training and support for issues involving sexual conduct and misconduct. Schools use these vendors, however, to varying extents depending on, among other things, cost and time. Most administrators said that they do not use any vendors specifically for student support regarding sexual conduct and misconduct.

CPS is currently working with the Chicago Children's Advocacy Center to, among other things:

► Provide student support and therapy;

► Provide post-incident debriefings and support;

► Train CPS clinical employees—including social workers, counselors, psychologists, and nurses—CPS' Crisis Response Team, and the OSP, including on how to work with survivors of sexual misconduct; and

► Develop a *Keeping Children Safe* interactive webinar with instructional videos and test questions.

According to administrators, however, students may prefer to confide in other members of the CPS community, such as teachers, administrators, on-site clinicians, coaches, or security employees, rather than outsiders. As described in Section III. B., above, a student may not trust their counselor, but may trust a teacher or other employee. This practice encourages meaningful relationships that many students need to receive their education and develop into well-balanced adults. In fact, CPS often encourages these relationships by design. CPS Central Office, for example, allocates millions of dollars toward Social and Emotional Learning programs for students and employees.

A major difference between schools and their students' access to or knowledge of support services is the school's culture. This in turn often correlates with how much time a school has allocated or can allocate to student support. Schools that have developed a supportive culture have healthy communication and feedback and, likely as a direct result, more student support structures and partnerships. Several administrators reported that the need to balance Social and Emotional Learning efforts with educating students in English, Math, and Sciences can be challenging.

CPS recently took a major step forward by emphasizing victim services to administrators by including victim services in the required notification process in re-

sponse to allegations of sexual misconduct. CPS must continue to ensure that administrators are aware of and follow this step. Furthermore, we recommend that CPS also emphasize supports for student perpetrators to address the causes of their behavior and to rehabilitate them.

Moreover, CPS' emphasis on Social and Emotional Learning has proven to be effective where it is used. CPS' Central Office should take steps to ensure that Social and Emotional Learning is especially emphasized in areas where it is needed the most. As with other recommendations, this recommendation may require allocating additional resources toward these schools.

## Conclusion

We note throughout this report that it is preliminary and not the final report. We have focused our efforts thus far on evaluating big-picture issues so that we could propose recommendations that would have the greatest impact and create the largest return on investment before the 2018/2019 school year begins. To fulfill this goal, we spoke extensively with senior CPS leadership, network chiefs, principals, and department heads, and analyzed the specific policies and practices detailed in the body of this preliminary report.

There is more work to be done. To complete our evaluation, Ms. Hickey intends to conduct more interviews and analysis regarding particular constituencies within CPS and to coordinate further with entities outside of CPS. These additional interviews will likely include CPS teachers, Athletics Directors, and representatives from the Illinois Department of Children and Family Services, the Chicago Police Department, the Cook County State's Attorney's Office, the Illinois Police Department, the Illinois State Board of Education, the CPS Inspector General's office, and various CPS partners, such as the Chicago Children's Advocacy Center. Likewise, we intend to continue to work with CPS to analyze, review, and ultimately recommend a district-wide protocol for how administrators should communicate incidents and allegations of sexual misconduct with school communities.

Ms. Hickey will also continue to work with the CPS Inspector General and the CPS Office of Student Protections and Title IX (OSP) leadership to meet their goals, including ensuring that they are sufficiently staffed and trained to conduct investigations and that they effectively collect and analyze data.

We also intend to evaluate other areas further, including security guards, athletic directors, leasing arrangements, special-education student populations, and the new Aspen software system. We are also evaluating whether CPS should conduct an employee survey at the end of the next school year to evaluate whether the implementation of the policies and procedures regarding sexual misconduct has been successful.

Furthermore, we know that CPS remains in the process of changing many policies, procedures, and practices relating to the subject matter of this preliminary report. Ms. Hickey shall continue to advise CPS on an ongoing basis regarding those changes rather than awaiting issuance of a final report because students' safety is at stake. Our final analysis of these changes must wait until they are implemented. Finally, we fully anticipate that our final recommendations may change based on anticipated constructive feedback from CPS and other stakeholders received in response to this Preliminary Report.

During this evaluation, CPS CEO Janice Jackson reiterated that student safety is her first priority, that CPS needs to improve, and that CPS will improve. She acknowledged that her "team has taken away an important lesson from the reporting on these issues: CPS' response to sexual misconduct cases has not been sufficiently centered on protecting student-victims." She further committed her administration to ensuring that they "take student allegation seriously," that victims are "protected and on a path to recovery," and that CPS works to "recognize patterns" to "take effective measures to prevent incidents in the future."

We appreciate the cooperation and support we have received from CPS leadership, employees, and others. We believe CPS is taking reasonable measures to correct the wrongs of the past and to establish policies, procedures, and practices, as well as instill a culture, to prevent and remediate future misconduct. We have already seen substantial improvements within CPS this summer, including increased attention and increased funding focused on preventing sexual misconduct. Although difficult steps lie ahead and CPS' commitment will be tested as it continues to implement difficult policies and costly change, we are optimistic that this positive momentum will continue.

Improvements are most likely to continue if CPS creates controls, failsafes, and supportive cultures at all levels—from each individual school to the network offices, the Central Office, and the Chicago Board of Education—to ensure that CPS students are protected from sexual misconduct and that this important issue never again goes unchecked. Subject to any further changes in the scope of the mandate and unanticipated developments, Ms. Hickey intends to issue the final report in spring 2019.