RENEWAL OF CHARTER AND CHARTER SCHOOL

AGREEMENT


BETWEEN


THE BOARD OF EDUCATION OF THE CITY OF CHICAGO

AND


LEGAL PREP CHARTER ACADEMIES, INC.

TABLE OF CONTENTS

1. RECITALS INCORPORATED BY REFERENCE.................................................................2
2. RENEWAL OF CHARTER. .................................................................................................2
3. TERM OF AGREEMENT.....................................................................................................2
4. EDUCATIONAL PROGRAM. .............................................................................................2
5. ADDITIONAL COVENANTS AND WARRANTIES OF CHARTER SCHOOL...............7
6. FINANCIAL OPERATIONS OF CHARTER SCHOOL. ....................................................16
7. ATTENDANCE CENTER; LAWS, RULES AND REGULATIONS FOR ATTENDANCE CENTER.
...................................................................................................................................................25
8. SPECIAL EDUCATION AND SUPPORTS. ......................................................................27
9. INSURANCE. .......................................................................................................................30
10. ACADEMIC ACCOUNTABILITY AND EVALUATIONS. .............................................30
11. COMPREHENSIVE SCHOOL MANAGEMENT CONTRACTS; PURCHASE AGREEMENT......31
12. RENEWAL OF CHARTER; FAILURE TO RENEW. ........................................................32
13. REVOCATION OF CHARTER............................................................................................32
14. INDEMNIFICATION. ..........................................................................................................33
15. DISCLAIMER OF LIABILITY............................................................................................34
16. WINDING DOWN PROCEDURES UPON REVOCATION, NON-RENEWAL OR TERMINATION BY MUTUAL CONSENT.........................................................................35
17. GOVERNING LAW. .............................................................................................................35
18. WAIVER. ...............................................................................................................................36
19. DISPUTE RESOLUTION. ...................................................................................................36
20. COUNTERPARTS; FACSIMILE/ELECTRONIC SIGNATURES.....................................36
21. TERMS AND CONDITIONS OF APPLICATION. ............................................................36
22. AMENDMENTS....................................................................................................................36
23. ASSIGNMENT......................................................................................................................36
24. TERMINATION. ...................................................................................................................37
25. NOTICES. .............................................................................................................................37
26. AUDIT AND RECORDS RETENTION. .............................................................................37
27. SURVIVAL/SEVERABILITY. ............................................................................................38
28. SUPERSEDER. .....................................................................................................................38
29. DELEGATION. .....................................................................................................................38
30. PRIOR ACTIONS..................................................................................................................38
31. CONSTRUCTION.................................................................................................................39
32. INCORPORATION OF EXHIBITS. ....................................................................................39

i

THIS RENEWAL OF CHARTER AND CHARTER SCHOOL AGREEMENT ("Agreement") dated July 1, 2017 (the "Effective Date") is entered into by and between the Board of Education of the City of Chicago, a body politic and corporate, commonly known as the Chicago Public Schools (the "Board" or "CPS") and Legal Prep Charter Academies, Inc., an Illinois not-for-profit corporation (the "Charter School"), an independent public school established under the Charter Schools Law, 105 ILCS 5/27A-1 *et seq.*, as amended (the "Charter Schools Law").

### RECITALS

WHEREAS, the State of Illinois enacted the Charter Schools Law as Public Act 89-450, effective April 10, 1996, as amended; and

WHEREAS, the Charter Schools Law was enacted for the following purposes:

To improve pupil learning by creating schools with high, rigorous standards for pupil performance;

To increase learning opportunities for all pupils, with special emphasis on expanded learning experiences for at-risk pupils;

To encourage the use of innovative teaching methods;

To allow for the development of innovative forms of measuring pupil learning and achievement;

To create new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the school site;

To provide parents and pupils with expanded choices within the school system;

To encourage parental and community involvement with public schools;

To hold charter schools accountable for meeting rigorous school content standards and to provide those schools with the opportunity to improve accountability; and

WHEREAS, on May 15, 2012, the Charter School entered into a Charter School Agreement with the Board for a term commencing July 1, 2012 and ending June 30, 2017, with the Charter School opening in the fall of 2012, which Charter School Agreement was approved and certified by the Illinois State Board of Education (the "State Board");

WHEREAS, on September 14, 2016, the Charter School submitted an application to the Board (the "Application") to renew its Charter School Agreement, portions of

1

which Application are incorporated by reference as described in Exhibit A hereto; and

WHEREAS, the parties desire that the Charter School be authorized to continue to operate and conduct its affairs in accordance with the terms of this Agreement and the Charter Schools Law.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein and for other good and lawful consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. **Recitals Incorporated by Reference.**
The recitals to this Agreement are incorporated herein by reference and made a part hereof.

2. **Renewal of Charter.**
Subject to the final certification by the State Board, the Charter School is hereby authorized, and granted a renewal of a charter in accordance with the Charter Schools Law and the terms and conditions of this Agreement, to operate a charter school as described herein.

3. **Term of Agreement.**
This Agreement shall commence on the Effective Date and shall expire at 11:59 p.m., June 30, 2022, unless terminated or extended pursuant to the terms hereof.

4. **Educational Program.**
The Charter School shall operate an educational program and instruction serving the educational needs of the students enrolled therein.

a. **Name of School.** The name of the school shall be known as the "Legal Prep Charter Academy".

b. **Mission Statement.** The Charter School shall operate under the mission statement set forth in the Application, and such mission statement is hereby accepted to the extent that it is consistent with the declared purposes of the General Assembly as stated in the Charter Schools Law. Any material changes to the mission statement subsequent to the Effective Date of this Agreement must be submitted to the Board or its designee for approval according to the annual timeline established by the Board. If approved, such modified mission statement shall be effective as of the first day of the next academic year and shall be incorporated herein by reference as if fully set forth herein.

2

    c.    <u>Age, Grade Range.</u>  The Charter School shall provide instruction to students in grades 9 through 12.

    d.    Maximum Enrollment, Attendance Boundary, Application Process.

    i.    <u>Maximum Enrollment.</u>  The Charter School's enrollment shall be no more than 850 students (the "Maximum Enrollment Number") during the term of this Agreement. The Charter School shall not permit dual enrollment of any student at both the Charter School and another public school or non-public school.

    ii.    <u>Attendance Boundary.</u>  Enrollment in the Charter School shall be open to any pupil who resides within the City of Chicago, provided that the Board may designate attendance boundaries for no more than one-third of the charter schools permitted in the City of Chicago if the Board determines that attendance boundaries are needed to relieve overcrowding or to better serve low-income and at-risk students. If the Board determines that an attendance boundary needs to be created for the Charter School, the Board shall notify the Charter School at least sixty (60) calendar days prior to Board approval of the attendance boundary to give the Charter School an opportunity to provide comment. Establishment of an attendance boundary for the Charter School is within the sole discretion of the Board. Neither pupils who were enrolled in the Charter School the previous year nor siblings of pupils enrolled in the Charter School shall be displaced by the creation of an attendance boundary for the Charter School.

    iii.    <u>Application Process.</u> The Charter School shall not request information in the application process about an applicant's social security number, academic aptitude, special education needs or English language proficiency. Moreover, the Charter School shall also not request a school visit, open house attendance, an essay, parent-student behavioral contract, material review, or other such activities as part of the application process. The application must be available to all parents and student applicants without limitations, such as open houses or school visits.

    A.    <u>Lottery.</u> If the number of eligible applicants for enrollment on the Charter School's application deadline date in any year exceeds the Maximum Enrollment Number for that year, then successful applicants shall be selected by lottery in accordance with the Charter Schools Law. The lottery must be administered in a way that ensures each applicant has an equal chance at admission into the Charter School as set forth in paragraph 4.d.iii. of this Agreement except that priority shall be given to siblings of pupils

3

enrolled in the Charter School and to pupils who were enrolled in the Charter School the previous academic year, unless expelled for cause. Priority may be given to pupils residing within the Charter School's attendance boundary, if an attendance boundary has been designated by the Board.

1.    Conduct/Manner of Lottery. The Charter School shall conduct and complete its lottery no earlier than February 1 of each year during the term of this Agreement. Before December 31 of the year before its lottery, the Charter School shall inform the Board's Office of Innovation and Incubation ("I&I") of that lottery date and provide I&I with a plan on how its lottery process will comply with Article 27A of the Illinois School Code. The Charter School shall video record the lottery and shall allow the Board or its designee to attend or view the lottery in real time. The Charter School shall maintain a video record of the lottery, and the video shall include a time and date stamp. After the lottery by the Charter School, the Charter School shall notify all participating student applicants of the lottery's outcome. Using the lottery process required herein, the Charter School shall establish a waitlist of student applicants who shall be offered the opportunity to enroll at the Charter School if additional space later becomes available.

2.    Lottery Verification to the Board. Within one (1) month after each lottery but no later than July 1 of each year, the Charter School shall submit to I&I a copy of the lottery video and all records relating to the lottery including, without limitation, a copy of the lottery results and a written summary of its lottery process. The Charter School shall submit to I&I the names of student applicants who participated in the lottery and a copy of the current waitlist of student applicants on a quarterly basis. The waitlist must be submitted to I&I at the same time as the Charter School's quarterly financial statements and reports are submitted to the Board in accordance with paragraph 6.b. of this Agreement. The Board reserves the right to request additional information regarding the lottery process from the Charter School. If the Chief Executive Officer of the Board ("CEO") or CEO's designee determines that the Charter School's lottery is in violation of Section 27A-4(h) of

4

the Charter Schools Law, the Board may administer the Charter School's lottery directly.

B. No Conditions for Enrollment. In accordance with Section 27(A)-4(h) of the Charter Schools Law, the Charter School must not create an admissions process subsequent to its lottery that could operate as a barrier to registration or enrollment at the Charter School. The Charter School may request additional intake activities from the parent or student applicant including, without limitation, student essays, student-parent compacts, or open houses; however, the Charter School may not make participation in such activities a condition of enrollment.

e. Student Transfers. The Charter School must document any student transfer out of the Charter School by obtaining a transfer form signed by the student's parent/guardian or the student (if 18 years of age or older) that affirmatively states that the student's transfer is voluntary. The Charter School must maintain records of its signed student transfer forms in accordance with the Illinois School Student Records Act and any regulations promulgated thereunder and be able to produce those records to I&I upon request.

f. Goals, Objectives, Pupil Performance Standards. The Charter School shall pursue and make reasonable progress toward the achievement of the goals, objectives and pupil performance standards consistent with those in accordance with the accountability plan (the "Accountability Plan") described in paragraph 10 of this Agreement, provided that such goals, objectives and pupil performance standards shall at all times remain in compliance with Section 2-3.64a-5 of the Illinois School Code, 105 ILCS 5/2-3.64a-5.

g. Evaluation of Pupils. The Charter School's plan for evaluating pupil performance, the types of assessments to be used, the timeline for achievement of performance standards, and the procedure for taking corrective action if pupil performance at the Charter School falls below those standards, shall be consistent with the Application and as described in paragraph 10 hereof.

h. Curriculum. The curriculum established by the Charter School shall be consistent with the Application and as otherwise modified or supplemented herein. Any material changes to the curriculum made after the Effective Date of this Agreement shall be submitted to the Board or its designee and may be subject to further review and approval prior to the academic year, and in no event later than July 1 of the subsequent year and shall be effective as of the first day of the next academic year. Such modified curriculum shall be incorporated herein by reference as if fully set forth herein.

5

i.     Academic Year; School Days; Hours of Operation.  Instruction shall commence in the 2017-2018 academic year and subsequent academic years on dates established by the Charter School. The days and hours of operation of the Charter School shall be as otherwise established by the Charter School in accordance with state law.

j.     School Calendar.  No later than the April 1 before each academic year that this Agreement is in effect, the Charter School shall submit to the Board its school calendar for the forthcoming academic year and the following summer session. This calendar shall list all student attendance days for each grade level.

k.     Discipline.  The Charter School shall implement a system of uniform student discipline. The Charter School may develop and implement its own system of student discipline in accordance with paragraph 4.k.i. or may elect to adopt the Chicago Public Schools Student Code of Conduct (the "CPS Conduct Code") effective at the beginning of any academic year in accordance with paragraph 4.k.ii.

i.     If the Charter School elects to develop its own system of student discipline, the Charter School shall submit a proposed disciplinary code, including procedures for suspension and expulsion, to the Board for review no later than April 1 of the academic year prior to implementation. The Charter School shall adopt such disciplinary code, including any reasonable modifications requested by the Board, no later than the first day of the subsequent academic year, and shall carry out all disciplinary actions in accordance with such disciplinary code, as modified. The Charter School shall comply at all times with applicable Illinois School Code and federal due process laws in its disciplinary activities and any regulations promulgated thereunder which shall include, but not be limited to, those laws and regulations with respect to the Individuals with Disabilities Education Act and Section 504 of the Rehabilitation Act of 1973 as set forth in paragraph 8.a. of this Agreement. If any student is expelled from the Charter School, the Charter School shall promptly notify the Board of such expulsion and shall provide to the Board within five (5) days of the expulsion, a summary statement of the grounds and evidence warranting expulsion, a record of the proceedings in which the expulsion decision was made, as well as the official transcript of the expelled student. The Board shall evaluate the student's expulsion records and determine appropriate placement on a case-by-case basis.

ii.    The Charter School may, at its option, elect to adopt the CPS Conduct Code effective at the beginning of any academic year, provided that the Charter School shall notify the Board of its election to do so no later than April 1 of the academic year prior to implementation. If the

6

Charter School fails to submit a proposed disciplinary code in a timely manner or fails to adopt a disciplinary code in a timely manner, the CPS Conduct Code shall be deemed to apply.

l. Student-Based Policies. Upon request, the Charter School shall provide the Board with copies of any and all student-based policies that are currently being used by the Charter School including, but not limited to, its attendance and truancy polices.

m. Bilingual Education. The Charter School shall provide bilingual education services to its students in accordance and compliance with all Federal and State laws and rules applicable to public schools that pertain to the instruction of English Learners ("ELs") including, but not limited to, Article 14C of the Illinois School Code (105 ILCS 5/14C-1 *et seq.*, as amended) and any regulations promulgated thereunder. Furthermore, the Charter School must: (i) identify students who have a language background other than English by administering the Chicago Public Schools' Home Language Survey ("HLS") form or the State Board's HLS forms available in additional languages to all incoming students; (ii) assess the English language proficiency of all students not previously enrolled in CPS and identified as coming from a non-English speaking background by administering the state-prescribed screening instrument applicable to the student's grade level, unless the student has previously been identified as English language proficient using the State Board's criteria; (iii) provide bilingual education services - Transitional Bilingual Education ("TBE") or Transitional Program of Instruction ("TPI") - as required and defined by the State Board to students who are eligible for TBE or TPI services based on their English language proficiency; and (iv) annually assess the English language proficiency of all identified ELs by administering the state-mandated English language proficiency assessment.

5. **Additional Covenants and Warranties of Charter School.** The Charter School covenants and warrants as follows:

a. Compliance with Laws and Regulations. The Charter School shall operate at all times in accordance with the Charter Schools Law and all other applicable Federal and State laws from which the Charter School is not otherwise exempt and constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, gender identity/expression, national origin, religion, ancestry, sexual orientation, marital status or need for special educational services. The Charter School shall also comply with the following, to the extent applicable to charter schools (as amended from time to time):

i. The Every Student Succeeds Act, (PL 114-95, signed December 10, 2015), as may be amended from time to time;

7

    ii.      Section 2-3.64a-5 of the Illinois School Code (105 ILCS 5/2-3.64a-5), regarding performance goals, standards and assessments;

    iii.     Section 10-17a of the Illinois School Code (105 ILCS 5/10-17a) regarding school report cards;

    iv.     Sections 10-21.9 and 34-18.5 of the Illinois School Code (105 ILCS 5/10-21.9; 105 ILCS 5/34-18.5) regarding fingerprint-based criminal history records checks and checks of the Statewide Sex Offender Database and the Statewide Murderer and Violent Offender Against Youth Database of applicants for employment;

    v.      Sections 10-20.14, 10-22.6, 24-24, 34-19 and 34-84a of the Illinois School Code (105 ILCS 5/10-20.14; 105 ILCS 5/10-22.6; 105 ILCS 5/24-24; 105 ILCS 5/34-19; 105 ILCS 5/34-84a) regarding discipline of students;

    vi.     The Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.*);

    vii.    Section 108.75 of the General Not For Profit Corporation Act of 1986 (805 ILCS 105/108.75) regarding indemnification of officers, directors, employees and agents;

    viii.    The Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.*);

    ix.     Sections 10-23.12(b) and 34-18.6(b) of the Illinois School Code (105 ILCS 5/10-23.12(b); 105 ILCS 5/34-18.6 (b)) regarding detection, reporting, and prevention of child abuse and neglect (effective 1/1/18);

    x.    The Illinois School Student Records Act (105 ILCS 10/1 *et seq.*);

    xi.    The Freedom of Information Act (5 ILCS 140/1 *et seq.*);

    xii.    The Open Meetings Act (5 ILCS 120/1.01 *et seq.*);

    xiii.   The Illinois Pension Code (40 ILCS 5/1-101 *et seq.*);

    xiv.    The P-20 Longitudinal Education Data System Act (105 ILCS 13/1 *et seq.*);

    xv.    Section 27-23.7 of the Illinois School Code (105 ILCS 5/27-23.7) regarding bullying prevention;

xvi.    Section 2-3.162 of the Illinois School Code (105 ILCS 5/2-3.162) regarding student discipline reporting;

xvii.    Sections 22-80 and 27-8.1 of the Illinois School Code (105 ILCS 5/22-80; 105 ILCS 5/27-8.1) regarding student athletes, concussions and head injuries;

xviii.    Sections 10-20.60 and 34-18.53 of the Illinois School Code (105 ILCS 5/10-20.60; 105 ILCS 5/34-18.53) (effective 1/1/18) regarding breastfeeding accommodations for pupils;

xix.    All non-curricular health and safety regulations of the State of Illinois and the City of Chicago including, without limitation, those laws specifically identified by the State Board as being applicable to charter schools, with the list of such regulations to be posted on the State Board's Internet website by September 1st of every year, and in any event upon any updates from the State Board of such list in accordance with 105 ILCS 5/27A-5(d); and

xx.    All Federal and State of Illinois orders and agreements, including desegregation orders, orders regarding special education, orders regarding bilingual education, compliance agreements or other agreements with the United States Department of Education or other Federal or State agencies, applicable to the Chicago Public Schools. Upon the request of the Charter School, the Board shall furnish copies of any such orders or agreements. In the event of any Federal or State governmental inquiries involving the Charter School with respect to such law, order or agreement, the Charter School shall fully cooperate with the Board in responding appropriately and coming to a final resolution. To the extent that the Charter School believes that it is exempt from compliance with any such law, order or agreement, the Charter School shall provide the Board's General Counsel with a copy of an exemption ruling or opinion rendered by the applicable Federal or State authority that has jurisdiction over such law or that issued the order or agreement. To the extent the Board is a party to a court action that is likely to result in a new order or agreement that will require compliance by the Charter School, the Board shall use reasonable efforts to notify the Charter School of such court action.

b.    Compliance with Agreement.    The Charter School shall operate at all times in accordance with the terms of this Agreement including the Accountability Plan attached hereto as Exhibit C, the additional specific terms and conditions set forth in Attachment 1 and all other exhibits attached hereto.

9

c.    Governance and Operation. The operation of the governing board of the Charter School shall at all times be as set forth below:

i.    The governing board of the Charter School shall consist of the number of directors required by applicable law and the bylaws of the Charter School.

ii.    Membership and the composition of the governing board shall be subject to and in accordance with the bylaws of the Charter School.

iii.    Governing board vacancies shall be filled by the Charter School's governing board.

iv.    Directors of the governing board of the Charter School shall have duties and responsibilities consistent with the Illinois General Not-For-Profit Corporation Act of 1986, as amended, and as stated in the Application.

v.    The governing board shall hold meetings at least six (6) times a year.

Every six (6) months the Charter School shall submit to the Board the approved minutes of every governing board meeting held since its last submission of its approved board meeting minutes to the Board and any advertised copies of such meeting notices.

d.    Maintenance of Corporate Status and Good Standing. The Charter School shall at all times maintain itself as an Illinois general not-for-profit corporation capable of exercising the functions of the Charter School under the laws of the State of Illinois, shall remain in good standing under the laws of the State of Illinois, and shall timely make all required filings with the office of the Illinois Secretary of State. Upon request, the Charter School shall provide the Board with certified copies of its Articles of Incorporation, a Certificate of Incorporation evidencing its incorporation as a nonprofit corporation, its bylaws, and all amendments or modifications thereto. The Charter School is also recognized as an organization exempt from Federal income taxation under Section 501(c)(3) of the Internal Revenue Code, and upon request, the Charter School shall provide the Board with copies of all filings relating to the Charter School maintaining 501(c)(3) exempt status.

e.    Personnel. The relationship between the Charter School and its employees, and the manner in which terms and conditions of employment shall be addressed with affected employees and their recognized representatives, if any, shall be as set forth in the Application and this Agreement, provided that

10

the Charter School shall comply with all Federal and Illinois employment laws and regulations made applicable to charter schools under the Charter Schools Law.

No later than September 1 and February 1 of each year during the term of this Agreement, the Charter School shall provide the Board with a current list of all of its employees, and shall cause each of its subcontractors to provide the Board with a current list of all of such subcontractor's employees, who may come into contact with students at the Charter School. Such lists shall contain the names, job positions, Illinois employee identification numbers and/or last four digits of the social security numbers of all applicable employees. Such lists shall also indicate: (i) for each employee, the results of the fingerprint-based criminal background checks required in Exhibit E (Criminal Background Checks) of this Agreement; and (ii) for each individual employed in an instructional position, evidence of certification, or evidence that such individual is otherwise qualified to teach under Section 27A-10(c) of the Charter Schools Law, including information regarding the additional mentoring, training and staff development, if any, to be provided by the Charter School pursuant to paragraph 5.g. of this Agreement. For any person hired in an instructional position after February 1 of any academic year, the Charter School shall provide the Board with such results of the fingerprint-based criminal background checks and evidence of certification (or other qualification if applicable) as noted hereinabove no later than five (5) business days before the individual's initial date of employment.

After November 13, 2017, the Charter School shall no longer be required to submit, as a part of such lists, the results of the fingerprint-based criminal background checks required in Exhibit E for each Charter School employee and subcontractor employee who may come into contact with students at the Charter School.

     f.     Background Checks and Adjudication Process. For the period from the Effective Date through November 13, 2017, please refer to Exhibit E attached hereto for the Criminal Background Checks provision for the Charter School. Beginning November 14, 2017, the parties acknowledge and agree to the following:

     i.     Background Checks. The Board shall conduct a criminal history records check on all the Charter School's prospective and existing employees, agents, contractors, subcontractors, and volunteers who may have contact with students (collectively, "Prospective or Current Staff"). The criminal history records check shall be in accordance with the Illinois School Code (105 ILCS 5/34-18.5); the Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 *et seq.*); and the Murderer and Violent Offender Against Youth Registration Act (730 ILCS 154/1 *et*

11

seq.). The Board also shall check for indicated reports of child abuse or neglect in the State Automated Child Welfare Information System of the Illinois Department of Children and Family Services ("DCFS") (or a substantially comparable determination of child abuse or neglect by a government agency in another jurisdiction). In addition, the Board shall perform a check of eligibility for re-hiring from the Board's Do Not Hire ("DNH") records. Collectively, the screenings described in this paragraph shall be referred to as "Background Checks". The Board shall subject the Background Checks to the adjudication process that the Board uses for its own prospective and current staff, and the Board shall share its results, to the extent permitted by law, with the Charter School.

ii.    Adjudication Process. After the Board receives results from the Background Checks, the Board shall conduct its standard adjudication process and share the following information with the Charter School:

A.    That the Board would reject a Prospective Staff member or terminate a Current Staff member who had been convicted of any enumerated offense set forth in the Illinois School Code. If the Prospective or Current Staff member has been convicted of an enumerated offense, the Charter School may not employ the Prospective or Current Staff member.

B.    That the Board would require additional information from a Prospective or Current Staff member who had a conviction of a non-enumerated offense or whose conviction status is unknown. The Board shall communicate with the Prospective or Current Staff member the need for additional information.

C.    After the Board considers the Prospective or Current Staff member's Background Checks, the Board shall inform the Charter School whether: (1) the Board would hire the Prospective Staff member or continue to employ the Current Staff member; (2) the Board would conditionally hire the Prospective Staff member or continue to employ the Current Staff member, pending a final adjudication; or (3) the Board would not hire the Prospective Staff member or would terminate the current Staff Member.

D.    If the Board's DNH check reveals a DNH, and the DNH is one of the bases for the Board's opinion that it would not hire the Prospective or Current Staff member, the Board shall provide the Charter School information concerning the basis for the DNH.

12

     iii.     <u>Charter School's Obligations.</u> The Charter School shall obtain and provide the Board with a signed copy of the Board-approved *Release and Consent to Conduct and Disclose Background Investigation and Personnel Information* ("Release") from each of its Prospective and Current Staff members in the form provided by the Board. <u>The Charter School shall not allow any Prospective Staff to have contact with students (*i.e.*, via text messages, live chats, emails, telephone, in person, or through any other means) until the Charter School receives the results of the Prospective Staff member's Background Checks and the Board's adjudication.</u> The Board reserves the right to modify the form of the Release from time to time.

     iv.     <u>Reimbursements.</u> The Charter School shall reimburse the Board for the actual costs and expenses incurred by the Board conducting Background Checks.

     v.     <u>Volunteers.</u> The Charter School shall categorize all Prospective and Current volunteers as either Level I or Level II volunteers as set forth in Sections II.A and II.B of the Board's Volunteer Policy ("Volunteer Policy") (14-0326-PO1), adopted March 26, 2014, as amended. Notwithstanding anything in paragraph 5.f.i above to the contrary, it is understood and agreed that only volunteers of the Charter School who fall within the scope of Level I volunteers as defined in the Volunteer Policy must complete the Background Checks and undergo the Board's adjudication. The Charter School may, but is not required, to cause its volunteers who fall within the scope of Level II volunteers as defined in the Volunteer Policy to complete the Background Checks and undergo the Board's adjudication."

     g.     <u>Instructional Providers.</u> The Charter School shall employ or otherwise utilize in instructional positions and shall require that its subcontractors employ or otherwise utilize in instructional positions only those individuals who are certificated under Article 21 of the Illinois School Code, 105 ILCS 5/21-1 *et seq.*, or who are otherwise qualified to teach under Section 27A-10(c) of the Charter Schools Law. The Charter School shall satisfy the required percentage of certificated individuals employed in instructional positions for its Charter School in accordance with Section 27A-10(c), (c-5) and (c-10) of the Charter Schools Law, as may be amended from time to time. For purposes of this Agreement, "instructional positions" means all those positions involving duties and responsibilities which, if otherwise undertaken in the Chicago Public Schools, would require teacher certification. In the event that the Charter School employs or otherwise utilizes or any of its subcontractors employs or otherwise utilizes non-certificated personnel in instructional positions, the Charter School

and/or its subcontractors shall provide such additional mentoring, training and staff development as the Charter School determines is necessary to ensure that such individuals perform their instructional duties satisfactorily.

Section 27A-10(c) of the Charter Schools Law references Article 21 of the Illinois School Code which had most of its sections repealed and replaced with Article 21B as it relates to the licensure of educators so the words "certificated" and "certification" can be used interchangeably with the words "licensed" and "licensure" in this Agreement.

h.  Homeless Children.  The Charter School acknowledges and agrees that Chicago Public Schools is committed to serving the needs of children who are homeless by addressing all barriers to the enrollment and participation of students in temporary living situations in the school environment, and by protecting their rights under Federal and State law.  The Charter School agrees that one goal of this Agreement is to ensure that all homeless children who attend the Charter School receive the same services provided by Chicago Public Schools to homeless children in its Students in Temporary Living Situations Program and agrees that it will provide services to homeless children at the same level that CPS provides those services.  The Charter School must protect the rights of children under the McKinney-Vento Homeless Assistance Act (42 U.S.C. §11431 *et seq.*, as amended) and the Illinois Education for Homeless Children Act (105 ILCS 45/1-1 *et seq.*, as amended) and all other laws that protect the rights of homeless children.  The Charter School further acknowledges that the Board has certain obligations under the Settlement Agreement in Salazar v. Edwards, 92 CH 5703 (Circuit Court, Cook County).  The Charter School shall ensure that no member of the Salazar class is deprived of his or her rights under the Settlement Agreement and the Charter School shall not interfere with the Board's performance of its obligations under the Settlement Agreement.

i.  Student Transportation.  The Charter School shall meet the transportation needs of its students including, the needs of its low-income and at-risk students, and its homeless children and youth, in the manner set forth in its Application which transportation plan may include, but not be limited to, the following: coordinating with Chicago Public Schools to provide transportation for any students with disabilities who have Individualized Education Programs ("IEPs") in which transportation is required; participating in the state's Parent/Guardian State Pupil Transportation Reimbursement Program; providing Chicago Transit Authority reduced fare permits or cards to students based on income qualifications; assisting parents in the development of car pool plans; and/or working with students and their parents to highlight the best routes to and from school via public transportation, expressways and streets. Once the Charter School identifies any students eligible for transportation assistance in accordance with the McKinney-Vento Homeless Assistance Act (42

U.S.C. §11431 *et seq.*, as amended), the Charter School shall coordinate with the Board's Students in Temporary Living Situations Department to obtain and distribute transportation fares to such students.

j.    Safety and Security. In the event that there is any allegation of misconduct by a person that affects the safety and/or welfare of any student at the Charter School, the Charter School shall (i) immediately take appropriate action(s) to protect such student, (ii) promptly contact the Board's Student Safety Center via email at Studentsafety@cps.edu, and (iii) fully cooperate with the Board in any investigations or inquiries that may be conducted by the Board until there is a final resolution of the matter to the satisfaction of the Board. In the event of an emergency, the Charter School must report the incident to the City's Emergency Communications Center at 9-1-1 and subsequently to the Board's Student Safety Center at (773) 553-3335 (open 24 hours/7 days a week). An emergency can include, but not be limited to, any of the following incidents: (A) a serious threat to the school, students or staff; (B) a disturbance involving a large number of students; (C) school lockdown; (D) any weapons or dangerous items found on school grounds; or (D) danger in the vicinity of the school that affects school safety (e.g., shots fired).

k.    Conflicts of Interest. The Charter School shall certify that neither it, nor any of its board members, directors, officers, employees, or agents, nor family members of any such persons, have a private interest, direct or indirect, or will acquire any such interest directly or indirectly, which does or may conflict in any manner with the Charter School's performance and obligations under this Agreement. The Charter School must establish safeguards to prohibit such a conflict of interest or an appearance of a conflict of interest from occurring during the term of this Agreement. If applicable, the Charter School also shall include conflicts of interest provisions in accordance with Section 27A-10.5 of the Charter Schools Law. By December 1, 2017, and thereafter no later than July 1 of each subsequent year, the Charter School shall submit to the Board a copy of its Conflict of Interest Policy (to the extent that it is not already a part of the Charter School's Ethics Policy as described in paragraph 5.1. below) with a summary of any revisions from the previous year's version.

l.    Ethics Policy. The Charter School shall adopt and maintain an Ethics Policy for its board members, directors, officers and employees to ensure that all such persons act in accordance with the highest standards of ethical conduct. By December 1, 2017, and thereafter no later than July 1 of each subsequent year, the Charter School shall submit to the Board a copy of its Ethics Policy with a summary of any revisions from the previous year's version.

m.    Debarment/Suspension; Bid-Rigging/Bid-Rotating. The Charter School certifies that it is not presently debarred, suspended, proposed for

15

debarment, declared ineligible, or voluntarily excluded from bidding for or participating in this transaction under 105 ILCS 5/10-20.21(b) or by any Federal or State department or agency. If it is later determined that the Charter School knowingly rendered a false certification, this Agreement may be voided, in whole or in part, in addition to other remedies available to the Board under this Agreement or by law. The Charter School further agrees by executing this Agreement that it will include this clause without modification in all lower tier transactions, solicitations, proposals, contracts and subcontracts. If the Charter School or any lower tier participant is unable to certify to this statement, it must attach an explanation to this Agreement.

The Charter School further certifies that it is not barred from entering into this Agreement by Sections 33E-3 and 33E-4 of the Criminal Code of 1961 (720 ILCS §5/33E-3, 33E-4). Sections 33E-3 and 33E-4 prohibit the award of a public contract to a person who has been convicted of bid-rigging or bid-rotating.

6.      Financial Operations of Charter School.

a.      Annual Audits. At fiscal year end, the Charter School shall prepare its annual financial statements in accordance with accounting principles generally accepted in the United States of America for not-for-profit organizations ("GAAP"). During the fiscal year, the Charter School shall operate in accordance with GAAP, the accrual basis of accounting, or any other basis of accounting, provided that the Charter School's accounting methods allow it to prepare reports required by the Board, the State Board, and any grantors.

The Charter School shall undergo a Financial Statement Audit and Financial and Administrative Procedures Controls Review (collectively, the "Financial Audit"), to be performed annually at its expense by an outside independent auditor that must be retained by the Charter School, and such auditor must be reasonably acceptable to the Board. To qualify as independent for purposes of the paragraph, such auditor must not be an employee of the Charter School or otherwise affiliated with the Charter School for non-audit purposes. The Financial Audit shall include, without limitation:

i.      An opinion on the financial statements (and Supplementary Schedule of Expenditures of Federal Awards, if applicable);

ii.     A report on compliance and on internal control over financial reporting based on an audit of financial statements performed in accordance with Government Auditing Standards and the Single Audit Act of 1984, as amended; and

16

   iii.  A report on compliance with requirements of applicable laws and regulations, including the audit requirements contained in the Accountability Plan.

The Financial Audit shall be submitted to the Board by the Charter School no later than November 1 of each year during the term of this Agreement, beginning with November 1, 2017.

The Financial Audit shall be submitted to the State Board by the Charter School no later than December 1 of each year during the term of this Agreement, beginning with December 1, 2017.

In addition, a copy of the Form 990 that the Charter School filed that year with the U.S. Internal Revenue Service (the "IRS") shall be submitted to the Board and the State Board no later than December 1 of each year during the term of this Agreement, beginning with December 1, 2017; provided, however, that in any year during the term of this Agreement that the Charter School has requested and been granted an extension by the IRS for filing the Form 990 using IRS Form 8868, then the Charter School shall submit to the Board and the State Board: (1) a copy of the filing receipt of such Form 8868 by December 1 of such year, and (2) a copy of such Form 990 no later than February 15 of such year.

   b.  <u>Financial Statements and Reports.</u> The Charter School shall prepare or cause to be prepared quarterly financial statements and reports including budgets, in accordance with Board instructions, which shall be submitted to the Board no later than thirty (30) calendar days after the end of each quarter and no later than forty-five (45) calendar days after the end of each fiscal year. Also the Board reserves the right to request accounts payable aging reports and cash forecast reports in a Board-specified format from the Charter School within ten (10) business days of the Board's request. The Charter School shall prepare and provide to the Board an annual budget for each fiscal year in a Board-specified format by no later than July 1 of such fiscal year unless a later date is agreed to in writing by the Board. The fiscal year for the Charter School shall begin on July 1 of each year and end on June 30 of the subsequent year.

   c.  <u>Distribution of Funds.</u>  The Board shall distribute the Charter School funds, as determined in paragraph 6.d., in four (4) quarterly installments distributed on or about July 22, October 15, January 15 and April 15 of each fiscal year, or the first business day following each such day if any such day falls on a Saturday, a Sunday, or a holiday. In the event of an exigent circumstance in which there is a delay in the Board receiving education funding, or a reduction in education funding, from third party sources such as Federal or State governmental entities (e.g., the Illinois General Assembly or the State Board), quarterly installments may be disbursed on a monthly basis as received by the

17

Board. All funds distributed to the Charter School from the Board shall be used for educational purposes only. The use of such funds for any other purpose is strictly prohibited.

    d.    <u>Funding Procedure.</u> The Board shall calculate the per capita tuition payment for each pupil enrolled at the Charter School for each fiscal year based on per pupil rates as set forth in the budget book ("Budget Book") adopted by the Board each fiscal year and shall provide this amount to the Charter School for each pupil enrolled at the Charter School as set forth below in paragraphs 6.d.i-v. <u>For the first year (2017-2018 FY) of the term of the Agreement,</u> per pupil rates for the first and second installments shall be defined as the Student Based Budgeting ("SBB") rate, non-SBB rate and facility supplement (if applicable) less the employer's proportionate pension contributions (normal cost). Per pupil rates for the third and fourth installments of 2017-2018 FY shall be defined as the tuition rates which the Board established in order for the Charter School's annual tuition rate not to be less than 97% or more than 103% of the Board's per capita tuition charge ("PCTC") in accordance with P.A. 100-0465. Also, for 2017-2018 FY, the Board shall make adjustments to the Charter School's third and fourth installments to true-up the prior installments to ensure that the annual tuition rate for the Charter School shall not be less than 97% or more than 103% of the Board's PCTC for the 2017-2018 fiscal year.

In addition an administrative fee shall be charged annually to the Charter School to cover the cost to the Board of overseeing charter schools ("Administrative Fee"). The Administrative Fee as well as the methodology for the calculation of the Administrative Fee shall be as specified in the Board-approved Budget Book and may be adjusted on an annual basis.

The Charter School acknowledges and agrees that the funding amounts provided to the Charter School by the Board may be adjusted or varied during the year and from year to year depending upon the amount of appropriations authorized by the Illinois General Assembly and subsequent Board approval of the budget on an annual basis. The Board reserves the right to amend the Board-approved Budget Book if necessary.

    i.    <u>First Installment (July 22).</u> The amount of the Board's first quarterly payment shall be based initially on a pre-enrollment projection for the number of students enrolled in the Charter School which shall be provided to the Board no later than December 15 of the prior academic year, multiplied by one-fourth the per capita tuition amount. If both parties agree that there has been a material change or an error(s) in the Charter School's pre-enrollment projection, the Board reserves the right to request a revised projection. The Board shall determine if the revised projection or the original projection will be used for the first quarter

18

payment. On the other hand, if the Board determines that the Charter School has consistently over-projected the number of students enrolled in the Charter School over the past five (5) years, the Board reserves the right to make adjustments to the original student projection number as needed for the first quarter payment. It is understood and agreed that the first installment for each fiscal year will be remitted only upon the Board receiving all required submissions and documentation on such dates as set forth in the compliance chart compiled by I&I.

      ii.    <u>Second Installment (October 15)</u>. The amount of the Board's second quarterly payment shall be calculated such that the aggregate amount of the first and second quarterly installments is equal to the number of students enrolled at the Charter School on an enrollment date for the first semester ("First Semester Enrollment Date") as determined by the Board which shall be provided to the Charter School in writing no later than September 1 of each year, as verified by attendance records, multiplied by one-half the per capita tuition amount.

      iii.    <u>Third Installment (January 15)</u>. The amount of the Board's third quarterly payment shall be based on the number of students enrolled at the Charter School on the same First Semester Enrollment Date as set forth in paragraph 6.d.ii above, as verified by attendance records, multiplied by one-fourth the per capita tuition amount.

The amount of the third quarterly payment shall be further adjusted based on the number of students who were expelled from the Charter School between the First Semester Enrollment Date set forth in paragraph 6.d.ii. above and a second date which shall be near the beginning of the second quarter of the CPS school year ("First Semester Adjustment Date") as determined by the Board, which shall be provided to the Charter School in writing no later than September 1 of each year. One-fourth of the per capita tuition amount shall be deducted from the third quarterly payment for each student who was expelled between the First Semester Enrollment Date and the First Semester Adjustment Date. If there is a decrease in the Charter School's total enrollment solely due to students who transferred out of the Charter School for reasons other than expulsion ("Transfers Out"), no further deduction shall be made from the third quarterly payment. However, if students have transferred in to the Charter School ("Transfers In") but the Charter School's total enrollment has decreased by a smaller number than the number of expelled students during the same period, then the deduction amount shall be only one-fourth of the per capita tuition amount multiplied by the net enrollment decrease. On the other hand, if there have been Transfers In and the Charter School's total enrollment has increased between the First Semester Enrollment Date

19

and the First Semester Adjustment Date, the Charter School shall receive additional funds equal to one-fourth of the per capita tuition amount multiplied by the net enrollment increase.

Using the Board's school funding formulas as set forth in its Board-approved Budget Book, for the third quarterly payment adjustments, the Board shall count the Charter School's students with disabilities the same as its general education students.

   iv.   Fourth Installment (April 15). The amount of the Board's fourth quarterly payment shall be calculated such that the aggregate amount of the third and fourth installments is equal to the number of students enrolled at the Charter School on an enrollment date for the second semester ("Second Semester Enrollment Date") as determined by the Board which shall be provided to the Charter School in writing no later than September 1 of each year, as verified by attendance records, multiplied by one-half the per capita tuition amount.

The amount of the fourth quarterly payment shall be further adjusted based on the number of students who were expelled from the Charter School between the Second Semester Enrollment Date set forth in paragraph 6.d.iv. above and a second date which shall be near the beginning of the fourth quarter of the CPS school year ("Second Semester Adjustment Date") as determined by the Board, which shall be provided to the Charter School in writing no later than September 1 of each year. One-fourth of the per capita tuition amount shall be deducted from the fourth quarterly payment for each student who was expelled between the Second Semester Enrollment Date and the Second Semester Adjustment Date. If there is a decrease in the Charter School's total enrollment solely due to Transfers Out, no further deduction shall be made from the fourth quarterly payment. However, if there have been Transfers In but the Charter School's total enrollment has decreased by a smaller number than the number of expelled students during the same period, then the deduction amount shall be only one-fourth of the per capita tuition amount multiplied by the net enrollment decrease. On the other hand, if there have been Transfers In and the Charter School's total enrollment has increased between the Second Semester Enrollment Date and the Second Semester Adjustment Date, the Charter School shall receive additional funds equal to one-fourth of the per capita tuition amount multiplied by the net enrollment increase.

Using the Board's school funding formulas as set forth in its Board-approved Budget Book, for the fourth quarterly payment adjustments, the

20

Board shall count the Charter School's students with disabilities the same as its general education students.

v. <u>Negative Value (if applicable).</u> Any quarterly payments provided to the Charter School as calculated above that result in a negative amount shall be treated as a receivable to the Board and all subsequent payments shall be offset by the Board until the obligation to the Board is fulfilled by the Charter School.

Enrollment shall not include students who are scheduled or have not attended a single day at the Charter School as of the enrollment count day. Enrollment counts shall be reduced retroactively for students who are later determined to have not been enrolled at the Charter School on the enrollment count day.

IN NO EVENT SHALL THE BOARD BE LIABLE TO THE CHARTER SCHOOL OR ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, WHETHER FORESEEABLE OR NOT, THAT ARE IN ANY WAY RELATED TO THE DELAY BY THE BOARD IN DISBURSING INSTALLMENT PAYMENTS TO THE CHARTER SCHOOL UNDER THIS AGREEMENT OR ANY SUBSEQUENT CLAIM BY ANY THIRD PARTY.

e. <u>School-Based Allocations for Federal Title I Funds and Other Eligibility Determinations.</u> The Charter School shall provide the Board with eligibility data regarding Title I of the Elementary and Secondary Education Act of 1965, as reauthorized by the Every Student Succeeds Act ("Title I") eligible students enrolled in the Charter School by a date determined by the Board. Title I funding to the Charter School may be adjusted by the Board to account for prior deviations between the estimated Title I Funds paid and the amount of Title I funds to which the Charter School was entitled to during each fiscal year. Such amounts shall be in addition to the per pupil funding amounts set forth in the Budget Book adopted by the Board each fiscal year. The Charter School shall keep financial records of such funds separate from its other revenues. During the first year of the Charter School's provision of educational services, any Title I or other Federal funding for which these students qualify shall be provided to the Charter School by the Board in accordance with the formulas set forth in the Budget Book adopted by the Board each fiscal year.

Availability of Title I funds to a Charter School is conditional upon the amount of governmental funding available, and the Charter School's maintaining continuous reporting, inspections, and audits, the quality of which shall be satisfactory to the Board and other relevant regulatory organizations. The scope and frequency of program reporting shall be agreed upon by the Charter School

21

and the Board prior to funding the relevant programs unless modifications are required by the governmental funding agencies.

Effective August 31, 2017, the evidence-based funding formula has replaced the calculation and apportionment of supplemental general state aid ("SGSA") starting in the 2017-2018 academic year pursuant to P.A. 100-0465; therefore, SGSA funds shall no longer be distributed to the Charter School as a separate allocation. However, the Charter School shall continue to provide the Board with eligibility data on an annual basis on students who qualify for free and reduced meals for other eligibility determinations.

     f.    Other Sources of Funds for Charter School. Paragraph 6.d is not intended to increase or decrease the amount of per capita student tuition to which the Charter School is entitled under the Charter Schools Law. If the Charter School satisfies the funding criteria, and subject to funding availability, the Charter School may be eligible to receive additional funding from the Board by means of Federal and State categorical funds which are not a part of the PCTC. In addition, any Charter School receiving Federal or State grant funding must comply with all Federal or State regulations tied to such grant funds. The availability of Federal and State grant funds is dependent upon the Charter School's maintaining continuous reporting, inspections, and audits, the quality of which shall be satisfactory to the Board and other relevant regulatory organizations. The funding criteria and procedures related to the aforementioned categories shall be set forth in the Budget Book adopted by the Board each fiscal year.

     g.    Refund of Unspent or Spent Funds. During the term of this Agreement, if the Charter School does not expend or obligate all Federal grant funds prior to the end of the respective grant period, the Board may recapture such unspent grant funds from the Charter School. In addition, if the Board determines that Federal or State grant funds provided to the Charter School were not used or expended for the specific purpose for which they were intended, the Charter School shall promptly reimburse such grant funds to the Board within thirty (30) days of receipt of written notice from the Board.

     h.    Tuition and Fees. The Charter School shall not charge tuition to any student, unless such student would otherwise be liable for tuition costs under the Illinois School Code. The Charter School may charge reasonable fees, to the extent permitted by law, for textbooks, instructional materials, summer school programs, after school programs, and student activities.

     i.    Outside Funding. The Charter School may accept gifts, donations or grants pursuant to Section 27A-11(d) of the Charter Schools Law, provided that no such gifts, grants or donations may be accepted if contrary to applicable

22

law or to the terms of this Agreement. If the Charter School solicits funding from sources other than those set forth in this paragraph 6, it shall comply with all applicable State and Federal laws regarding the reporting of charitable solicitations.

j.    Pension Payments. The Board shall make payments directly to the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Teachers Pension Fund") for the employer's pension liability on behalf of any education, administrative or other staff member employed at the Charter School (whether by the Charter School itself or one of its subcontractors) who is certified under the law governing certification of teachers. The Board shall have the right to charge the Charter School for the proportionate share of the annual estimated employer's normal pension cost, and to deduct that amount from the quarterly payments due to the Charter School. After each fiscal year, the Charter School shall provide a calculation (as defined by the Board) of its share of the employer's normal pension cost based on the total actual pensionable salaries for that year ("Final Employer's Pension Cost"). The Board shall review that calculation and shall reserve the right to obtain any and all records and additional documentation that support the Charter School's calculation. If the Charter School's Final Employer's Pension Cost exceeds or is less than the actual amount withheld by the Board, an adjustment (refund/withholding) shall be made by the Board in a future quarterly payment to the Charter School.

The Board shall not have any duty to make the employee's or other staff member's contributions. Notwithstanding the foregoing, the Charter School acknowledges and agrees that the Board retains the right to collect delinquent employee contributions from the Charter School in accordance with Section 17-132 of the Illinois Pension Code (40 ILCS 5/17-132) and may deduct such delinquent contributions from any quarterly payments due the Charter School. Pursuant to Section 17-132(b) of the Illinois Pension Code, employee contributions are deemed delinquent if the Chicago Teachers Pension Fund does not receive the employee contributions by the 30th calendar day after each predesignated payday.

If the Board elects to deduct delinquent employee contributions from quarterly payments due the Charter School, the Board shall provide the Charter School with fifteen (15) calendar days' prior written notice setting forth in detail the grounds for such action and the amount delinquent. If the Charter School fails to cure such delinquency to the Board's satisfaction within said 15-day cure period, the Board shall be deemed to have a sufficient basis to withhold such funds from any quarterly payments otherwise due the Charter School and to remit such funds to the Chicago Teachers Pension Fund.

23

At such time that the Charter School submits any members' payroll records to the Chicago Teachers Pension Fund in accordance with Section 17-132 of the Illinois Pension Code (40 ILCS 5/17-132) in the format requested by the Chicago Teachers Pension Fund, the Charter School shall provide the Board with copies of such records as well.

If the Charter School closes for any reason, including a revocation or non-renewal by the Board, or if there is a filing by or against the Charter School of any petition or proceeding under any bankruptcy, insolvency, or similar law, the Board reserves the right to recover from the Charter School all or any portion of the Charter School's remaining pension obligations.

    k.    <u>Management and Financial Controls</u>.  At all times, the Charter School shall maintain appropriate governance and managerial procedures and financial controls including, but not limited to: (i) accounting methods as specified in paragraph 6.a.; (ii) a checking account; (iii) adequate payroll procedures; (iv) bylaws; (v) an organizational chart; (vi) procedures for the creation and review of monthly and quarterly financial reports, which procedures shall specifically identify the individual who will be responsible for preparing such financial reports in the following fiscal year; (vii) internal control procedures for, including but not limited to, cash receipts, cash disbursements and purchases; and (viii) maintenance of asset registers and financial procedures for grants in accordance with Education Department General Administrative Regulations ("EDGAR") or the State Board.

    l.    <u>Enrollment/Attendance</u>.  The Charter School shall maintain accurate enrollment data and daily records of student attendance in accordance with Section 27A-9(f) of the Charter Schools Law.  On a daily basis (or on any other time-frame basis consistent with district-level reporting), the Charter School shall provide the Board with current enrollment and attendance data, including EL and IEP service minutes provided to the Charter school's students with disabilities in accordance with Paragraph 8.b. herein, via the Board's IMPACT System ("IMPACT System"), or such other system as may be subsequently implemented by the Board. The Board shall provide the Charter School with the necessary IMPACT System access, software and training to allow Charter School personnel to use the Board's IMPACT System and input enrollment/attendance data. The Board shall have the right to perform spot checks or spot audits at the Charter school for verification of enrollment and/or attendance data.

    m.    <u>Deductions for Facility Expenses.</u>  If the Charter School is located in a Board facility, the Board may offer to provide the Charter School with certain facility services including building maintenance, food services, technology services, utilities, and/or safety and security ("Facility Services"). A

24

Charter School located in a Board facility and utilizing the Facility Services will have such charges deducted from the quarterly payments issued by the Board and such services and charges will be outlined in the lease agreement between the Board and the Charter School. Such charges may be adjusted annually or upon such other terms as set forth in the lease agreement.

n.  Withholding of Funds. If the Board deems that there has been a material violation of this Agreement by the Charter School, the Board may withhold any and all payments of funds to the Charter School, provided that the Board gives the Charter School prior written notice enumerating each violation and a reasonable period of time during which the Charter School shall have the opportunity to cure any such violation after the Charter School's receipt of such written notice. Upon the Charter School's cure of any such material violation, the Board shall immediately release any and all payments of funds due the Charter School.

o.  Right to Offset. If there are (i) costs and expenses from conducting the Charter School's Background Checks by the Board or (ii) overpayments of special education or Federal or State categorical funds to the Charter School under this Agreement that have not been paid to the Board when due, the Board shall have the right, upon the Charter School's failure to cure after written notice to the Charter School, to fully offset against any such costs and expenses or overpayments owed to the Board pursuant to this Agreement. Any such offset shall be made against any future quarterly payments due the Charter School. As a part of its written notification, the Board shall provide details regarding the amount of the offset, the reason for the offset, and the timing of the offset on the part of the Board. The Board, in its sole discretion, may consider the Charter School's request, if made, to authorize a payment plan to repay any such deficient amounts before any offsets may be made by the Board although the Board shall be under no obligation to do so.

p.  Public Funds Used for Advertising. In accordance with Section 27A-4(l) of the Charter Schools Law, any advertisement created after January 1, 2015, including a radio, television, print, Internet, social media, or billboard advertisement, purchased by the Charter School with public funds must include a disclaimer stating that the advertisement was paid for using public funds. However, this disclaimer requirement shall not apply to materials created by the Charter School including, but not limited to, a school website, informational pamphlets or leaflets, or clothing with affixed school logos.

7.  Attendance Center; Laws, Rules and Regulations for Attendance Center.

a.  Attendance Center. The Charter School shall be located at 4319 West Washington Boulevard, Chicago, Illinois (the "Attendance Center"). The

Charter School shall comply with all project deadlines and reporting requirements set by the Board as well as obtain and submit to the Board for review no later than thirty (30) calendar days prior to the start date of the Charter School's academic year: all applicable zoning and occupancy permits and health and safety approvals for such Attendance Center; and (i) an executed copy of the lease agreement for such Attendance Center, if occupied under a lease agreement; or (ii) evidence of title to such Attendance Center, if owned by the Charter School. The Charter School shall provide prompt notice to the Board if there is any delay by the Charter School in submitting such documents within the thirty-day time period. The Charter School shall take such actions as are necessary to ensure that all leases (for any Attendance Center not owned by the Charter School), zoning and occupancy permits and health and safety approvals for the established Attendance Center remain valid and in force, and shall certify to the Board by September 1, 2017 or the first day of the Charter School's academic year, whichever is earlier, that such leases, permits, certificates and approvals have been obtained and shall remain in force during the term of this Agreement.

      b.   <u>Change in Location.</u> The Charter School may request to change the physical location of an existing Attendance Center, provided that the Charter School fulfills certain conditions of the Board and provides such information as requested by the Board with respect to such proposed physical location. The Charter School must notify the Board of the proposed change in location not less than one hundred and twenty (120) days prior to the proposed effective date of relocation. I&I shall notify the Charter School whether it will recommend the change in location to the Board.

Such a change in the physical location of an existing Attendance Center by the Charter School shall be deemed a material change to this Agreement which requires the prior approval of the Board to be in full force and effect.

      c.   <u>Temporary Change in Location for Emergency.</u> If the change in location of an Attendance Center is due to an emergency where the Attendance Center has been made untenantable by fire, flooding, tornado, earthquake or other casualty or where its occupancy permit has been revoked due to a reason outside of the Charter School's reasonable control, the one hundred and twenty (120) days' prior notice to the Board from the Charter School is not required. In such an emergency situation, the Charter School shall provide immediate written notice to the Board after the Charter School becomes aware of the need to change the location of its Attendance Center and the Charter School shall proceed as follows:

      i.   The Charter School shall promptly repair any damage to the Attendance Center caused by the emergency and to remedy any

accessibility and building code compliance issues at its current temporary location until such time as the damaged Attendance Center is returned to the condition in which it was found prior to the emergency. While in its temporary location, the Charter School must submit written status reports as often as requested by I&I regarding the renovation work performed on the damaged Attendance Center; or

ii. If the Attendance Center has been condemned or has such extensive damage that the Charter School does not want to expend any funds to make the necessary repairs to the Attendance Center, the Charter School shall provide to I&I written notice of the change in its permanent location and the reasons for abandoning its original Attendance Center. The Charter School shall fulfill certain conditions of the Board and provide the information set forth in this paragraph 7 with respect to such new physical location. I&I shall notify the Charter School whether it will recommend such change in location to the Board.

d. <u>Compliance with Disability Access Laws and Regulations.</u> The Charter School shall ensure at all times that its facilities (including any improvements) and operations comply with: (i) all applicable provisions of Federal, State and local disability access laws which shall include, but not be limited to, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.*, as amended, including, without limitation, Title III; the Rehabilitation Act of 1973, 29 U.S.C.A. §701 *et seq.*, as amended; their implementing regulations; the Illinois Environmental Barriers Act, 410 ILCS 25/1 *et seq.*; and the accessibility portions of the Chicago Building Code; and (ii) the ADA and Rehabilitation Act aspects of the Accountability Plan.

e. <u>ADA Plan.</u> The Charter School shall submit a facility plan for the Attendance Center which shall comply with the ADA and Section 504 of the Rehabilitation Act of 1973, as amended, their implementing regulations, the Illinois Environmental Barriers Act, and the accessibility portions of the Chicago Building Code ("ADA Plan"). Any such ADA Plan shall be submitted to I&I for the Board's approval which shall not be unreasonably withheld. The ADA Plan approved by the Board shall be incorporated herein by reference and made a part of this Agreement. If a Charter School fails to submit an ADA Plan to I&I by the Board-specified date, such failure shall be deemed a material violation of this Agreement, subject to paragraph 13 herein, and the Board shall consider such non-compliance a factor in determining whether to revoke or not renew the Charter School's charter.

8. <u>Special Education and Supports.</u>

27

    a.    <u>Compliance with Laws, Rules and Regulations.</u> The Charter School shall comply with all Federal and State laws and rules applicable to public schools that pertain to special education including, but not limited to, (i) the Individuals with Disabilities Education Act (20 U.S.C. §1401 *et seq.*, as amended) ("IDEA") and any regulations promulgated thereunder; (ii) Article 14 of the Illinois School Code (105 ILCS 5/14-1.01 *et seq.*, as amended) and any regulations promulgated thereunder; and (iii) Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794 *et seq.*, as amended) and any regulations promulgated thereunder. The Charter School shall provide special education and related services to students with disabilities in accordance and compliance with (iv) the student's IEP; (v) the Board's procedural manual regarding educating students with disabilities in the Chicago Public Schools, as may be amended from time to time, which is incorporated herein by reference; (vi) any and all Federal court orders applicable to students with disabilities in the Chicago Public Schools; (vii) any and all guidance issued by the Board's department that oversees the provisioning for students with disabilities currently known as the Office of Diverse Learner Supports and Services ("ODLSS") and the Office of Student Health and Wellness (whether posted on the CPS web site or distributed at case manager meetings); and (viii) all non-curricular health and safety regulations of the State of Illinois and the City of Chicago including, without limitation, those laws specifically identified by the State Board as being applicable to charter schools as referenced in paragraph 5.a.xvii set forth herein. In addition, the Charter School shall provide reasonable accommodations and related services to students with mental or physical impairments who qualify under Section 504 of the Rehabilitation Act of 1973 in accordance and compliance with (ix) the student's Section 504 Plan ("504 Plan"), and (x) the Board policies and procedures regarding students' 504 Plans.

    b.    <u>Special Education Teachers & Paraprofessionals.</u> The Charter School shall hire, or subcontract for, special education teachers and paraprofessionals to provide special education services to the Charter School's students with disabilities. All special education teachers and paraprofessionals employed by, or subcontracting with, the Charter School shall have the requisite qualifications, Illinois certificates and/or licenses. A representative of the Charter School must attend all CPS special education teacher and paraprofessional meetings, respectively, in particular for IEP training, no more than four (4) times per year. The Board shall notify the Charter School of the available dates, locations, times and topics for the CPS special education teacher and paraprofessional meetings through several communication channels.

    c.    <u>Related Service Providers.</u> The parties acknowledge and agree that it is the expectation of both parties that the Charter School will hire, or subcontract for, related service providers to provide special education and 504

Plan services to the Charter School's students with disabilities. All related service providers employed by, or subcontracting with, the Charter School shall have the requisite qualifications, Illinois certificates and/or licenses. The related service providers of the Charter School must attend all CPS related service provider meetings, in particular for IEP training, no more than four (4) times per year. The Board shall notify the Charter School of the available dates, locations, times and topics for the CPS related service provider meetings through several communication channels.

If the Charter School is having great difficulty in hiring, or subcontracting for, related service providers to provide special education or 504 Plan services for a given academic year, the Charter School may apply for a waiver of that requirement at such time. The information submitted by the Charter School on the waiver application must be consistent with ODLSS-provided guidelines and must include evidence of the Charter School's previous efforts to hire, or subcontract for, its own related service providers. The CEO or designee shall review the Charter School's waiver application and, subject to the Board's capacity to assign the necessary staff of related service providers to the Charter School, make a determination whether to approve or reject the waiver request. Beginning March 1, 2018, if the CEO or designee approves a waiver for the Charter School as a last resort, the Charter School must reimburse the Board for the salary and benefits of such related service providers based on the Board's per CPS allocation which shall be based on the related service providers' workload including student enrollment and the students' IEPs and 504 Plans.

Failure to inform the Board of its inability to hire, or subcontract for, its related service providers shall be deemed a material violation of the Agreement by the Charter School, subject to paragraph 13 herein, and the Board shall consider such non-compliance a factor in determining whether to revoke or not renew the Charter School's charter.

    d.    Case Manager. The principal of the Charter School must ensure a case manager has been identified to serve as the Charter School's 504 Plan coordinator, as well as the local school district representative ("Local School District Representative") at IEP meetings whenever an ODLSS district representative ("District Representative") has not been designated as the District Representative for that particular meeting. In order to serve as the Local School District Representative at such IEP meeting, the case manager must have a valid Professional Educator License ("PEL") in one of the following areas: Special Education (PK-Age 21) endorsement or School Support Personnel endorsement with a supervisory endorsement and two (2) years' experience. The case manager of the Charter School must attend all CPS case manager meetings, in particular for IEP training, on a monthly basis. The Board shall notify the Charter School of

29

the available dates, locations, times and topics for the CPS case manager meetings through several communication channels.

e.    Funding for Special Education and Supports.    In contrast to previous years, the Board shall no longer reimburse the Charter School for the salaries and benefits for its full-time equivalent certified special education teachers, paraprofessionals and related service providers. Based on the Board's PCTC formula, funding for special education and 504 Plan services shall now be included in the Charter School's annual tuition rate provided by the Board in addition to any supplemental special education funding. With such special education funding, the Charter School shall be responsible for any and all necessary additional resources including assistive technologies (as required by a student's IEP and/or 504 Plan) for the education of students with disabilities enrolled in the Charter School in accordance with the IDEA, Section 504 of the Rehabilitation Act of 1973, and the IEPs and 504 Plans of such students. Such additional resources shall be sufficient to comply with all provisions of the Charter Schools Law, including Section 27A-11 thereof. The Charter School shall be expected to meet the needs of all students' IEPs and 504 Plans in accordance and compliance with this Agreement and all applicable Federal and State laws and any regulations promulgated thereunder.

9.    Insurance.

The Charter School shall, at its own expense, purchase and maintain insurance covering all of its operations, whether performed by the Charter School or by subcontractors. Such insurance shall include the types of insurance set forth in Exhibit B hereto, subject to the conditions and in no less than the respective limits set forth therein. All insurers shall be licensed by the State of Illinois and rated A-VII or better by A. M. Best or a comparable rating service. No later than fifteen (15) days following the execution of this Agreement, and each July 1 thereafter, the Charter School shall provide the Board with certificates of insurance or other satisfactory proof evidencing coverage in the types and amounts as set forth in Exhibit B.

10.    Academic Accountability and Evaluations.

a.    Accountability Plan.    The Charter School shall be held accountable by the Board in accordance with the Accountability Plan contained in Exhibit C of this Agreement, which includes, but is not limited to, (i) the Board's School Quality Rating Policy ("SQRP") adopted November 19, 2014 (14-1119-PO1), (ii) Board Resolution Regarding School Quality Rating Policy adopted September 29, 2015 (15-0929-RS3), (iii) the Board's Charter School Quality Policy ("CSQP") adopted October 28, 2015 (15-1028-PO1), and (iv) any other resolutions adopted by the Board related to the SQRP. Said policies and resolutions, as may be amended from time to time, are hereby incorporated by reference into and made a part of this Agreement as if fully set forth herein.

30

The parties agree that the Accountability Plan attached hereto as Exhibit C shall be subject to revision and modification by the Board effective on August 1 of each year of the Agreement. However, any changes to the SQRP in particular shall be effective as of the date of adoption by the Board. The Board shall make reasonable efforts to solicit input from the Charter School regarding proposed changes to the Accountability Plan and to provide written notice to the Charter School no later than June 30 of each year if changes to the Accountability Plan are based solely on the Board's directives and not requirements arising from State or Federal regulations or other circumstances outside of the Board's control. Any subsequently revised Accountability Plans approved by the Board shall be incorporated herein by reference and made a part of this Agreement as if fully set forth herein.

       b.    Standardized Tests. The Charter School shall administer such standardized tests of academic proficiency as provided in the Accountability Plan, and shall participate in State assessments required by Section 2-3.64a-5 of the Illinois School Code. In accordance with Section 27A-6(b) of the Charter Schools Law, the Charter School shall administer any other nationally recognized standardized tests to its students that the Board administers to the district's students and the results on such tests shall be included in the Board's assessment reports. The Charter School is responsible for ensuring that the data elements (i.e., student names, demographic information, etc.) required to administer the State and CPS assessments are correctly entered into the district's IMPACT System, or such other system as may be subsequently implemented by the Board.

       c.    Site Visits. In addition to the above procedures, the Charter School shall grant reasonable access to, and cooperate with, the Board, its officers, employees and other agents, including allowing site visits by the Board, its officers, employees and other agents, for the purpose of allowing the Board to fully evaluate the operations and performance of the Charter School pursuant to the Accountability Plan and the Charter Schools Law. Whenever possible, the Board shall provide the Charter School with at least twenty-four (24) hours prior notice of such site visits.

11.    Comprehensive School Management Contracts; Purchase Agreement.

       a.    Comprehensive School Management Contract. No entity or party other than the Charter School may provide comprehensive school management or operations except upon the prior approval of the Board. Furthermore, if the Charter School desires to enter into any contract for comprehensive school management or operations services to be performed in substantial part by an

entity not a party to this Agreement, the provisions of Exhibit D attached hereto must be incorporated into any such contract.

      b.    Purchase Contract.  The Board and the Charter School may enter into a purchase agreement(s) providing for the purchase by the Charter School from the Board of certain goods, services and/or materials in connection with the operation of the Charter School.

## 12.    Renewal of Charter; Failure to Renew.

No later than January 1, 2022, and no earlier than July 1, 2021, but in no event later than the date set by I&I, the Charter School shall provide a written proposal to the Board in accordance with Section 27A-9 of the Charter Schools Law, setting forth proposed terms of renewal of this Agreement. Pursuant to Section 27A-9(b) of the Charter Schools Law, the renewal proposal of the Charter School shall contain the most recent audit report and financial statement of the Charter School. The written proposal may contain proposed changes to this Agreement that the Charter School desires to incorporate into the renewed agreement.

No later than thirty (30) days prior to the expiration of this Agreement, I&I shall notify the Charter School of its recommendation regarding such renewal indicating whether, and upon what conditions, it is willing to recommend to the Board the renewal of the charter and the Agreement, including any modified terms proposed by I&I. If there is no agreement on the terms of renewal, then the parties shall fulfill their mutual obligations hereunder to the end of the term of this Agreement. The Board may refuse to renew the charter and the Agreement upon a finding that any cause for revocation exists under paragraph 13 hereof.

## 13.    Revocation of Charter.

The Board may revoke the charter of the Charter School and terminate this Agreement in accordance with Section 27A-9 of the Charter Schools Law if the Board clearly demonstrates that the Charter School did any of the following, or otherwise failed to comply with the requirements of the Charter Schools Law:

      a.    Committed a material violation of any of the conditions, standards, or procedures set forth in this Agreement including the Accountability Plan; or

      b.    Failed to meet or make reasonable progress toward achievement of the content standards or pupil performance standards identified in this Agreement or in the Accountability Plan; or

        c.      Failed to meet generally accepted standards of fiscal management;
or

        d.      Materially violated any provision of law from which the Charter School was not exempted.

In case of revocation, the Board shall notify the Charter School in writing of the reason why the charter of the Charter School is subject to revocation and the Agreement is subject to termination. The Charter School shall submit a written plan to the Board to rectify the problem. The plan shall include a timeline for implementation, which shall not exceed two (2) years or the date of the charter's expiration, whichever is earlier. If the Board finds that the Charter School has failed to implement the plan of remediation and adhere to the timeline, then the Board shall revoke the charter of the Charter School and terminate the Agreement. Except in situations of an emergency where the health, safety or education of the Charter School's students is at risk, the revocation and termination shall take place at the end of the academic year. Nothing in this subparagraph shall be construed to prohibit an implementation timetable that is less than two (2) years in duration.

In the event that the Board proposes to revoke the charter of the Charter School and terminate this Agreement, the Board shall provide the Charter School with written notice setting forth in detail the grounds for such revocation and termination at least 14 days prior to the date the Board takes final action on such revocation and termination.

In addition, the parties may agree to revoke the charter of the Charter School and terminate this Agreement by mutual consent prior to expiration pursuant to paragraph 24 of this Agreement.

14.    <u>Indemnification.</u>

        a.      To the fullest extent permitted by law, the Charter School shall indemnify, defend and hold harmless the Board, its members, officers, employees, agents, affiliates and representatives, past and present (collectively, the "Board Indemnitees"), from and against any and all liabilities, losses, penalties, damages and expenses, including costs and attorney fees, arising out of all claims, liens, demands, suits, liabilities, injuries (personal or bodily), of every kind, nature and character arising or resulting from or occasioned by or in connection with (i) the possession, occupancy or use of the property of the Charter School by its faculty, students, patrons, employees, guests or agents, (ii) any negligent, willful or wrongful act or omission to act by the Charter School, its faculty, students, patrons, employees, guests or agents, (iii) a violation of any law, statute, code, ordinance or regulation by the Charter School, its faculty, students, patrons, employees, subcontractors, guests or agents, and/or (iv) any breach, default, violation or nonperformance by the Charter School of any term, covenant, condition, duty or obligation provided in this Agreement including,

33

but not limited to, the Accountability Plan. In addition, to the extent that the Charter School is subject to taxes under Section 4980H of the Internal Revenue Code (pertaining to the Patient Protection and Affordable Care Act), the Charter School shall be solely responsible for paying such taxes and in the event that the Board is determined to be liable for taxes under Section 4980H of the Internal Revenue Code as a result of the performance of the Charter School's faculty, employees or agents under this Agreement, the Charter School shall indemnify, defend and hold harmless the Board for any such liability. All of the foregoing shall be referred to collectively herein as the "Covered Losses." This indemnification shall not apply to the extent that any Covered Loss results from the negligence or wrongful act or omission of any Board Indemnitee or from any act or omission of the Charter School required by law or this Agreement.

b.      To the fullest extent permitted by law, the Board shall indemnify, defend and hold harmless the Charter School, any successor entity thereto, and their respective members, officers, employees, agents, affiliates and representatives, past and present (collectively, the "Charter Indemnitees"), from and against any and all liabilities, losses, penalties, damages and expenses, including costs and attorney fees, arising out of all claims, liens, demands, suits, liabilities, injuries (personal or bodily), of every kind, nature and character arising or resulting from or occasioned by or in connection with (i) a violation of any law, statute, code, ordinance or regulation by the Board, its members, officers, employees or agents and/or (ii) any breach, default, violation or nonperformance by the Board of any term, covenant, condition, duty or obligation provided in this Agreement or the Accountability Plan (collectively, the "Covered Losses"). This indemnification shall not apply to the extent that any Covered Loss results from the negligence or wrongful act or omission of any Charter Indemnitee or from any act or omission of the Board required by law or this Agreement.

c.      This indemnification, defense and hold harmless obligation shall survive the termination of this Agreement. Any indemnified party shall have the right, at its own expense, to participate in the defense of any suit, without relieving the indemnifying party of any of its obligations hereunder.

15.     Disclaimer of Liability.

The parties expressly acknowledge that the Charter School is not operating as the agent, or under the direction and control, of the Board except as required by law or this Agreement, and that the Board assumes no liability for any loss or injury resulting from: (i) the acts and omissions of the Charter School, its directors, trustees, agents, subcontractors or employees; (ii) the use and occupancy of the building or buildings occupied by the Charter School, or any matter in connection with the condition of such building or buildings; or (iii) any debt or contractual obligation incurred by the Charter

34

School. The Charter School acknowledges that it is without authority to, and will not, extend the faith and credit of the Board or the Chicago Public Schools to any third party.

16.  **Winding Down Procedures upon Revocation, Non-Renewal or Termination by Mutual Consent.**

If the Board revokes the charter of the Charter School, does not renew the charter of the Charter School, or the charter of the Charter School is otherwise terminated by the mutual consent of the parties, the Charter School shall follow the procedures set forth below:

      a.    The Charter School shall be responsible for winding down the operations of the Charter School by a date identified by the Board, including payment of any and all debts, loans, liabilities (contingent or otherwise) and obligations incurred at any time by the Charter School in connection with the operation of the Charter School. Under no circumstances, shall the Board or the Board's members, officers, employees or agents, or those acting on behalf of the Board's members, officers, employees and agents, be responsible for such obligations.

      b.    The Charter School shall cooperate with the Board and shall abide by the school wind down procedures as required by the Board to effectuate the orderly wind down of the Charter School including, but not limited to the following:

           i.    Unspent Public Funds. Upon the wind down of the Charter School, the governing body of the Charter School or its designee shall refund to the Board all unspent public funds. In addition, any unspent public funds or other property or assets received by the Charter School directly from any Federal or State agency shall be refunded to or revert back to that Federal or State agency, respectively.

           ii.    Disposition of Property and Assets. Unless otherwise permitted by the Board, any property or assets of the Charter School purchased with public funds for the operations of the Charter School shall be returned to the Board, at no cost to the Board, subject to the Board's acceptance of the property or asset of the Charter School.

17.  **Governing Law.**

This Agreement shall be governed by, subject to and construed under the laws of the State of Illinois without regard to its conflicts of laws provisions. The Charter School agrees that service of process on the Charter School may be made, at the option of the Board, by either registered or certified mail addressed to the office identified in the notice provision herein, by registered or certified mail addressed to the office actually

maintained by the Charter School, or by personal delivery on any officer, director, or managing or general agent of the Charter School.

18.   Waiver.
No waiver of any breach or violation of this Agreement shall be held as a waiver of any other or subsequent breach or violation.

19.   Dispute Resolution.
If a minor violation or dispute arises between the parties relating to the interpretation or performance of this Agreement, designated representatives of each party who have the authority to resolve the dispute shall attempt in good faith to negotiate or mediate a resolution of the dispute. Notwithstanding anything to the contrary in this paragraph, both parties shall continue to perform their obligations under this Agreement in good faith during the resolution of such minor dispute, unless and until this Agreement is terminated in accordance with the provisions hereof.

20.   Counterparts; Facsimile/Electronic Signatures.
This Agreement may be signed in counterparts, which shall together constitute the original Agreement. Signatures received by facsimile or electronically scanned by either of the parties to the other shall have the same effect as original signatures.

21.   Terms and Conditions of Application.
The parties hereto expressly agree that the Application sets forth the overall goals, standards and general operational policies of the Charter School. The Charter School acknowledges and agrees that its Application is an integral part of this Agreement, and the Board shall have the right to hold the Charter School responsible for all information, representations and statements contained in the Application. The parties understand, however, that the Application is not a complete statement of each detail of the Charter School's operation. To the extent that the Charter School desires to implement specific policies, procedures or other specific terms of operation that supplement or otherwise differ from those set forth in the Application, the Charter School shall be permitted to implement such policies, procedures, and specific terms of operation, provided that such policies, procedures and terms of operation are consistent with the goals, standards and general operational policies set forth in this Agreement and the Charter Schools Law.

22.   Amendments.
Any modification of or amendment to this Agreement shall not be effective unless such modification or amendment is in writing and signed by both parties hereto.

23.   Assignment.
This Agreement may not be assigned or delegated by the Charter School under any circumstances, it being expressly understood that the charter granted hereby runs solely and exclusively to the Charter School.

36

24.  Termination.

This Agreement may be terminated prior to its expiration by the mutual consent of the parties or revocation of the charter of the Charter School pursuant to paragraph 13 hereof. Termination of this Agreement for any reason shall serve to immediately revoke the charter granted hereby.

25.  Notices.

All notices required under this Agreement shall be in writing and sent to the addresses and persons set forth below, or to such other addresses as may be designated by a party in writing. Any notice shall be deemed to have been sufficiently given or served for all purposes, when received, if hand delivered; when transmitted, if transmitted by facsimile or email; upon confirmation of delivery, if sent by recognized overnight courier; and upon receipt if mailed. Refusal to accept delivery has the same effect as receipt.

| | |
|---|---|
| If to the Charter School: | Legal Prep Charter Academies, Inc. |
| | 4319 West Washington Boulevard |
| | Chicago, Illinois 60624 |
| | Attn: Walter Pryor, Board Chair |
| | Facsimile: (312) 386-5796 |
| | Email: walterpryor@gmail.com |
| If to the Board: | Chicago Board of Education |
| | Office of Innovation and Incubation |
| | 42 West Madison Street, 3rd Floor |
| | Chicago, Illinois 60602 |
| | Attn: Mary K. Bradley, Executive Director |
| | Facsimile: (773) 553-3225 |
| With a copy to: | Chicago Board of Education |
| | Law Department |
| | One North Dearborn Street, Suite 900 |
| | Chicago, Illinois 60602 |
| | Attn: Joseph T. Moriarty, General Counsel |
| | Facsimile: (773) 553-1701 |

26.  Audit and Records Retention.

The Charter School shall permit and cooperate in good faith in any audits by the Board or its agents for compliance by the Charter School with this Agreement. Failure of the Charter School to comply in full and cooperate with the requests of the Board or its agents shall give the Board the right to charge the Charter School for the cost of such audit.

The Charter School shall maintain all records showing the time expended and costs

37

incurred in operating the Charter School. All records referenced above and all records required to be retained as part of operating the Charter School shall be retained for five (5) years after the revocation, termination or expiration of this Agreement and such records shall be subject to inspection and audit by the Board. If any audit, litigation or other action involving the records is being conducted or has not been resolved, all applicable records must be retained until the proceeding is closed. As used in this clause "records" includes correspondence (including emails), receipts, vouchers, memoranda and other data, regardless of type and regardless of whether such items are in written form, electronic, digital, or in any other form. The Charter School shall include in all subcontractor agreements provisions requiring subcontractors to retain the above-described records and allow the Board, the Inspector General of the Board, and their duly authorized agents the same right to inspect and audit said records as set forth herein.

27.    Survival/Severability.
All express representations or indemnifications made or given in this Agreement shall survive the revocation, termination or expiration of this Agreement for any reason. In the event that any provision of this Agreement or the application thereof to any person or in any circumstances shall be determined to be invalid, unlawful, or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful or unenforceable, shall not be affected thereby, and each remaining provision of this Agreement shall continue to be valid and may be enforced to the fullest extent permitted by law.

28.    Superseder.
This Agreement supersedes and replaces any and all prior agreements and understandings between the Board and the Charter School with respect to the subject matter hereof. To the extent that any conflict or incompatibility exists between the Application as incorporated herein and the other terms of this Agreement, such other terms of this Agreement shall control.

29.    Delegation.
The parties agree and acknowledge that the functions and powers of the Board may be exercised by the Chief Executive Officer of the Board, provided that any ultimate decision regarding renewal, non-renewal or revocation of this Agreement may be made only by the Board.

30.    Prior Actions.
It is expressly agreed and understood that as a condition precedent to this Agreement becoming effective on the Effective Date hereof, the Charter School shall have taken, completed and satisfied on or before the date specified herein any action or obligation which is required to be completed before such Effective Date, and that failure to do so shall constitute grounds for the Board to declare this Agreement null and void.

38

31.   Construction.

This Agreement shall be construed fairly as to both parties and not in favor of or against either party, regardless of which party prepared the Agreement.

32.   Incorporation of Exhibits.

All exhibits referenced herein are hereby incorporated into and made a part of this Agreement.

[Rest of this page left intentionally blank.]

IN WITNESS WHEREOF, the parties have made and entered into this Agreement as of the Effective Date hereof.

BOARD OF EDUCATION OF THE
CITY OF CHICAGO

By: _~Frank M Clark~_

Frank M. Clark, President


LEGAL PREP CHARTER ACADEMIES, INC.

By: _~signature~_
Name: _Samuel Finkelstein_
Title: _C.EO_


ATTEST:                          6/28/18

By: _~Estela G. Beltran~_

Estela G. Beltran, Secretary


ATTEST:

By: _~signature~_
Name: _Kather A. Stanto_
Title: _COO_


Dated: _6/28/18_                 Dated: _6/8/18_


By: _~signature~_

Janice K. Jackson, Ed.D., Chief Executive Officer

16-1207-EX9; 17-0426-AR2-26;
17-0628-AR1-17; 17-0828-AR4-14;

Board Report: 17-1025-AR1-11; 18-0124-AR1-8;
18-0321-AR5-5; 18-0523-AR1-4

Approved as to legal form:

_~signature~_

Joseph T. Moriarty, General Counsel


Attachments:
Attachment 1 – Additional Specific Terms and Conditions
Exhibit A – Application
Exhibit B – Insurance Requirements
Exhibit C – Accountability Plan
Exhibit D – Comprehensive Management Services Contract Requirements
Exhibit E – Criminal Background Checks


40

ATTACHMENT 1

ADDITIONAL SPECIFIC TERMS AND CONDITIONS

The Charter School must fulfill the following additional specific terms and conditions below and submit the necessary documentation to I&I although fulfillment of these additional specific terms and conditions alone in no way ensures a future renewal of the charter and the Agreement:

1. On or before October 1, 2018, the Charter School must have demonstrated full resolution of facility and ADA issues identified in the CPS Architect on Record's Facility Evaluation Report dated October 18, 2016;

2. On or before June 1, 2018, the Charter School must demonstrate compliance with CPS Diverse Learner expectations of timely completion of evaluations/IEPs and Related Service Provider ("RSP") service documentation as measured by ODLSS;

3. The Charter School must meet the terms of its financial Corrective Action Plan for Fiscal Year 2018; and

4. On or before June 30, 2022 (the end of the term of the Agreement), the Charter School must demonstrate that the number, length, and rate of in-school suspensions and out-of-school suspensions have declined at the Charter School.

**Conclusion**

Upon approval by the Board to renew the charter and the Agreement, the aforementioned specific terms and conditions shall be incorporated into and made a part of the Agreement. If the Charter School fails to meet these conditions within the designated timeframes, the Board may elect to i) revoke the charter and the Agreement, ii) pursue all other remedies available under the Agreement, or iii) not renew the charter and the Agreement in the future.

41

EXHIBIT A

APPLICATION

The following documents are hereby incorporated by reference as if set forth fully herein and collectively constitute the Application:

4.  Excerpts of the renewal Application of the Charter School dated September 14, 2016, as approved by the Board on December 7, 2016.

42

## EXHIBIT B

INSURANCE REQUIREMENTS

*See attached.*

43

## INSURANCE REQUIREMENTS

1. **Insurance:** The Charter School, at its own expense, shall procure and maintain insurance covering all operations under the Agreement, whether performed by the Charter School or by subcontractors. All insurers shall be licensed by the State of Illinois and rated A-VII or better by A.M. Best or a comparable rating service. The Charter School shall submit to the Board satisfactory evidence of insurance coverage prior to commencement of operations under the Agreement and upon request, shall promptly provide a certified copy of any applicable policy of insurance. Minimum insurance requirements include the coverage set forth below:

   a. <u>Workers' Compensation and Employers' Liability Insurance</u>: Workers' Compensation Insurance affording workers' compensation benefits for all employees as required by law and Employers' Liability Insurance covering all employees who are to provide services under the Agreement with limits of not less than Five Hundred Thousand and 00/100 Dollars ($500,000.00) per occurrence.

   b. <u>Commercial General Liability Insurance</u>: Commercial General Liability Insurance or equivalent with limits of not less than One Million and 00/100 Dollars ($1,000,000.00) per occurrence, and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate, combined single limit for bodily injury, personal injury and property damage liability coverage shall include the following: all premises and operations, products/completed operations (for a minimum of two (2) years following completion), independent contractors, separation of insureds, defense and contractual liability. Any aggregate limit must apply per Attendance Center and must be unimpaired. Policy shall not exclude corporal punishment coverage. The Board shall be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from services.

   c. <u>Automobile Liability Insurance</u>: Automobile Liability Insurance is required when any motor vehicle (whether owned, non-owned or hired) is used in connection with services to be performed, with limits of not less than One Million and 00/100 Dollars ($1,000,000.00) per occurrence for bodily injury and property damage. If a vehicle (whether owned, non-owned or hired) is used to transport students, then limits of not less than Ten Million and 00/100 Dollars ($10,000,000) per occurrence for bodily injury and property damage must be provided unless a Board-approved bus vendor is used. The bus vendor's insurance certificate shall be endorsed to provide that the

i

Board of Education of the City of Chicago, a body politic and corporate, and its members, employees, officers, officials and agents, and the Charter School are named as additional insured on a primary, non-contributory basis without recourse or right of contribution from the Board.

d. Sexual Abuse & Molestation: Sexual Abuse & Molestation Insurance with limits of not less than One Million and 00/100 Dollars ($1,000,000.00) per claim and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate. If coverage is claims-made, the policy shall have a retroactive date effective upon the Effective Date of the Agreement and have extended reporting period of not less than two (2) years following completion of the Agreement. Any retroactive date or prior acts exclusion must predate both the Effective Date of this Agreement and any earlier commencement of services.

e. School Board Legal/Professional: School Board Legal/Professional Liability Insurance covering the Charter School and its directors and officers from liability claims arising from wrongful acts, errors or omissions in regards to the conduct of their duties related to the operation and management of the school with limits of not less than One Million and 00/100 Dollars ($1,000,000.00) per claim and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate. Coverage shall include 3rd Party Employment Practices Liability and Sexual Harassment.

f. Umbrella/Excess Liability Insurance: Umbrella or Excess Liability Insurance with limits of not less than Two Million and 00/100 Dollars ($2,000,000.00) to provide additional limits for underlying general and automobile liability coverages.

g. Catastrophic Accident Insurance: Catastrophic Accident Insurance covering the Charter School that enrolls grades 9 through 12 with aggregate benefit limits of $3 million or 5 years, whichever occurs first, for eligible students in grades 9 through 12 who sustain an accidental injury while participating in school-sponsored or school-supervised interscholastic athletic events sanctioned by the Illinois High School Association (including direct and uninterrupted travel to and from the athletic event as well as during a temporary stay at the location of an athletic event held away from the student's school) that results in medical expenses in excess of $50,000. These benefit limits are to be in excess of any and all other insurance, coverage or benefit, in whatever form or designation.

ii

(Source: P.A. 98-0166)

h. Property Insurance/Fire Legal Liability:

    i. If the Charter School occupies a non-Board facility to operate its Attendance Center, the Charter School shall maintain Property Insurance (on a special form cause of loss or all-risk basis) and Fire Legal Liability for full Replacement Cost of property, including property for which the Charter School is contractually responsible, by lease or other agreement, from physical loss or damage. Such insurance shall cover boiler and machinery exposures and business interruption/extra expense losses.

    ii. If the Charter School occupies a Board facility to operate its Attendance Center, the Charter School shall maintain Property Insurance/Fire Legal Liability in accordance with the terms and conditions of the lease agreement between the Charter School and the Board.

i. Fidelity Bond. Fidelity bond coverage in the amount of at least Two Hundred Thousand and 00/100 Dollars ($200,000.00) with a responsible surety company with respect to all of Charter School's employees as may be necessary to protect against losses including, without limitation, those arising from theft, embezzlement, fraud, or misplacement of funds, money or documents. The bond shall name the Board of Education of the City of Chicago as a third party.

j. Cyber, Privacy & Network Security: Cyber Liability, Privacy and Network Security coverage for damages arising from a failure of computer security, or wrongful release of private information including expenses for notification as required by local, Federal or State guidelines. Limit of liability must be at least One Million and 00/100 Dollars ($1,000,000.00) per claim and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate. Coverage shall include failure to prevent transmission of malicious code. Any retroactive or prior acts exclusion must predate both the Effective Date of this Agreement and any earlier commencement of any services. If coverage is on a "claims made basis", a 2 to 5 year extended reporting provision must be included.

k. Construction: The Charter School shall indemnify, defend and agree to save and hold Board harmless from and against all liability, injury, loss, claims, cost, damage and expense with respect to any injury to, or

iii

death of, any person, or damage to or loss or destruction of, any property occasioned by or growing out of any construction work on Board property. The Charter School shall not commence any such work until the Board has been provided with insurance certificates evidencing that the contractors and subcontractors performing such work have in full force and effect adequate insurance as required by the Board's construction program at the time of the work. Required coverage may include, but is not limited to: workers' compensation, general liability, professional liability, automobile liability, environmental liability, excess liability, property and builders' risk insurance. The Charter School's contractors are subject to the same requirements as the Charter School in regards to additional insured, rating, notice, etc.

2.  **Additional Insured.** The Charter School shall have its general liability insurance and automobile liability insurance policies endorsed to provide that the Board of Education of the City of Chicago, a body politic and corporate, and its members, employees, officers, officials and agents, and any other entity as may be designated by the Board are named as additional insured on a primary basis without recourse or right of contribution from the Board.

3.  **Insurance Certificate.** The Charter School, its insurance company, or its insurance company representative shall submit an insurance certificate to the Board evidencing all coverage as required hereunder and indicating the Additional Insured status as required above. The Board will not pay the Charter School for any work if satisfactory proof of insurance is not provided prior to the commencement of services. The certificate must provide thirty (30) days prior written notice of material change, cancellation, or non-renewal be given to:

> Board of Education of the City of Chicago
> Risk Management
> 42 West Madison Street, 2nd Floor
> Chicago, Illinois 60602
> riskmanagement@cps.edu

4.  **General.** Any failure of the Board to demand or receive proof of insurance coverage shall not constitute a waiver of the Charter School's obligation to obtain the required insurance. The receipt of any certificate does not constitute an agreement by the Board that the insurance requirements in the Agreement have been fully met or that the insurance policies indicated on the certificate are in compliance with all requirements in the Agreement.

iv

The Charter School's failure to carry or document required insurance shall constitute a breach of the Charter School's Agreement with the Board. Non-fulfillment of the insurance conditions may constitute a violation of the Agreement, and the Board retains the right to stop work until proper evidence of insurance is provided, or the Agreement may be terminated.

Any deductibles or self-insured retentions on referenced insurance coverage must be borne by the Charter School. Any insurance or self-insurance programs maintained by the Board do not contribute with insurance provided by the Charter School under the Agreement.

All subcontractors are subject to the same insurance requirements of the Charter School unless otherwise specified in this Agreement. The Charter School shall require any and all subcontractors under this Agreement to carry the insurance as required herein and to comply with the foregoing requirements; otherwise, the Charter School shall provide coverage for subcontractors. The Charter School will maintain a file of subcontractor's insurance certificates evidencing compliance with these requirements.

The coverages and limits furnished by the Charter School in no way limit the Charter School's liabilities and responsibilities specified within the Agreement or by law. The required insurance is not limited by any limitations expressed in the indemnification language in this Agreement, if any, or any limitation that might be placed on any indemnity in this Agreement given as a matter of law.

The Charter School agrees that insurers waive their rights of subrogation against the Board.

The Charter School must register with the insurance certificate monitoring company designated by the Board stated below, and must maintain a current insurance certificate on file during the entire term of this Agreement. The Charter School must register and pay the initial annual monitoring fee to the insurance certificate monitoring company prior to performance under this Agreement. The initial annual monitoring fee is currently Twelve and 00/100 Dollars ($12.00) per year, but is subject to change.

Each year, the Charter School will be notified 30 to 45 days prior to the expiration date of its required insurance coverage (highlighted on its latest submitted insurance certificate on file) that it must submit an updated insurance certificate with the insurance certificate monitoring company. Insurance certificate submissions and related annual fees are required to be made online at the dedicated website established by the insurance certificate monitoring

v

company identified below. Any questions on submissions and payment options should be directed to the insurance certificate monitoring company.

**Certificate Monitoring Company:**
Topiary Communications Inc.
676 N. LaSalle - Suite 230
Chicago, IL 60654
Phone - (312) 494-5709
Email - dans@topiarycomm.net

**Website for online registration, insurance certificate submissions and annual fee payments:** URL - http://www.cpsvendorcert.com

[Rest of this page left intentionally blank.]

vi

<u>EXHIBIT C</u>

ACCOUNTABILITY PLAN

*See attached.*

CHARTER ACCOUNTABILITY PLAN – STARTING IN 2017-2018 SCHOOL YEAR

The Board and the Charter School have determined that it is in the best interests of the Board, the Charter School, students, parents and the public to articulate clear standards for the Charter School. The governing board of the Charter School shall be responsible for overseeing the academic performance of the Charter School and ensuring the academic success of the Charter School's students. Additionally, the governing board of the Charter School is responsible for ensuring that the Charter School's financial management and compliance meets the minimum acceptable standards, defined as Average performance in the below plan. The governing board of the Charter School shall be held accountable through an annual performance evaluation and the publishing of a public Performance Scorecard outlining the level of achievement of the Charter School with respect to those standards, based on data collected during the prior school year.

1. Accountability Components

The Board and the Charter School hereby agree that the Charter School and each of its Attendance Center or campus, if applicable, shall be evaluated annually in accordance with the Agreement and this Accountability Plan including (i) the Board's School Quality Rating Policy ("SQRP") adopted November 19, 2014 (14-1119-PO1), (ii) Board Resolution Regarding School Quality Rating Policy adopted September 29, 2015 (15-0929-RS3), (iii) the Board's Charter School Quality Policy ("CSQP") adopted October 28, 2015 (15-1028-PO1), and (iv) any other resolutions adopted by the Board related to the SQRP. Said policies and resolutions, as may be amended from time to time, are hereby incorporated by reference into and made a part of this Agreement as if fully set forth herein.

2. Annual Performance Scorecard

Annually the Board shall publish a Performance Scorecard indicating the Charter School's performance overall and by each Attendance Center or campus, if applicable, on each of the indicators ("Indicators") in the following two categories: (i) Pupil Performance and (ii) Financial Management and Compliance. The Board reserves the right to also publish any underlying documentation with respect to such Performance Scorecard including, but not limited to, the Financial Audit of the Charter School as referenced in paragraph 6.a. of the Agreement. A Performance Scorecard for the preceding school year will be issued each year as soon as the data and corresponding analysis is available.

For the Pupil Performance Indicators, the Board will assign Charter Schools an

i

accountability designation for purposes of comparison to other CPS schools and public reporting. The level of the Charter School's achievement and progress will be determined by a set of Indicators measuring, among other things, student academic performance and growth, attendance, progress toward graduation, post-graduation success, school culture and climate, and data quality.

The SQRP and CSQP shall be used to determine if a school is meeting or making reasonable academic progress, as defined in the Illinois Charter Schools Law. When conducting the annual performance evaluation, the Charter School's academic performance shall be categorized as Meeting Standards, Making Reasonable Progress, or Failing to Meet Standards or Make Reasonable Progress. This determination shall also be used in decisions concerning the renewal, non-renewal or revocation of a school's charter and agreement.

For the Financial Management and Compliance Indicators, the Charter School's performance on each Indicator will be rated as follows:

- Exceeds Standards – Above average performance
- Meets Standards – Average performance
- Does Not Meet Standards – Below average performance

This Accountability Plan establishes the performance levels, listed below, which generate the ratings for each Indicator. However, additional information or extenuating circumstances may lead the Board to rate an Indicator higher or lower than when performance level criteria are strictly applied.

A. Pupil Performance

*Standardized Tests*

In the spring of each year, the Charter School shall participate fully in assessments required by the State of Illinois as well as any other assessments required by the district's performance policy during the administration period agreed upon by the Chicago Public Schools and the Charter School. Data from these assessments will be compiled and evaluated as described in the SQRP. If for any reason the Chicago Public Schools ceases to use any of the assessment systems described herein, the Board shall implement, for Charter School accountability purposes, the same alternate student assessment system and test measure criteria used for district's students.

B. <u>Financial Management and Compliance</u>

The following Financial Management and Compliance Categories will be included on and evaluated for each Performance Scorecard: Financial Condition, Financial Controls, Reporting, and Legal Compliance. The school will receive a rating for each Indicator based on the rubric described below. Performance against each Indicator will be reported on the Annual Performance Scorecard.

*Financial Condition*

This category measures the overall financial health of the school based on the change in net assets, current ratio (liquidity), net asset ratio, cash on hand ratio, and loan delinquency. Ratings will be assigned for each Indicator as follows:

| Indicator | Exceeds Standards | Meets Standards | Does Not Meet Standards |
|---|---|---|---|
| Change in Net Assets (Key Indicator) | Sum of last three years Change in Net Assets is greater than or equal to 2% of the sum of last three years total revenue *and* current year Change in Net Assets is greater than or equal to 2% of current year revenue | Either the sum of last three years Change in Net Assets is greater than or equal to 2% of the sum of last three years total revenue *or* current year Change in Net Assets is greater than or equal to 2% of current year revenue | Neither the sum of last three years Change in Net Assets is greater than or equal to 2% of the sum of last three years total revenue *or* current year Change in Net Assets is greater than or equal to 2% of current year revenue |
| Current Ratio (Key Indicator) | Current Ratio is greater than or equal to 3.0 | Current Ratio is less than 3.0 but greater than or equal to 1.1 | Current Ratio is less than 1.1 |
| Net Asset Ratio (Key Indicator) | Net Asset Ratio is greater than or equal to 50% | Net Asset Ratio is less than 50% but greater than or equal to 20% | Net Asset Ratio is less than 20% |
| Cash on Hand Ratio (Key Indicator) | Cash/avg. monthly expenses greater than or equal to 3.0 | Cash/avg. monthly expenses less than 3.0 but greater than or equal to 1.0 | Cash/avg. monthly expenses is less than 1.0 |

| Loan Delinquency | No late payments in the last twelve months or no outstanding debt | One or two late payments in the last twelve months | Three or more late payments in the last twelve months |

The Board shall use the annual Financial Audit, required under paragraph 6.a, along with any other relevant information as part of the Financial Condition Category.

*Financial Controls*

This category assesses the fiscal soundness of the financial system in place at each school, taking into consideration the auditor's independent review.

| Indicator | Exceeds Standards | Meets Standards | Does Not Meet Standards |
| --- | --- | --- | --- |
| Annual Audit | Unqualified opinion, no significant deficiencies or material weaknesses | Unqualified opinion, one or two significant deficiencies and no material weaknesses | Unqualified opinions, one material weakness or more than two significant deficiencies; or an audit with a qualified opinion |

The following items, required by paragraph 6.a of the Agreement, shall be evaluated and presented as part of the Financial Controls Category:

i)    the Charter School's audit report opinion on its financial statements; and

ii)    the Charter School's audit report on compliance and internal control over financial reporting based on an audit of the financial statements performed in accordance with Government Auditing Standards and the Single Audit Act of 1984, as amended.

*Reporting*

This category measures a school's timely submission of documents. Documents include annual budgets, quarterly financial statements, audit reports, and other compliance documents required at the federal, state, and local levels as outlined in the Office of Innovation and Incubation's compliance chart.

| Indicator | Exceeds Standards | Meets Standards | Does Not Meet |

v

| | | | Standards |
|---|---|---|---|
| Fed/State/CPS Compliance Document Timeliness | On-time submission percentage is greater than or equal to 95% | On-time submission percentage is less than 95% but greater than or equal to 80% | On-time submission percentage is less than 80% |

*Legal Compliance*

This category measures legal compliance reflected and reported in the annual audit and detailed in any findings

| Indicator | Exceeds Standards | Meets Standards | Does Not Meet Standards |
|---|---|---|---|
| Legal Compliance | Auditor report on compliance reflects no findings | Auditor report on compliance reflects one or two findings | Auditor report on compliance reflects three or more findings; or repeat finding |

The following items, required by paragraph 6.a.iii. of the Agreement shall be tested and reported upon annually by the Charter School's independent auditor and evaluated and presented as part of the Legal Compliance Indicator:

    i.    Compliance with all Federal and State laws and constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, gender, national origin, religion, ancestry, marital status or need for special educational services pursuant to 105 ILCS 5/27A-4(a);

    ii.    Compliance with the Freedom of Information Act and Open Meetings Act pursuant to 105 ILCS 5/27A-5(c);

    iii.    Compliance with all applicable health and safety requirements applicable to public schools under the laws of the State of Illinois pursuant to 105 ILCS 5/27A-5(d);

    iv.    Compliance with all Federal and State laws and rules applicable to public schools that pertain to special education and the instruction of English language learners pursuant to 105 ILCS 5/27A-5(g);

    v.    Compliance with all enumerated State laws and regulations applicable to Charter Schools in accordance with 105 ILCS 5/27A-5(g); and

    vi.    Conformance with the following paragraphs of the Agreement:

        a)    Paragraph 4.d., an application process, open enrollment process and lottery,

vi

b)  Paragraph 5.c., the school's governance structure,
c)  Paragraph 5.d., maintenance of corporate status and good standing,
d)  Paragraph 5.f., completion of criminal background checks and adjudication process,
e)  Paragraph 6.j., compliance with Illinois Pension Code,
f)  Paragraph 6.k., ongoing presence of management and financial controls,
g)  Paragraph 6.p., monitoring of public funds used for advertising,
h)  Paragraph 7., the school's facility(ies)/Attendance Center(s) and ADA compliance, and
i)  Paragraph 9., maintenance of required insurance coverage.

In addition to the above items, the Board will also consider the Charter School's compliance with the Office of Innovation and Incubation's compliance requirements and the teacher qualification requirements in accordance with both the Charter Schools Law (Section 27A-10). Failure to comply with either the compliance requirements or the teacher qualification requirements shall affect the rating on the Legal Compliance Indicator.

When determining how to classify a Financial Management and Compliance Indicator, the Board may consider information from various sources including, but not limited to, Financial Audits, site visits, spot checks or spot audits to verify enrollment and/or attendance data, and any information provided by other CPS departments, parents, or employees.

If a Financial Audit states that there were material weaknesses or significant deficiencies found, the Board may request from the Charter School the auditor's management letter and/or an opinion from a qualified, third-party professional regarding the importance of the finding. The Board shall also ask the Charter School to respond to the finding.

To further strengthen the Board's financial accountability process, the Board has established baseline financial standards for the Charter School which have been detailed below:

<u>Financial Remediation Process</u>
The Office of Innovation and Incubation ("I&I") shall oversee a financial remediation process ("Financial Remediation Process") that requires a Charter School to submit documentation to I&I regarding the Charter School's financial health. As indicated above, there are four "Key Indicators" related to financial performance A Charter

vii

School shall enter the Financial Remediation Process if:

- At least two (2) out of four (4) Key Indicators are not meeting standards in one (1) fiscal year, or
- Exigent circumstances cause the Charter School unexpected financial hardship.

A Charter School that begins the Financial Remediation Process for the first time or begins in a non-consecutive year shall be required to submit monthly cash flow statements to I&I, with the possibility of other requirements.

A Charter School in its second consecutive year of the Financial Remediation Process shall be required to submit a financial corrective action plan ("Financial Corrective Action Plan") and other required documents to I&I. This Financial Corrective Action Plan should detail the actions the Charter School will take to improve its financial position.

As stated in the CSQP under "Other Considerations", nothing in this policy shall prohibit the Charter School from being subject to non-renewal or revocation based on the totality of factors. The financial factors that may be taken into consideration include, but are not limited to: (i) the Charter School's financial situation is severe enough that it impacts the education of students, (ii) the Charter School not successfully completing the Financial Corrective Action Plan within the Financial Remediation Process, or (iii) the Charter School being in the Financial Remediation Process for more than half of the duration of its Agreement. These criteria may also be considered for expansion, replication, or a shortened renewal term.

3. Charter School Participation in the Accountability Process

The Charter School shall take all necessary actions to collect and report the information required by this Accountability Plan for the Charter School overall and by each Attendance Center or campus, if applicable, including, without limitation:

- A.    Full participation in the administration of all required student assessments, as the case may be, including all procedures designed to safeguard the integrity of the assessments;
- B.    Participation in site visits conducted by the Board to ascertain that sufficient, minimum educational, facility, and operational practices are in place;
- C.    An annual financial and compliance audit, as required by law, including but not limited to, the Single Audit Act Amendments of 1996 (31 U.S.C. §7501-07, as amended), OMB Circular A-133,   and the compliance

viii

requirements set forth in OMB Compliance Supplement, and by the Agreement;

D.   Provision of student, school, and employee information required by the Agreement and/or the Accountability Plan;

E.   Submission and implementation of ADA Plan(s) for the Attendance Center(s) required by the Agreement;

F.   Provision of information that is necessary to evaluate parent, student, employee, or public allegations or audit findings that, if true, would constitute a violation of the law or Agreement; and

G.   Provision of additional information or cooperation in other actions not listed in this section necessary to evaluate the Charter School's performance with respect to the Financial Management and Compliance Categories.

4.  Renewal, Non-Renewal and Revocation

The Board shall evaluate the Charter School in accordance with the Accountability Plan and may rely on its evaluation of one or more Indicators included in the Accountability Plan when the Board acts to revoke, renew, or not renew the Charter School's charter. Depending upon the circumstances, any Indicators for the current year of the Charter School or any optional site visit(s) by the Board may or may not be considered when the Board evaluates the Charter School against this Accountability Plan.

With respect to the Pupil Performance Category, the Board will take any such action using the SQRP rating for the Charter School then available. For example, for a five-year charter agreement ending on June 30, 2021, the 2017 SQRP Rating would assess the academic performance of the Charter School for the 2016-2017 school year and so on as illustrated below:

| Issuance of SQRP Rating | Based on School Year |
| --- | --- |
| Summer/Fall 2017 | August/September 2016-June 2017 |
| Summer/Fall 2018 | August/September 2017-June 2018 |
| Summer/Fall 2019 | August/September 2018-June 2019 |
| Summer/Fall 2020 | August/September 2019-June 2020 |
| Summer/Fall 2021 | August/September 2020-June 2021 |

When a charter is up for renewal, the Board will take into account previous years of the Charter School's academic performance on the SQRP; provided, however, the Board will not take into account the final year's academic performance of the Charter School other than as set forth in the CSQP except under extraordinary circumstances.

ix

When the Board considers revoking a charter, it may take into account whether: (i) the Charter School has failed to implement its academic remediation plan and adhere to the timeline as defined by the Board; (ii) the Charter School has remained on the Academic Warning List for two consecutive years as defined in the CSQP; or (iii) such other criteria as set forth in the then current SQRP, CSQP or amendatory resolutions regarding the aforementioned policies.

The Board may act to renew, not renew, or revoke a charter of the Charter School during the term of the Agreement in accordance with paragraphs 12 and 13 of this Agreement.

In all circumstances, the Board shall follow the requirements of the Charter Schools Law and its Agreement, including all due process requirements, regarding the processes required for renewal, non-renewal and revocation.

x

EXHIBIT D

COMPREHENSIVE MANAGEMENT SERVICES CONTRACT REQUIREMENTS

In the event the Charter School intends to contract with a third party for comprehensive school management or operations services ("Service Provider"), all of the following requirements must be met by the Charter School:

1.     Required Provisions of Bylaws. The bylaws of the Charter School shall provide that the Charter School may not enter into any contract for comprehensive school management or operations services ("Service Contract") without first submitting such Service Contract to the Board for review. The Charter School shall further incorporate within its bylaws, or duly establish pursuant to such bylaws, procedures for the termination of the Service Contract as provided herein.

2.     Submission of Service Contract. The Service Contract shall be submitted to the Board for approval according to the annual timeline established by the Board. If the Board determines that the Service Contract does not comply with the provisions set forth in paragraph 3 of this Exhibit, or that the Charter School's entering into the Service Contract would otherwise be in violation of the conditions set forth in this Exhibit, the Charter School Agreement, or the Charter Schools Law, then the Board shall notify the Charter School within twenty (20) days, stating with particularity the grounds for its objections. In such event, the Charter School shall not enter into the Service Contract unless and until the deficiencies noted by the Board have been remedied to the Board's reasonable satisfaction.

3.     Required Terms of Service Contract. The Service Contract shall include, without limitation, the following required terms:

a. The Service Contract shall be subject to, and shall incorporate by reference, the terms and conditions of the Charter School Agreement.

b. The Service Contract shall clearly delineate the respective roles and responsibilities of the Service Provider and the Charter School in the management and operation of each school facility for which the Service Provider shall provide management or operations services. The Service Contract shall also include acceptable procedures by which the Service Provider may be held accountable to the Charter School.

c. The Service Contract shall be terminable by the Charter School, in accordance with its bylaws or other established termination procedures, (i) upon default by the Service Provider including, without limitation, any act or omission of the Service Provider that causes a default under the Charter School Agreement or that causes the

45

Charter School to be in violation of the Charter Schools Law, or (ii) for other good cause as agreed to by the Charter School and the Service Provider.

d. The Service Contract shall require that the Service Provider furnish the Charter School with all information deemed necessary by the Charter School or the Board for the proper completion of the budget, quarterly reports, other financial reports, or Financial Audits, required under paragraph 6 of the Charter School Agreement.

e. The Service Contract shall provide that all financial reports provided or prepared by the Service Provider shall be presented in GAAP/FASB approved nonprofit format.

f. The Service Contract shall provide that all employees, agents, contractors or volunteers of the Service Provider who may have contact with students of the Charter School shall be subject to the criminal background check requirements as defined in Exhibit E of the Agreement to the same extent as employees of the Charter School.

After November 13, 2017, the Service Contract shall provide that all prospective and existing employees, agents, contractors and volunteers of the Service Provider who may have contact with students of the Charter School shall be subject to all provisions in the Background Checks and Adjudication Process as defined in paragraph 5.f. of the Agreement to the same extent as employees, agents, contractors and volunteers of the Charter School.

g. The Service Contract shall contain provisions requiring compliance with all requirements, terms and conditions established by any Federal or State funding source.

4. Financial Reporting.

a. Budget. The budget prepared by the Charter School pursuant to paragraph 6 of the Charter School Agreement shall include, without limitation, the following itemized information:

i. All revenue anticipated to be received from the Board under the Charter School Agreement.

ii. All expenses and anticipated expenses associated with the operation and management of the Charter School.

iii. All expenses associated with the operation of the governing board of the Charter School including, without limitation, personnel, occupancy and travel expenses, if any, and that are not paid out of expenses received from or through the Board, such expenses shall not be required to be separately itemized

46

hereunder.

      iv.    All contract payments, lease payments, management fees, administrative fees, licensing fees, expenses and other amounts paid to the Service Provider or otherwise paid for the contract services by the Charter School.

      v.    All loan repayments for any loans made to the Charter School by the Service Provider, including separate line items for interest, principal and premium, if any, on such loan repayments.

      vi.    All investments in the Charter School by the Service Provider, including the expected returns on equity for such investments.

  b.  <u>Quarterly Financial Statements and Reports</u>.  In the event that quarterly financial statements and reports are required to be furnished by the Charter School pursuant to paragraph 6 of the Charter School Agreement, such financial statements and reports shall reflect the entire school's financial operations, including an itemized accounting of all amounts paid to the Service Provider or otherwise paid for the contract services, which amounts shall be itemized in a manner that clearly corresponds with those categories provided in the Charter School's annual budget or the Service Contract.

  c.  <u>Annual Audit</u>.  The Financial Audits required under paragraph 6 of the Charter School Agreement shall include review of all fees and payments made by the Charter School to the Service Provider.

  d.  <u>Reporting of Loans and Investments</u>.  All loans to, or investments in, the Charter School by the Service Provider must be evidenced by appropriate documentation, either in the Service Contract between the Charter School and the Service Provider, or through separate agreements. In the case of investments, such documentation shall explain how the investment shall be treated on the books of the Charter School and shall clearly state the Service Provider's expected return on equity.

Nothing in this paragraph 4 shall be construed to waive or otherwise limit the obligation of the Charter School to provide information otherwise required to be reported by the Charter School under the Charter Schools Law or the Charter School Agreement.

[Rest of this page left intentionally blank.]

47

<u>EXHIBIT E</u>

CRIMINAL BACKGROUND CHECKS

<u>Criminal Background Checks</u>.  The Charter School shall not knowingly employ and shall not permit its subcontractors to knowingly employ any individual who shall come into direct, regular contact with pupils at the Charter School (i) for whom a fingerprint-based criminal background investigation and checks of the Statewide Sex Offender Database and the Statewide Child Murderer and Violent Offender Against Youth Database has not been conducted or (ii) who has been convicted of committing or attempting to commit one of the offenses enumerated in Section 34-18.5(c) of the Illinois School Code.

[Rest of this page left intentionally blank.]

48